## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TWENTIETH CENTURY FOX HOME | ) | |
| ENTERTAINMENT, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Redbox Automated Retail, LLC ("Redbox") makes the following allegations against Defendant Twentieth Century Fox Home Entertainment LLC ("Fox" or "Defendant"):

## OVERVIEW

1.      Redbox is the nation's leading, low-cost alternative for consumers to rent DVDs for home entertainment. Redbox rents and sells digital video disks ("DVDs") to consumers through innovative, consumer-friendly means: automated, self-service kiosks located at various retail outlets. Consumer demand for Redbox has exploded since the company's inception in 2002, primarily due to Redbox's efficient means of providing consumers with low-cost, easily accessible DVD releases on the day those new-release DVDs become available to the general public.

2.      Historically, the movie industry has weathered recessions – and even a depression – better than most other sectors of the economy. People simply need some form of release from their financial pressures, even if just for a couple of hours, during tough economic times. Redbox offers that release to millions of consumer across America through a simple, $1.00 per

night value proposition. Despite clear consumer preference to move to this lower-priced alternative during this recession, Fox seeks to strangle that alternative to prop up an artificially high pricing scheme. Fox's tactics – cutting off all source of supply unless Redbox acquiesces to a business-killing "blackout period" – hearkens back to the days when Fox and other studios controlled the entire distribution chain under the old "studio system," when they sought to choke off the supply of content to the new television medium during its infancy, and later, when they fought the introduction of the VCR in the 1980s. Now, despite the fact that consumers are being battered by one of the toughest recessions in history, Fox again wants to restrict supply and impose higher prices.

3.      Fox seeks to eliminate consumers' ability to enjoy low-cost new-release DVD rentals from Redbox. Specifically, on August 5, 2009, Fox instructed the two firms that distribute new-release DVDs to Redbox, Ingram Entertainment, Inc. ("Ingram") and Video Product Distribution ("VPD"), as well as all of Fox's other distributors, to withhold new-release Fox DVDs from Redbox because Redbox refuses to agree to a 30-day blackout period during which consumers would be allowed to procure these DVDs only through more expensive channels.

4.      Consumer demand for a DVD is at its highest immediately after its release and declines substantially within a period of weeks thereafter. Fox's unlawful actions harm consumers by decreasing the available supply of copyrighted new-release DVDs, reducing consumer choice in the marketplace and increasing the prices that consumers must pay. Fox seeks to unlawfully eliminate the popular and growing kiosk distribution channel, which provides low-cost, highly-convenient new-release DVD rental. Fox seeks to eliminate consumers' ability to enjoy Redbox's "Dollar-Per-Night" rental rate for new-release DVDs.

5.      Fox's actions constitute copyright misuse, violate the antitrust laws and tortiously interfere with Redbox's existing supply contracts with its distributors. Redbox seeks the following relief against Fox: (1) declaratory relief; (2) injunctive relief; (3) money damages; (4) attorneys' fees and costs; and (5) such further relief as this Court deems just and appropriate. In particular, Redbox is entitled to a declaration that Defendant's conduct renders its copyrights unenforceable so long as Fox continues to engage in its inequitable and illegal conduct.

## THE PARTIES

6.      Redbox is a Delaware limited liability company with its principal place of business in Oakbrook Terrace, Illinois.

7.      Fox is a Delaware limited liability corporation with its principal place of business in Los Angeles, California. Fox is one of the world's leading distributors of motion pictures. Fox, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others copyrighted motion pictures and other video entertainment in the United States and throughout the world. Fox is a subsidiary of News Corporation, the film, television, cable and publishing conglomerate owned by Rupert Murdoch. Some of Fox's more popular movie franchises include the *Star Wars*, *Ice Age*, *X-Men*, *Die Hard*, *Alien*, and *Predator* series.

8.      Fox distributes DVDs by and through various distributors, including Ingram and VPD, both of which, in the absence of Fox's illegal and tortious behavior, would continue to sell Fox DVDs to Redbox as they have done for years.

9.      Non-party Ingram is a Tennessee corporation with its principal place of business in La Vergne, Tennessee. Ingram is a wholesale distributor of DVDs.

10.     Non-party VPD is a California corporation with its principal place of business in Folsom, California. VPD is a wholesale distributor of DVDs.

## JURISDICTION AND VENUE

11.    Subject matter jurisdiction exists over Counts I, II, III, IV and V of this action pursuant to 28 U.S.C. § 1331, 17 U.S.C. §§ 101, *et seq*. (Copyright Act) and 15 U.S.C. §§ 1, *et seq*. (Sherman Antitrust Act), and 28 U.S.C. §§ 1337, 1338.  Supplemental subject matter jurisdiction over Count VI exists pursuant to 28 § U.S.C. 1367.  Pursuant to 28 U.S.C. §§ 2201-02, this Court may declare the rights and other legal relations of the parties because there exists an actual controversy between them.

12.    Personal jurisdiction exists over Fox because it does business and resides in the State of Delaware.  Venue is proper pursuant to 28 U.S.C. § 1391 because Fox is organized under the laws of the State of Delaware and thus "resides" for purposes of § 1391 within that state.

## FACTUAL ALLEGATIONS

### A.    Redbox's Consumer-Friendly Business Model

13.    Since the introduction of DVDs into the marketplace, the DVD has become the dominant medium for the distribution of movies for home viewing.

14.    Redbox was founded in July 2002, when the company deployed DVD rental kiosks in a "test market" in Washington, D.C.  After initial success in that market, Redbox chose Las Vegas, Nevada as a second "test market" in 2003.  These test markets established that consumers would enthusiastically turn to this convenient, low-cost source for new-release DVD rentals and sales, and the company expanded.

15.    Redbox is an innovator.  It has developed a highly-convenient, yet low-cost, option for consumers wishing to obtain DVDs.  Redbox provides DVDs to consumers through a nationwide network of over 17,000 self-service kiosks.  Each kiosk features an interactive touch screen and sign, a robotic disk array system and a web-linked electronic communications system

that allows customers to rent or buy DVDs. Kiosks typically hold up to 700 DVDs comprising 70 to 200 individual titles. The kiosks are updated weekly with a supply of new-release DVDs. A single kiosk may hold up to as many as forty-five (45) copies of a popular new-release DVD.

16.    Consumers use credit cards to rent or purchase DVDs from Redbox. They can also search for and reserve DVDs online through Redbox's website. Consumers enjoy the ability to rent DVDs at one location and return them at any other Redbox location, thanks to Redbox's patented rent and return system. For instance, a family can rent the latest Disney movie at a McDonald's restaurant on Friday night, and return it to their neighborhood Albertson's supermarket when shopping the next day. In 2007, readers of "SelfServiceWorld" magazine ranked Redbox as the No. 1 self-service application, besting other kiosks deployed by NCR, IBM, Kodak and Starbucks, among others.

17.    Consumers love Redbox. Consumer demand for Redbox rentals and sales has grown substantially in the last five years. Redbox had 125 kiosks in 2004, had nearly 6500 by the end of 2007 and had over 12,000 kiosks nationwide at the end of 2008. Consumer demand has enabled Redbox to surpass Blockbuster, Inc. Redbox now has nearly four times the number of DVD rental locations in the United States that Blockbuster has. To date, consumers have rented nearly 500 million DVDs from Redbox. Consumers average approximately 50 DVD rentals per day per kiosk, and in the first half of 2009, Redbox rented an average of 27 million DVDs per month. Indeed, consumer demand has supported Redbox's expansion such that Redbox installed a new kiosk, on average, every 58 minutes somewhere in the United States this year. As part of this expansion, Redbox hired over 600 new employees during the past year.

## B.    The Market For Redbox DVD Rental

18.    Consumers currently find Redbox kiosks located in retail outlets such as McDonald's restaurants, Walmart stores, grocery stores such as Albertson's, Kroger, Stop &

Shop, Harris Teeter, and Meijer's, convenience stores like 7-Eleven, and drug stores such as

Walgreen's, throughout the continental United States and Puerto Rico. Redbox has contracts

with these retail outlets. Much of Redbox's success depends on maintaining a business model

that satisfies the expectations of the retail outlets and consumers.

19.    Consumers seeking to rent a new-release DVD generally search by specific title,

or by category or genre. Video rental stores are laid out this way. So are video rental websites

and so, too, are the menus of Redbox DVD rental kiosks. This is because consumers seeking to

rent a new-release musical comedy DVD are generally not interested in renting or buying a new-

release action DVD. Accordingly, Redbox, like others in the new-release DVD rental and resale

business, categorizes each DVD by title, release date and also by category or genre.

20.    Consumers can also purchase previously-viewed new-release DVDs from

Redbox, typically beginning 12 days after their release, for as little as $7.

21.    Consumer preference for Redbox rentals can largely be attributed to its ability to

conveniently provide consumers with low-cost rentals on or soon after the day that a DVD is

released by a studio and made available for home viewing. This release date is known as the

"street date." By industry convention, the "street date" for nearly every new-release DVD is on

Tuesday of the week of its release. Consumer demand for a new-release DVD is the highest

during the weekend immediately after its street date and declines substantially thereafter. Over

thirty percent of a new-release DVD's revenue is generated during the first two weeks of its

release. More than sixty percent of the rental demand for a particular title occurs within forty-

five days of the street date. In this Complaint, a "new-release" DVD refers to those DVDs that

are within 30 days of their street date.

22.    The primary reason that consumers prefer using Redbox, rather than alternative means such as brick and mortar stores, is Redbox's low cost. Whereas consumers can rent from Redbox for $1 per night, the average cost per rental from other sources is $3.41. Through convenience and lower cost per rental, Redbox saves consumers a total of more than $38 million per month. The result of Redbox's more efficient distribution of new-release DVDs is not just lower prices. Redbox customers report that they watch 20% more films because of Redbox's low-cost, consumer-friendly model.

C.    **The New-Release DVD Industry And Market**

23.    New-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first date they appear on the shelf. Because consumer demand for a particular new-release DVD is highest while new on the market, consumer demand for a new-release DVD is different from consumer demand for back-catalog DVDs, *i.e.,* DVDs that have been on the market for longer periods. Like the difference between fresh produce and canned goods, or the difference between first-run theatrical films and older films that are displayed in smaller theaters and at lower prices, new-release DVDs constitute a separate market. In economic terms, the cross-elasticity of demand between new-release DVDs and back catalog items is low. This is reflected, among other ways, by different pricing and different marketing for new-release DVDs, as opposed to older, back-catalog DVDs. The demand for new-release DVDs is price inelastic due to the monopoly power arising from Fox's government-granted copyright.

24.    Fox recruits new audiences for each of its theatrical films by advertising on its television and cable networks, and then attempting to ensure that the audience will not defect to another film by scheduling, or rescheduling, the release date of its film to a date when there will be no competition. For instance, the National Research Group supplies a "Competitive

Positioning" report to major studios. The NRG polls likely moviegoers to project how well upcoming movies will do against each other in each audience quadrant (males under 25, males over 25, females under 25, females over 25) should they be released during the same time period. A "losing" studio will reschedule the release of a film to a different time period, even if it is less advantageous (i.e. not the summer and not the holidays). For instance, Fox avoided head-to-head competition with "*War of the Worlds*" during a coveted Fourth of July weekend by releasing its "*Fantastic Four*" a week later. Similarly, Warner Brothers released "*Batman Begins*" in mid-June, thereby avoiding competition with Fox's "*Fantastic Four.*" As a result all three films won their weekend box office and could advertise themselves, as *Fantastic Four* did, as "America's No. 1 hit." On information and belief, the studios apply this same approach to scheduling the release dates for their new-release DVDs.

      25.    Because of this industry practice, a particular new-release DVD is generally not an acceptable substitute for another new-release DVD. Studios work hard to ensure that a release in a particular category, or genre, does not share its street date with another release in the same category or genre. Moreover, consumers seeking to rent a new-release DVD generally search by title, or by genre. Video rental stores are laid out this way. So are video rental websites and so, too, are the menus of Redbox DVD rental kiosks. This is because consumers seeking a family-oriented new-release DVD will not often rent a new-release action DVD instead. Accordingly, Redbox, like others in the new-release DVD rental business, categorizes DVDs by title, by release date and also by their genre. Each category, or genre, constitutes a distinct submarket within the overall new-release DVD market. Common categories, or genres, include: action/adventure, comedy, drama, family and kids, horror and sci-fi, suspense and others. There is low cross-elasticity of demand among consumers for new-release DVDs of

different genres.  Consumers who want to see Keanu Reeves in a science fiction film (*e.g.* "*The Day the Earth Stood Still*") are unlikely to accept a Jennifer Aniston comedy ("*Marley and Me*") instead.

26.    Release dates for new-release DVDs are timed so that a particular new-release DVD title will face as little competition as possible with other new-release DVDs in the same genre.  Thus, for example, the Fox DVD "*Marley and Me*," was released on Tuesday, March 31, 2009, when it directly competed with few, if any, other comedy DVDs.

27.    Because of the inelastic demand for each particular new-release DVD, Fox possesses significant market power for a particular new-release DVD and, in the alternative, within a specific category or genre during the weeks immediately following the street date. Consumers have few, if any, acceptable substitutes for a particular new-release DVD in a particular category or genre during the relevant time period.

28.    Because demand peaks for a new-release DVD in the first weekend following its release, consumers also value Redbox's ability to stock multiple copies (as stated above, as many as 45 copies per kiosk in some instances) of popular, high-demand new-release DVDs.

**D.    Redbox's Relationship With Ingram and VPD**

29.    Redbox has historically been able to meet consumer demand for multiple copies of new-release Fox DVDs for rental on a title's street date because of its longstanding contractual and business relationships with its distributors, VPD and Ingram.  Redbox has historically purchased all, or nearly all, of its supply of new-release Fox DVDs from these distributors, and Redbox had enjoyed long term, mutually beneficial business relationships with VPD and Ingram with respect to purchase of new-release Fox DVDs.

30.    Redbox has a supply contract with Ingram (the "Ingram Supply Contract" (attached as Ex. A, redacted so as to protect sensitive commercial information)) that gives

Redbox the right to purchase Fox DVDs from Ingram, and similarly obligates Ingram to sell to

Redbox, upon Redbox's request, Fox DVDs. Specifically, the Ingram Supply Contract requires

Ingram to order DVDs from the studios. The term "studios" has, throughout the relationship

between Redbox and Ingram, always included Fox and its affiliates.

31.     The Ingram Supply Contract also contains a "DVD Buy Back" clause that permits

Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new-release

DVD product" pursuant to a timeframe tied to the title's street date. Under this arrangement,

Ingram purchases back significant amounts of previously-viewed DVDs from Redbox, and in

turn sells them to other buyers in the distribution stream.

32.     Redbox has a similar business relationship with VPD, although the agreement is

not reflected in a single integrated document. VPD has always permitted Redbox to buy Fox

DVDs from VPD and receive these Fox DVDs in advance of their street date. VPD, like Ingram,

holds itself out as having the ability to provide retailers like Redbox access to all of the titles

released by the major Hollywood studios, which includes Fox. As with Ingram, Redbox is able to

sell back significant amounts of previously-viewed DVDs to VPD, which in turn sells them to

other buyers in the distribution stream.

33.     Notwithstanding these contractual relationships, VPD and Ingram will, by

necessity, bow to Fox's coercion and stop filling Redbox's orders for Fox DVDs with release

dates beginning October 27, 2009. Absent Fox's unlawful acts, Redbox would have continued to

purchase all, or nearly all, of its supply of Fox DVDs from VPD and Ingram beyond October 27,

2009 and into the foreseeable future. Fox's ability to stop Ingram and VPD from selling to

Redbox is due to Fox's dominant market position and monopolistic power within the industry

with respect to its unique, new-release DVDs. Because Fox has ordered all of its distributors to

stop selling to Redbox, Redbox lacks viable wholesale channels from which to purchase new-release Fox DVDs.

### E. Fox's Decision To Tortiously Interfere With Redbox's Relationships With Ingram and VPD And To Shut Off Redbox's Supply Of Fox New-Release DVDs

34.     On August 5, 2009, Chase Carey, Chief Operating Officer of Fox's parent company, stated in a conference call with industry analysts that Fox saw Redbox's competition as a "problem" that News Corporation would "actively" attempt to solve. (*See* Ex. B). Later that day, Fox told Redbox that it was demanding that its wholesalers, including VPD and Ingram, cease selling any new-release Fox DVD to Redbox for at least 30 days after its street date.

35.     News of Fox's attempt to solve its "problem" with Redbox spread quickly, prompting media reports with headlines such as "Fox Tries to Strangle Redbox." (Ex. C). Wholesalers, including VPD and Ingram, will have no choice but to comply with Fox's demand due to Fox's dominant market position with respect to new-release DVDs.

36.     Fox's attempt to choke off Redbox's supply of new-release DVDs follows a failed attempt to require Redbox to end its "dollar-a-night" pricing and to force Redbox to substantially raise its prices to consumers. Redbox refused, and Fox's boycott followed.

### F. Fox's Actions Are Unlawful And Substantially Harm Both Redbox and Consumers

37.     Fox's actions, if not remedied by this Court, will restrict output, eliminate competition in the rental and sales markets and artificially raise prices to consumers. Fox seeks to restrict output, increase prices and artificially control the market for new-release DVD rentals and re-sales.

38.     Fox has no legally valid right to restrict or govern how or to whom VPD and Ingram resell Fox DVDs that they have purchased. But because of Fox's monopoly power

derived from its government-granted copyrights, and its position within the industry, Fox has the power to unlawfully coerce VPD and Ingram to not sell new-release Fox DVDs to Redbox. Faced with the prospect of being denied access to new-release Fox DVDs, VPD and Ingram have had no choice but to acquiesce to Fox's demands, and accordingly have indicated they will refuse to fill Redbox's orders for Fox DVDs beginning October 27, 2009 – even though Redbox is entitled to have these orders filled pursuant to its supply contracts with VPD and Ingram. A list of titles affected by the boycott appears at Ex. D. Thus, as a result of Fox's unlawful acts, Redbox will no longer have access to new-release Fox DVDs through its normal wholesale channels.

39.    Fox's actions, if allowed to stand unchecked, will artificially constrain output by preventing consumers from renting new-release Fox DVDs from Redbox and other kiosk rental outlets. Fox's true purpose in demanding that VPD and Ingram stop selling to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product with a correspondingly high artificial price for rental or re-sale of new-release Fox DVDs. Fox seeks to eliminate the low-cost, highly-convenient and fast-growing Redbox channel, because (1) Redbox (and other independent kiosk vendors) threaten to undercut the artificial pricing of the distribution structure that Fox seeks to establish; and (2) by virtue of its monopoly power, Fox seeks to capture excess revenue from artificially high prices for new-release DVD rentals and re-sales.

40.    Simply because Fox views Redbox's efficient, consumer-friendly business model as a "problem" that it wants to "strangle" does not justify the measures it has taken. Antitrust and copyright laws prohibit Fox's unlawful acts, as does tort law protecting Redbox's longstanding business and contractual relationships with Ingram and VPD.

## COUNT I

## DECLARATORY RELIEF:  COPYRIGHT MISUSE

41.    Redbox incorporates the allegations set forth in paragraphs 1 through 40, above, as if fully set forth herein.

42.    Copyright law provides copyright holders only a limited monopoly in order to enhance retail competition and maximize dissemination of copyrighted works to the general public.  The first-sale doctrine prevents copyright holders from extending the monopoly beyond the initial sale of the copyrighted work.  Thus, Congress expressly provided that "[T]he owner of a particular copy . . . lawfully made under [Title 17 of the United States Code] . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . ."  17 U.S.C. § 109(a).

43.    The public policy behind copyright law favors the enhancement of retail competition and the maximization of dissemination of copyrighted works.  Anti-competitive agreements or anti-competitive behavior, such as an unlawful group boycott, conflicts with this public policy, subverts the goals of copyright law and constitutes "copyright misuse."  The doctrine of copyright misuse prevents copyright holders from using their copyright to extend their government-sanctioned monopoly beyond its proper scope.  The existence of such anti-competitive agreements or unlawful activity precludes the enforcement of the copyright during the period of copyright misuse.

44.    Fox's actions with respect to VPD and Ingram are unlawful, contrary to and violative of, the first sale doctrine.  Fox has improperly restricted the statutory right of VPD, Ingram and other wholesalers to sell or otherwise dispose of the Fox DVDs that they have purchased.  Defendant's attempts to thwart the first sale doctrine of Section 109(a) of the

Copyright Act violate the public policy embodied in the grant of copyright, and constitute copyright misuse.

45.     There is an actual controversy over Fox's copyright misuse because it has now cut off Redbox's wholesale supply sources. Consumers and Redbox will suffer harm as a result of Fox's coercion of VPD and Ingram to cease selling Fox DVDs to Redbox.

46.     Redbox is entitled to a declaration that Fox's actions constitute copyright misuse and that Fox is precluded from enforcing copyrights for new-release Fox DVDs. Further, Redbox is entitled to a declaration that so long as Fox continues to engage in its inequitable conduct, Redbox may lawfully reproduce and sell copies of copyrighted Fox DVDs without incurring any liability pursuant to copyright law.

## COUNT II

## VIOLATION OF SHERMAN ANTITRUST ACT:  QUICK LOOK DOCTRINE

47.     Redbox incorporates the allegations set forth in paragraphs 1 through 46, above, as if fully set forth herein.

48.     Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

49.     The boycott of Redbox orchestrated by Fox constitutes a naked restraint of trade that will decrease the supply of new-release Fox DVDs in many, or all genres, reduce consumer choice in the various submarkets in the new-release DVD marketplace and artificially increase prices that consumers will have to pay to rent or buy new-release DVDs in those submarkets, thereby negatively affecting consumer welfare. In simple terms, because of the restraint, there are consumers who want to rent titles like *Night at the Museum 2*" from Redbox for $1 per-

night, but will be unable to do so because of the boycott. These consumers will now either have to pay more elsewhere or do without.

50.    Fox's actions will limit the number of copies of new-release Fox DVDs that individual kiosks may contain and prevent consumers from renting new-release DVDs until 30 days after their street date. Consumers will face artificially constrained supply and artificially higher prices.

51.    Fox's actions are intended to unlawfully eliminate Redbox's ability to rent or re-sell new-release Fox DVDs and have no pro-competitive effect that would enhance inter-brand or intra-brand competition with rentals or resales through other channels, such as brick-and-mortar stores. Fox's actions nakedly reduce output and increase prices paid by consumers for Fox DVDs. Fox's scheme does not enhance competition with new-release DVDs released by other copyright holders. Fox's actions are so plainly anti-competitive that even a "cursory exam" demonstrates that they constitute unlawful and illegal restraint of trade in violation of Section 1 of the Sherman Act.

## COUNT III

### VIOLATION OF SHERMAN ANTITRUST ACT: MISUSE OF COPYRIGHT ACT

52.    Redbox incorporates the allegations set forth in paragraphs 1 through 51, above, as if fully set forth herein.

53.    Each copyrighted work recorded on DVD constitutes an individual product market. Each copyrighted work is unique, and each such unique work has been granted a limited governmental monopoly. The geographic market for each such copyrighted work is nationwide.

54.    A copyright holder enjoys a "distribution right" and may initially sell, or not sell, copies of a copyrighted work to others on such terms as he or she sees fit. However, the

copyright holder's distribution right is limited to the first sale of the copyrighted item.  Under the

"first sale" doctrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised

solely with respect to the initial disposition of copies of a work, not to prevent or restrict the

resale or other further transfer of possession of such copies."

55.     Fox's right to control distribution of copyrighted new-release Fox DVDs ends

once the DVD has been sold.  The distribution right may not lawfully be exercised after the

initial sale, "to prevent or restrict the resale or further transfer of possession of such copies."

56.     Fox's boycott of Redbox exceeds the scope of the government-granted

distribution right, and violates the antitrust laws as an illegal restraint of trade.

57.     As such, Fox has violated Section 1 of the Sherman Act and unlawfully entered

into agreements with VPD and Ingram to restrain commerce within the United States.

## COUNT IV

### VIOLATION OF SHERMAN ANTITRUST ACT:
### UNREASONABLE RESTRAINT OF TRADE

58.     Redbox incorporates the allegations set forth in paragraphs 1 through 57, above,

as if fully set forth herein, and pleads, as an alternative to Count III, as follows.

59.     Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that, "Every

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

commerce among the several States, or with foreign nations, is declared to be illegal."

60.     New-release DVDs are introduced to the nationwide marketplace on a weekly

basis.  Within the new-release market, a particular new-release DVD competes with another only

to the extent that consumers view one as a reasonable substitute for another.  As described above,

each DVD category, or genre, constitutes a separate submarket.

61.    The reason that Redbox kiosks, like all new-release DVD outlets, carry dozens of titles at a time is because consumer behavior plainly demonstrates that there are few, if any, substitutes for a given new-release DVD title. If all new-release DVDs were fungible, consumers would be satisfied with rental/resale outlets that carried only a few titles. Consumers would be indifferent if rental and resale outlets stocked three, ten or a hundred individual titles at one time. Thus, even if one does not accept the premise that each copyrighted title is a monopoly (paragraph 59, *supra*), well-established consumer preferences, as reflected by industry practice, demonstrate that there is low cross-elasticity of demand among new-release titles belonging to different categories, or genres, and that each such genre constitutes a distinct submarket.

62.    Fox's actions will eliminate or significantly decrease the supply of new-release DVDs in each relevant submarket, will reduce consumer choice in the marketplace and will artificially increase prices that consumers have to pay to rent and/or buy new-release DVDs.

63.    By boycotting Redbox (and orchestrating a boycott of Redbox by others), Fox is in violation of Section 1 of the Sherman Act and has entered into unlawful agreements to restrain commerce within the United States.

## COUNT V

### VIOLATION OF SHERMAN ANTITRUST ACT:
### UNLAWFUL BOYCOTT

64.    Redbox incorporates the allegations set forth in paragraphs 1 to 63 as part of this Count.

65.    Under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

66.    Despite the clear language of Section 1, Fox, Ingram and VPD have entered into agreements that will forbid Ingram and VPD from selling Fox DVDs to Redbox and other DVD rental kiosk operators.

67.    Fox has orchestrated this boycott to artificially restrain output, raise prices and give Fox a bigger cut of rental revenues, or in the alternative to force Redbox out of business. Either way, Fox will be able to restrict supply and increase prices that consumers must pay to rent or buy new-release Fox DVDs.

68.    Fox's agreements with VPD and Ingram that they not sell to Redbox are unlawful group boycotts in violation of the antitrust laws.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACTUAL/BUSINESS RELATIONSHIPS

69.    Redbox hereby incorporates the allegations set forth in paragraphs 1 through 68, above, as if fully set forth herein.

70.    Redbox has a valid and existing contract with Ingram to purchase, among other things, new-release Fox DVDs.

71.    Redbox has a valid and existing contract with VPD to purchase, among other things, new-release Fox DVDs.

72.    Fox is aware of the existence of Redbox's supply contracts with its distributors. This is evidenced by Fox's instruction to VPD and Ingram to cease selling to Redbox.

73.    Fox's threat to no longer supply Fox DVDs to VPD and Ingram unless they boycott Redbox constitutes an intentional inducement to those distributors to breach their supply agreements with Redbox. This inducement is not protected by any recognized judicial, statutory, constitutional or other privilege and therefore is not justified.

74.     Fox's threatened action to no longer supply Fox DVDs to VPD and Ingram has made it impossible for those distributors to satisfy their contractual obligations to Redbox. Indeed, Fox's coercion of VPD and Ingram will cause those distributors to stop selling Fox DVDs to Redbox effective October 27, 2009, notwithstanding Redbox's purchase orders for such product, thereby resulting in a breach of their supply contracts with Redbox.

75.     Fox's actions have been carried out with the improper motive of, *inter alia*, interfering with Redbox's contracts with VPD and Ingram.

76.     Defendant's decision to cut off the supply of Fox DVDs to Redbox through VPD and Ingram has and will continue to result in substantial damages to Redbox.  Damages have and will continue to accrue not only as a direct result of the breach of the supply contracts, but also due to the proximate causes of that breach, including loss of customers, decreased demand for Redbox rentals and sales, attorneys' fees, and loss of customer goodwill.

## DEMAND FOR JURY

Redbox demands a trial by jury in this action for all issues so triable pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Redbox respectfully requests that this Court award the following relief:

a.     A declaration that Defendant's conduct constitutes copyright misuse, and thereby renders copyrights for Fox DVDs – however marketed, sold or distributed - unenforceable during the period of misconduct;

b.     Injunctive relief prohibiting Fox from engaging in any efforts to limit the supply of Fox DVDs from third-parties, including VPD and Ingram, to Redbox;

c.     Judgment that Fox's actions violate the Sherman Antitrust Act;

d.     Damages to the full extent permitted by law;

e.     Attorneys' fees and costs; and

- 19 -

f.    Such further relief as this Court deems just and appropriate.

Of Counsel:

Charles S. Bergen
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
Phone: (630) 756-8255

Dated: August 11, 2009

/s/ Henry E. Gallagher, Jr.
Henry E. Gallagher, Jr. (DE Bar ID #495)
Chad S.C. Stover (DE Bar ID #4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile:  (302) 658-5614

*Attorneys for Plaintiff*

709159_2.DOC/16295*2