# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,   )
                               )
                               )
            Plaintiff,         )
                               )   Civil Action No. 09-592-RBK
          vs.                )
                               )
TWENTIETH CENTURY FOX HOME   )
ENTERTAINMENT, LLC,   )
                               )
            Defendant.      )
                               )
                               )

## <u>TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS REDBOX'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)</u>

OF COUNSEL:

Yosef Riemer (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York City, NY 10022
Tel: (212) 446-4802
Email: yosef.riemer@kirkland.com

Corey C. Watson (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017
Tel: (213) 680-8482
Email: corey.watson@kirkland.com

Beth Moskow-Schnoll (No. 2900)
BALLARD SPAHR LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel:   (302) 252-4447
Fax:   (302) 355-0221
Email: moskowb@ballardspahr.com

Neal Walters
BALLARD SPAHR LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043
Tel: (856) 761-3438
Email: waltersn@ballardspahr.com

*Attorneys for Twentieth Century Fox Home Entertainment LLC*

Dated:  October 1, 2009

Dockets.Justia.com

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

INTRODUCTION ....................................................................................................................1

SUMMARY OF ARGUMENT ...............................................................................................3

SUMMARY OF ALLEGATIONS ...........................................................................................4

ARGUMENT............................................................................................................................6

I.     Redbox Fails to State a Claim Under Section 1 of the Sherman Act. .................................8

     A.     Redbox Has Not Pled a "Contract, Combination . . . or Conspiracy" Under Section 1....................................................................................................................8

     B.     Redbox Cannot Plead an Unlawful "Restraint of Trade." .....................................12

            1.     Redbox Has Not, And Cannot, Plead That Fox's Distribution Policy Harms *Inter-brand* Competition for DVD Rentals..........................16

            2.     Redbox's Allegations Of Injury to Itself and Injury to *Intra-brand* Competition Do Not Satisfy the Requirement of Pleading Harm to Competition...............................................................................................18

     C.     Redbox Asserts An Implausible Market Definition...............................................21

II.    Redbox's Copyright Misuse Claim Fails Because Copyright Misuse is an Affirmative Defense, Not a Claim. ...................................................................................27

III.   Redbox's Tortious Interference Claim Fails Because Redbox Cannot Allege That Ingram or VPD Breached Their Contract With Redbox...................................................28

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

**Page No(s).**

**Cases**

*Alberta Gas Chems., Ltd., v. E.I. Du Pont De Nemours and Co.,*
  826 F.2d 1235 (3d Cir. 1987)............................................................................................ 19

*Altera Corp. v. Clear Logic, Inc.,*
  424 F.3d 1079 (9th Cir. 2005) ........................................................................................ 28

*Am. Airlines v. Christensen,*
  967 F.2d 410 (10th Cir. 1992) ........................................................................................ 10

*Arista Records v. Flea World, Inc.,*
  356 F. Supp. 2d 411 (D.N.J 2005) .................................................................................. 28

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)..................................................................................... 6, 7, 23, 24

*Associated Gen. Contractors v. Cal. State Counsel of Carpenters,*
  459 U.S. 519 (1983)......................................................................................................... 20

*Bell Atl. v. Twombly,*
  550 U.S. 544 (2007).................................................................................................. 6, 7, 8

*Bldg. Materials Corp. of Am. v. Rotter,*
  535 F. Supp. 2d 518 (E.D. Pa. 2008) .............................................................................. 26

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)......................................................................................................... 19

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962)......................................................................................................... 19

*Brunson Commc'ns, Inc. v. Arbitron, Inc.,*
  239 F. Supp. 2d 550 (E.D. Pa. 2002) .............................................................................. 26

*Carell v. Shubert Org., Inc.,*
  104 F. Supp. 2d 236 (S.D.N.Y. 2000).............................................................................. 22

*Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,*
  836 F.2d 173 (3d Cir. 1988).............................................................................................. 8

*Conley v. Gibson,*
  355 U.S. 41 (1957)............................................................................................................. 7

*Cont'l T.V. Inc. v. GTE Sylvania,*
433 U.S. 36 (1977)....................................................................................................... 13, 15

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)............................................................................................................ 9

*Cosmetic Gallery v. Schoeneman Corp.,*
495 F.3d 46 (3d Cir. 2007)................................................................................................. 9

*Crane & Shovel Sales Corp v. Bucyrus-Erie Co.,*
854 F.2d 802 (6th Cir. 1988) ............................................................................................ 17

*Cupp v. Alberto-Culver USA, Inc.,*
310 F. Supp. 2d 963 (W.D. Ten. 2004)............................................................................ 26

*DeBonaventura v. Nationwide Mut. Ins. Co.,*
428 A.2d 1151 (Del. 1981) ............................................................................................... 30

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005)............................................................................................................ 8

*E. Food Servs., Inc. v. Pontificial Catholic Univ. Servs. Ass'n, Inc.,*
357 F.3d 1 (1st Cir. 2004)................................................................................................. 13

*E-Z Bowz, LLC v. Prof'l Prod. Research Co.,* No. 00 8670,
2003 WL 22068573 (S.D.N.Y. Sept. 5, 2003)................................................................. 22

*Fowler v. UPMC Shadyside,*
No. 07-04285, 2009 WL 2501662 (3d Cir. Aug. 18, 2009) ........................................... 6, 7

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.,*
789 F. Supp. 760 (S.D. Miss. 1992)................................................................................. 17

*George Haug Co. v. Rolls Royce Motor Cars, Inc.,*
148 F.3d 136 (2d Cir. 1998).......................................................................................... 20, 21

*Gordon v. Lewistown Hosp.,*
423 F.3d 184 (3d Cir. 2005)............................................................................................. 13

*Hack v. President and Fellows of Yale College,*
237 F.3d 81 (2d Cir. 2000)............................................................................................... 23

*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l,* No. 03-4113,
2005 WL 3447615 (D.N.J. Dec. 15, 2005)................................................................... 13, 20

*Illinois Tool Works, Inc. v. Indep. Ink, Inc.,*
547 U.S. 28 (2006)............................................................................................................ 22

*In re Frederick's of Hollywood, Inc. Shareholders Litig.,*
No. 15944, 1998 WL 398244 (Del. Ch. July 9, 1998)........................................................ 29

*Int'l Logistics Group, Ltd. v. Chrysler Corp.,*
884 F.2d 904 (6th Cir. 1989) .................................................................................. 10, 11

*Intercontinental Parts, Inc. v. Caterpillar, Inc.,*
260 Ill. App. 3d 1085 (Ill. App. Ct. 1994) .......................................................... 10

*Jala v. W. Auto Supply Co.,* Civ. No. 95-100-P-H,
1995 WL 463683 (D. Me. July 26, 1995)............................................................... 11

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,*
61 F.3d 123 (2d Cir. 1995).................................................................................... 17

*Lum v. Bank of Am.,*
361 F.3d 217 (3d Cir. 2004)................................................................................. 16

*Luscavage v. Dominion Dental USA, Inc.,*
No. 06C-07-219, 2007 WL 901641 (Del. Super. Ct. Mar. 20, 2007) ............................ 30

*Mathews v. Lancaster Gen. Hosp.,*
87 F.3d 624 (3d Cir. 1996).................................................................................... 19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
269 F. Supp. 2d 1213 (C.D. Cal. 2003) ................................................................ 28

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984)................................................................................ 8, 10, 11, 15

*Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc.,*
747 F.2d 1396 (11th Cir. 1984) ........................................................................... 15

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
127 F.3d 1157 (9th Cir. 1997) .............................................................................. 19

*Online Policy Group v. Diebold, Inc.,*
337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................ 28

*Orson Inc. v. Miramax Film Corp.,*
79 F.3d 1358 (3d Cir. 1996)........................................................................ 13, 14, 17

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,*
129 S. Ct. 1109 (2009).......................................................................................... 12

*Patterson v. Charter Fin. Group, Inc.,*
471 U.S. 1056 (1985)............................................................................................ 15

*Perry v. Rado,*
  504 F. Supp. 2d 1043 (E.D. Wash. 2007) ........................................................................... 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997) ................................................................................... 21, 24, 27

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.,*
  199 F. Supp. 2d 362 (M.D.N.C. 2002) ............................................................................. 14

*Re/Max Int'l, Inc. v. Smythe, Cramer Co.,*
  265 F. Supp. 2d 882 (N.D. Ohio 2003) ............................................................................ 11

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.,*
  812 F. Supp. 387 (S.D.N.Y. 1993) ................................................................................... 23

*Redbox Automated Retail LLC v. Universal City Studios LLP, et al.,*
  Civ. No. 08-766 ................................................................................................................ 14

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC,*
  532 F.3d 963 (9th Cir. 2008) ........................................................................................... 22

*Rosenberg v. XM Ventures,*
  129 F. Supp. 2d 681 (E.D. Pa. 1988) ............................................................................... 16

*Rossi v. Standard Roofing, Inc.,*
  156 F.3d 452 (3d Cir. 1998) ......................................................................................... 9, 11

*Rutman Wine Co. v. E&J Gallo Winery,*
  829 F.2d 729 (9th Cir. 1987) ...................................................................................... 20, 21

*Sands v. McCormick,*
  502 F.3d 263 (3d Cir. 2007) ............................................................................................ 29

*Save Ardmore Coal. v. Lower Merion Twp.,*
  419 F. Supp. 2d 663 (E.D. Pa. 2005) ................................................................................. 9

*Seaboard Supply Co. v. Congoleum Corp.,*
  770 F.2d 367 (3rd Cir. 1985) ........................................................................................... 15

*Seagood Trading Corp. v. Jerrico, Inc.,*
  924 F.2d 1555 (11th Cir. 1991) .................................................................................. 15, 19

*Shaw v. Rolex Watch, U.S.A., Inc.,*
  673 F. Supp. 674 (S.D.N.Y. 1987) ................................................................................... 23

*Southmark Prime Plus, L.P. v. Falzone,*
  776 F. Supp. 888 (D. Del. 1991) ...................................................................................... 16

Page No.(s)

*Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187,
2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ............................................................... 23

*Stark v. Ear Nose & Throat Specialists of Northwestern Penn.*,
185 Fed. Appx. 120 (3d Cir. 2006 ...................................................................................... 8

*Swierkeiwicz v. Sorema*,
534 U.S. 506 (2002) ............................................................................................................ 23

*Syncsort Inc. v. Sequential Software, Inc.*,
50 F. Supp. 2d 318 (D.N.J. 1999) ..................................................................................... 24

*Tampa Elec. Co. v. Nashville Coal Co.*
365 U.S. 320 (1961) ............................................................................................................ 13

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
695 F. Supp. 150 (S.D.N.Y. 1988) ..................................................................................... 23

*Ticketmaster, L.L.C. v. RMG Techs., Inc.*,
536 F. Supp. 2d 1191 (C.D. Cal. 2008) ............................................................................. 28

*Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div.*,
932 F.2d 1384 (11th Cir. 1991) ......................................................................................... 15

*Tigard Elec. v. Nat'l Elec. Contractors Ass'n*,
790 F. Supp. 1498 (D. Or. 1992) ....................................................................................... 20

*Toscano v. Prof'l Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ............................................................................................. 10

*UGG Holdings v. Severn*, No. 04-1137,
2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ..................................................................... 23

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) ............................................................................................................ 12

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ............................................................................................................ 22

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003) ............................................................................................... 28

*Waris v. HCR Manor Care*,
No. 07-3344, 2008 WL 5352278 (E.D. Pa. Dec. 17, 2008) .............................................. 16

Page No.(s)

**Statutes**

The Sherman Act, 15 U.S.C. § 1 ............................................................................................. passim

**Other Authorities**

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802b ........................................... 17

6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1402b4 (2007) ............................... 11

7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1451d2 .......................................... 11

Restatement (Second) of Torts § 773 (1979) ................................................................................ 30

## NATURE AND STAGE OF THE PROCEEDINGS

On August 11, 2009, Redbox Automated Retail, LLC ("Redbox") sued Twentieth Century Fox Home Entertainment LLC ("Fox") alleging copyright misuse, tortious interference with contract and violations of Section 1 of the Sherman Act. Because Redbox's Complaint fails to state a claim, Fox moves to dismiss under Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Fox has not refused to provide DVDs to Redbox. Redbox's own complaint reveals that Fox tried to negotiate a contract to provide DVDs *directly* to Redbox. But after months of negotiations, the parties could not agree on price. Fox had the right to stop selling DVDs to Redbox altogether. It did not. Instead, Fox unilaterally announced a change to its distribution policy that allowed distributors to continue selling Fox DVDs to Redbox 30 days after Fox releases the DVD, but not before.

This case, therefore, is not about any refusal to provide Fox DVDs to Redbox. Rather, this case is about Redbox's insistence that Fox (i) sell DVDs to Redbox through distributors; (ii) on the date that Redbox demands the DVDs; and (iii) at the price that Redbox wants to pay. Unable to get the terms it wanted at the bargaining table, Redbox brought this suit claiming violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (along with claims of copyright violations and tortious interference), apparently hoping to pressure Fox into selling DVDs to Redbox on Redbox's terms.

Antitrust law does not require a seller to provide its product through the distribution channel that the buyer demands, on the date that the buyer demands, or at the price that the buyer demands. To the contrary, sellers have considerable freedom under the law to sell (or not sell) to whomever they want, how they want, and when they want. To this end, a seller's distribution policies do not violate Section 1 of the Sherman Act unless the plaintiff pleads and proves (i) a

contract, combination, or conspiracy; that (ii) injures competition; (iii) in a plausible antitrust market. Redbox cannot meet any of these elements, let alone all of them, as it must to state a Section 1 claim.

*First*, Redbox does not identify any agreement between Fox and its distributors that caused competitive injury. Rather, Redbox alleges that Fox unilaterally announced a policy restricting distributors' DVD sales to kiosk operators. But a seller's unilateral decision to impose a restraint on distributors does not constitute a contract, combination or conspiracy under Section 1 as a matter of law. Redbox's antitrust claim should be dismissed for this reason alone. (*See* Part I.A, *infra*.)

*Second*, Redbox does not, and cannot, plead that Fox's distribution policy injures market-wide *competition*. To state a Section 1 claim based on a seller's distribution policy, courts typically require factual allegations demonstrating injury to market-wide competition among all brands (referred to as "inter-brand" competition). Here, Redbox does not allege that Fox's distribution policy injures inter-brand competition (i.e. rentals of DVDs produced by other studios) at all.

Instead, Redbox asserts only that *Redbox's* rentals of *Fox DVDs* are injured, or in antitrust parlance, that "intra-brand" competition is injured. The law gives a seller (like Fox) substantial freedom to *restrict* distribution of its *own brand* in order to strengthen the brand and thereby *improve* competition with other brands. Accordingly, the Supreme Court and many lower courts have stated that alleged injury to *one competitor* (here, Redbox) or to *one brand* (here, Fox DVDs) does not demonstrate injury to *market-wide competition*.

In any event, Redbox's allegations do not withstand scrutiny. Redbox only alleges that it cannot obtain Fox DVDs from *its two normal wholesale distributors*. This contrasts with

2

Redbox's case against Universal Studios (pending before this Court), in which Redbox asserts that it is completely foreclosed from obtaining Universal's DVDs, even from retailers. Redbox makes no allegation that it is completely foreclosed from obtaining Fox DVDs. Even if it had, Redbox's acknowledgement that other retail rental companies will continue to compete for customers who rent Fox DVDs defeats any assertion that even intra-brand competition for Fox DVDs will be injured. Thus, Redbox's allegation of injury to its rentals of Fox DVDs flunks the injury-to-competition test. (*See* Part I.B, *infra*.)

*Third*, Redbox fails to allege a plausible antitrust market. Unable to plead any injury to inter-brand competition, Redbox attempts to circumvent that requirement by pretending that *every single Fox DVD title* comprises its own individual market without competition from any other DVD title. But asserting that a DVD title never faces competition from any other DVD title defies common sense. Because individual products are rarely so unique as to have *no substitutes at all*, courts routinely grant motions to dismiss antitrust claims that rely on allegations of "single product" markets — like Redbox alleges here. (*See* Part I.C, *infra*.)

Redbox's antitrust claims under Section 1 of the Sherman Act, therefore, should be dismissed. The Court also should dismiss Redbox's remaining counts: (a) Redbox's claim for "copyright misuse" is an affirmative defense to a claim of copyright infringement, not a cause of action (*see* Part II, *infra*); and (b) Redbox's claim for tortious interference fails because Redbox's contracts with Fox's distributors excuse performance when the distributors cannot obtain timely delivery of DVD product from studios (*see* Part III, *infra*). For these reasons, discussed more fully below, the Court should grant Fox's motion to dismiss with prejudice.

## SUMMARY OF ARGUMENT

1.      Redbox's antitrust claims under Section 1 of the Sherman Act can and should be dismissed for any of the following four reasons:

3

(a) Redbox does not identify any unlawful agreement between Fox and its distributors;

(b) Redbox does not allege harm to inter-brand competition;

(c) Redbox's allegations of harm to intra-brand competition are inadequate to demonstrate market-wide injury to competition; and

(d) Redbox does not allege a plausible antitrust market.

2.      Redbox's copyright misuse claim should be dismissed because copyright misuse is an affirmative defense to copyright infringement, not a cause of action.

3.      Redbox's tortious interference claim fails because Fox is not alleged to have interfered with any contract *requiring* distribution of Fox DVDs to Redbox.

## SUMMARY OF ALLEGATIONS

According to Redbox's Complaint[1], Fox and its affiliates are "engaged in the business of developing, producing, and distributing to others copyrighted motion pictures and other video entertainment in the United States and throughout the world." (Compl. ¶ 7.) "Some of Fox's more popular movie franchises include the *Star Wars*, *Ice Age*, *X-Men*, *Die Hard*, *Alien*, and *Predator* series." (*Id.*)

Redbox rents and sells DVDs to consumers at over 17,000 self-service kiosks located at retail outlets including fast-food restaurants, grocery stores and convenience stores. (*Id.* ¶¶ 15, 16, 18, 20.) Each of these kiosks holds "up to 700 DVDs comprising 70 to 200 individual titles." (*Id.* ¶ 15.)

---

[1]   "Complaint" refers to the complaint filed by Redbox against Fox in this case dated August 11, 2009. (D.I. 1.) Although Fox disputes many of the allegations in the Complaint, for purposes of this Motion only, Fox recites allegations from the Complaint as if they are true.

Fox — like any other seller —makes business decisions about how to price and distribute its product. In certain instances, Fox provides its DVDs directly to large retailers for sale or rental to consumers. In other instances, Fox provides its DVDs through wholesale distributors, such as Video Product Distributors, Inc. ("VPD") and Ingram Entertainment Inc. ("Ingram"). (Compl. ¶ 8.) In the past, Redbox typically acquired new-release Fox DVDs through VPD and Ingram. (*Id.* ¶ 29.)

Redbox has a supply contract with Ingram and represents that its agreement with VPD is similar. (*Id.* ¶¶ 29-30, Ex. A.) When Redbox orders new-release DVDs from Ingram and VPD, the distributors then order those DVDs from the studios. (*Id.*) Of course, if the studios do not agree to deliver product to VPD or Ingram, then VPD and Ingram cannot deliver to Redbox. Accordingly, Redbox's supply contracts do not impose an unconditional obligation on the distributor to fill Redbox's orders for new-release Fox DVDs. (*See id.*, Ex. A.) Instead, the distributors' "delivery to Redbox is conditioned on 'Ingram Entertainment's suppliers mak[ing] timely delivery to Ingram.'" (*See Redbox Automated Retail LLC v. Universal City Studios LLP, et al.*, Civ. No. 08-766, Opinion, dated 8/17/09, D.I. 46 ("Universal Op.") at 11.)

Considering Redbox's growth and business model, Fox decided in 2009 to change its distribution method to Redbox. Therefore, Fox offered to directly provide DVDs to Redbox on the DVD's "street date" (*id.* ¶¶ 35-36; Ex. C), just as Fox does with other large retailers such as Blockbuster and Netflix. Fox and Redbox negotiated the proposal but ultimately did not reach agreement on price. (*Id.*) Rather than stop selling DVDs to Redbox altogether, Fox announced a policy allowing its distributors to continue providing DVDs 30 days after the DVD's "street date" (the term used to refer to the DVD's release date), but not before. (*Id.* ¶ 34.) Fox's

5

announced distribution policy does not go into effect until October 27, 2009, with the release of *Ice Age 3*. (Compl. ¶ 38; *id.* Ex. D.)

After negotiations for a direct distribution agreement between Fox and Redbox broke down, Redbox sued on August 11, 2009. Redbox's lawsuit asks this Court to hold Fox liable under the antitrust laws (imposing treble damages), copyright law, and in tort for not selling DVDs to Redbox on the date that *Redbox* wants, at the price that *Redbox* demands.

Redbox claims injury because it "will no longer have access to new-release Fox DVDs through its normal wholesale channels." (*Id.* ¶ 38.) Redbox, however, does not allege that it cannot obtain Fox DVDs through other channels, including from retailers such as Best Buy and Wal-Mart. Nor, for that matter, does Redbox allege that it cannot obtain DVDs directly from Fox.

Redbox does not allege that Fox's distribution policy will affect the rental of any other brand DVD — through Redbox or the many other DVD rental companies. Rather, Redbox alleges only that Fox's distribution policy will "prevent[] consumers from renting new-release Fox DVDs from Redbox . . . ." (*Id.* ¶ 39.)

## ARGUMENT

The Third Circuit recently issued an opinion stating that "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, No. 07-04285, 2009 WL 2501662, at \*4-5 (3d Cir. Aug. 18, 2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).[2]

---

[2] Redbox has filed a separate lawsuit against Universal that is pending before this Court. *See Redbox Automated Retail LLC v. Universal City Studios LLP. et al.*, Civ. No. 08-766. The

6

Under this new regime, the test is no longer whether "no set of facts" exists entitling the plaintiff to relief. Indeed, while the *Twombly* court "retired" the "no set of facts" standard from *Conley v. Gibson*, 355 U.S. 41, 45 (1957), *Iqbal* buried it once and for all. *See Fowler*, 2009 WL 2501665, at *5 ("*Iqbal* additionally provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*.") (citation omitted). Now, a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citation omitted).

Under *Iqbal*, a district court considering a complaint's sufficiency must conduct a "two-part analysis." *Fowler*, 2009 WL 2501662, at *5. First, the court must separate out the factual and legal elements of a claim. *Id.* Though the court must accept *well-plead* factual allegations, it may disregard bare legal conclusions. *Id.* (citing *Iqbal*, 129 S. Ct. at 1949); *see also Iqbal*, 129 S. Ct. at 1950 ("conclusions [] are not entitled to the assumption of truth"). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 2009 WL 2501662, at *5 (citing *Iqbal*, 129 S. Ct. at 1950). This "plausibility" determination is a "context-specific task" requiring the court to "draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950 (citation omitted).

The Supreme Court has emphasized that enforcing these more rigorous pleading requirements is especially important in antitrust cases. Otherwise, "a plaintiff with a 'largely groundless claim' [could] be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.'" *Twombly*, 550 U.S. at

Court granted in part and denied in part Universal's motion to dismiss Redbox's first amended complaint. (D.I. 46.) The Third Circuit's decision in *Fowler* discussing pleading standards was issued the day after this Court issued its order on Universal's motion to dismiss.

558 (quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347 (2005)). The Supreme Court explicitly rejected the argument that insubstantial or flawed complaints could be weeded out later, for example at the summary judgment stage. *Twombly,* 550 U.S. at 559 ("And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage . . . .") (internal quotations omitted). In the Court's view, this type of relief is too late because it comes only after "enormous expense" and causes a real risk that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases" before the summary judgment stage is ever reached. *Id.* (citations omitted); *see also Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 182 (3d Cir. 1988) (noting that "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint") (citation omitted). Because Redbox fails to plead facially plausible antitrust, copyright or tort claims, the Complaint should be dismissed.

## I.     Redbox Fails to State a Claim Under Section 1 of the Sherman Act.

### A.     Redbox Has Not Pled a "Contract, Combination . . . or Conspiracy" Under Section 1.

As a threshold matter, Redbox's antitrust claims should be dismissed because Redbox fails to identify any "*contract, combination . . . or conspiracy*" that allegedly injured competition. 15 U.S.C. § 1 (emphasis added). It is black-letter law that Section 1 of the Sherman Act does not apply to *unilateral* conduct. *Monsanto Co. v. Spay-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984) ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.") (citations omitted); *Stark v. Ear Nose & Throat Specialists of Northwestern*

*Penn.*, 185 Fed. Appx. 120, 124 (3d Cir. 2006) ("[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a Section 1 violation") (citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998)). Rather, to state a Section 1 claim, a plaintiff must plead that two independent actors agreed, or otherwise combined, to engage in conduct that injured competition. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("[U]nity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" must exist to trigger Section 1 liability.) (citation omitted); *Cosmetic Gallery v. Schoeneman Corp.*, 495 F.3d 46, 55 (3d Cir. 2007) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation") (citation omitted).

In this case, Redbox alleges that, on August 5, 2009, Fox told Redbox that it "was demanding that its wholesalers, including VPD and Ingram, cease selling any new-release Fox DVD to Redbox for at least 30 days after its street date." (Compl. ¶ 34.) The Complaint contains no allegations that VPD or Ingram played any role in the formulation of Fox's distribution policy. To the contrary, Redbox alleges that Fox "coerce[d] VPD and Ingram to not sell new-release Fox DVDs to Redbox" and that "[f]aced with the prospect of being denied access to new-release Fox DVDs, VPD and Ingram have had no choice but to acquiesce . . . ." (*Id.* ¶ 38.)[3]

---

[3] Even if a distributor's acquiescence in a seller's unilateral distribution policy somehow constituted an agreement under Section 1 (it does not), Redbox cannot plausibly allege that VPD and Ingram have already acquiesced in Fox's unilateral policy decision. Indeed, Redbox's Complaint concedes that Fox's policy does not go into effect until October 27, 2009 with the release of *Ice Age 3*. (Compl. ¶ 38.) *Ice Age 3*, of course, had not been released as of the filing of Redbox's Complaint (and still has not been released as of the date of this Motion). VPD and Ingram, therefore, have not even had an opportunity to "acquiesce" in Fox's unilateral policy announcement. Accordingly, Redbox's conspiracy claim, in addition to being plead inadequately, is not ripe and should thus be dismissed. *See, e.g., Save Ardmore Coal. v. Lower Merion Twp.*, 419 F. Supp. 2d 663, 676 (E.D. Pa. 2005)

Redbox assumes that VPD and Ingram's anticipated compliance with Fox's unilateral policy announcement satisfies the requirement under Section 1 of a "contract, combination . . . or conspiracy." (*Id.* ¶ 48.) It does not. Courts have consistently held that a distributor's acquiescence in a manufacturer's unilateral policy decision does not trigger Section 1. *See Monsanto*, 465 U.S. at 761 ("Under [*Colgate*], the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination."); *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989) ("Current legal precedent supports the conclusion that a conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source."); *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) ("acceptance of . . . part of the [contract] package provides no evidence of concerted action to restrain trade . . . the PGA Tour independently set the terms of the contracts, and the local sponsors merely accepted them"); *Am. Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) ("No evidence in the record suggests that American did not independently set the terms under which it would offer its travel awards, and the mere fact that its members accepted those terms does not generate the kind of concerted action needed to violate Section 1.") (citing *Monsanto*, 465 U.S. at 761); *cf. Intercontinental Parts, Inc. v. Caterpillar, Inc.*, 260 Ill. App. 3d 1085, 1095 (Ill. App. Ct. 1994) ("A conspiracy will not be found where a dealer or distributor involuntarily complies with a manufacturer's restrictive parts policy in order to avoid termination of its product source. There can be no conspiracy where the party imposing the alleged restraint does not need the agreement of the other party.") (applying Illinois state law analog to Section 1) (citations omitted).

(dismissing complaint where the claim was not ripe for review).

10

This rule applies with equal force at the pleading stage. *See e.g., Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 899 (N.D. Ohio 2003) (granting motion to dismiss challenge to policy offering lower commissions to real estate brokers employing former agents of competing brokerage where policy was unilaterally imposed); *Jala v. W. Auto Supply Co.*, Civ. No. 95-100-P-H, 1995 WL 463683, at \*2 (D. Me. July 26, 1995) (granting motion to dismiss complaint alleging Section 1 conspiracy based on plaintiff's acquiescence in defendant's pricing demands); *see also* 7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1451e ("[E]ven the most circumscribed reading [of *Monsanto*] does not permit finding an agreement on the basis of unwilling compliance alone. The Court said that a manufacturer 'can announce . . . and refuse to deal' and that a dealer 'is free to acquiesce . . . in order to avoid termination.' In this context 'can' and 'free' have the clear meaning that *no agreement is formed when a dealer unwillingly complies solely because it wishes to avoid termination.*") (emphasis added, citing *Monsanto*, 465 U.S. at 761).

The principle that acquiescence in a unilateral distribution policy does not equal a Section 1 agreement is particularly true where the seller does not need the distributor's acquiescence to accomplish its objective — as is the case here. *See Int'l Logistics*, 884 F.2d at 907 ("There can be no conspiracy 'where the actor imposing the alleged restraint does not . . . need the acquiescence of the other party or any quid pro quo from him.'") (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1402b4 (1986)); *see also Rossi*, 156 F.3d at 480 ("Since there is no evidence that Servistar could overrule a unilateral GAF decision to refuse to supply a Servistar member, we cannot reasonably infer . . . that Servistar and GAF agreed to refuse to sell.") (citing *Int'l Logistics*, 884 F.2d at 907). Here, Fox could have refused to fill Redbox's

orders placed through VPD and Ingram and thereby stopped distribution of its new-release DVDs to Redbox without its distributors' acquiescence at all.

Redbox's own supply contracts with VPD and Ingram reinforce this point. According to the Complaint, these supply contracts require VPD and Ingram to "order DVDs from the studios" to supply to Redbox. (Compl. ¶ 30.) Therefore, VPD and Ingram could not supply Fox DVDs to Redbox if Fox refused to fill the order. To this end, the Redbox-Ingram contract provides that Ingram's delivery obligations are conditioned on "Ingram Entertainment's suppliers [i.e. Fox] mak[ing] timely delivery to Ingram." (*Id.*)

In short, Redbox fails to allege the most basic element of a Section 1 claim: a contract, combination or conspiracy. Because Redbox fails to meet this threshold requirement, the Court may dismiss the Section 1 claims without even having to reach the other grounds for this motion, discussed below.

## B. Redbox Cannot Plead an Unlawful "Restraint of Trade."

Even if Redbox could plead concerted action (it cannot), the Court should dismiss Redbox's Section 1 claim because Redbox has failed to adequately plead that Fox's distribution policy is an unlawful "restraint of trade." 15 U.S.C. § 1.

The law gives sellers freedom to decide what products to sell, to whom, when, where, and what price to charge. The U.S. Supreme Court, for example, has stated that a seller may "freely . . . exercise his own independent discretion as to parties with whom he will deal" without violating the antitrust laws. *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919); *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 129 S. Ct. 1109, 1123 (2009) (noting that sellers have freedom to price their own products and to refuse to deal with buyers). To the extent that market economics permit, therefore, a seller can raise its price, reduce its output, or delay or otherwise limit distribution of its own products. Basic economics disciplines the seller's

12

decisions. If the seller raises its price too high, or brings its product to market at the wrong time, or erroneously refuses to sell to a particular customer, or decides on the wrong distribution method, the market will make the seller pay for bad business decisions, just as the market will reward good ones.

As a natural extension of the seller's freedom to decide how to sell its products, the law also gives a seller substantial freedom to restrain distributors. Thus, more than 30 years ago, the U.S. Supreme Court declared that an agreement between a seller and a distributor does not violate the antitrust laws unless it is shown to injure *market-wide competition* under the "rule of reason." *Cont'l T.V. Inc. v. GTE Sylvania*, 433 U.S. 36, 54 (1977); *see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (noting that Third Circuit has held agreements between manufacturers and distributors are "reviewed under the traditional rule of reason" (citing *Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996)). In rule of reason cases, a failure to plead facts that demonstrate injury to *competition* in a plausible antitrust market warrants dismissing the case on a Rule 12(b)(6) motion. *See, e.g., IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, No. 03-4113, 2005 WL 3447615, at *10 (D.N.J. Dec. 15, 2005) (dismissing complaint in part because plaintiff "has failed to allege sufficient facts concerning the anticompetitive effects of [d]efendants' conduct in the relevant product and geographic markets").

The rule of reason permits a seller to impose restraints on its distributors unless doing so can be shown to foreclose a substantial portion of the market to competition. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320. 327 (1961) (requiring that allegedly anticompetitive restraint foreclose a substantial share in the relevant supply market); *E. Food Servs., Inc. v. Pontificial Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 9 (1st Cir. 2004) (dismissing complaint

in part because "[t]here is no indication that [the plaintiff] has any hope of showing substantial foreclosure in a properly defined market"); *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002) (noting that "courts generally require plaintiffs to show substantial foreclosure in vertical restraint cases involving Rule of Reason analysis") (collecting cases).[4]

Consistent with the rule of reason, a seller may restrict the sales of its own brand. *See, e.g., Orson*, 79 F.3d at 1372. For example, a seller might decide to limit competition within its own brand (or "intra-brand" competition) by assigning territories to distributors or by creating distribution "channels" so that distributors can sell only to certain kinds of customers, but not others. Because the seller is presumed to know best how to promote and strengthen its own brand, sellers may limit distribution of their own brands on the theory that strong brands improve

---

[4] Redbox asserts four antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1: (i) a Section 1 claim under the "quick look doctrine" (Count II); (ii) an antitrust claim for "misuse of copyright" (Count III); (iii) a claim labeled "unreasonable restraint of trade" (Count IV); and (iv) a Section 1 claim labeled "unlawful boycott" (Count V). Each of these "claims," however, is based on the same allegation: that Fox's alleged distribution policy to sell DVDs to Redbox 30 days after they are released, but not before, violates Section 1 of the Sherman Act.

Redbox does not have four separate antitrust claims. At best, it has only one claim under Section 1 of the Sherman Act arising out of an alleged anticompetitive vertical non-price restraint. Indeed, this Court already has recognized this fact in another case pending before it filed by Redbox against Universal City Studios. *See Redbox Automated Retail LLC v. Universal City Studios LLP, et al.*, Civ. No. 08-766. In that case, Redbox alleged that Universal "pressured VPD and Ingram to cease filling Redbox's orders for Universal DVDs" and that "Universal orchestrated a boycott of Redbox by Ingram, VPD, and other distributors and retailers, including Best Buy and Wal-Mart." (Universal Op. at 2, 7.) As it does here, Redbox made allegations against Universal using terms such as "quick look," "boycott," and "copyright misuse." In the end, however, the Court recognized that "Plaintiff's Sherman Act claim, practically speaking, alleges a vertical nonprice restraint or vertical boycott . . . ." (*Id.* at 9.) The issue in this case, therefore, is whether Redbox has stated a claim for a vertical non-price restraint under the rule of reason in violation of Section 1 of the Sherman Act. It has not.

14

*overall competition among brands* (called "inter-brand" competition). Put differently, courts are willing to sacrifice "intra-brand" competition (i.e. competition between distributors of one brand) because strengthening individual brands generally will benefit "inter-brand" competition. *See, e.g., Cont'l T.V., Inc.*, 433 U.S. at 52 n.19, 54, 56 (noting that *inter-brand* competition is "the primary concern of antitrust law" and stating that courts are far less concerned about policing *intra-brand* competition because "manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products"). As a result, "[t]he unilateral decision of a single manufacturer to rearrange its distribution structure by limiting or increasing the number of its dealers or transferring its business to different dealers does not violate the Sherman Act." *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 374 (3rd Cir. 1985) (citation omitted).[5]

Applying these principles to this case, Redbox cannot plead an unlawful restraint of trade because (i) Redbox has not alleged, and cannot allege, that Fox's distribution policy injures *inter-brand competition* for DVD rentals market-wide; and (ii) in any event, Redbox cannot even allege that intra-brand competition for rentals of Fox DVDs has been restricted.

---

[5] *See also Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1389 (11th Cir. 1991) (stating that "[i]t is elementary, under the antitrust laws, that a supplier 'has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently'" (citing, among other cases, *Monsanto Co.*, 465 U.S. at 761); *Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc.*, 747 F.2d 1396, 1402 (11th Cir. 1984) ("Section 1 of the Sherman Act does not proscribe independent action."), *cert. denied, Patterson v. Charter Fin. Group, Inc.*, 471 U.S. 1056 (1985); *see also Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) ("It is a harsh reality that when competition occurs, some win and some lose. Emerging victorious from competition, however, is not illegal under the Sherman Act. To hold otherwise would require us to interpret the Sherman Act as mandating cooperation among rivals.") (footnote reference omitted).

## 1.     Redbox Has Not, And Cannot, Plead That Fox's Distribution Policy Harms *Inter-brand* Competition for DVD Rentals.

Fox does not, and cannot, allege that Fox is the *only* brand of DVD. Studios such as

Paramount, Disney, Sony, Warner Bros., Universal, Lionsgate and others create and distribute

their own DVDs. (*See, e.g.,* Universal Am. Compl. ¶ 9 (alleging that Universal "is one of the

world's leading creators and distributors of motion pictures"); Warner Compl. ¶ 1 (alleging that

"Warner is the largest distributor of filmed entertainment in the world [and] distributes [DVDs]

for home video use).)[6] In fact, Redbox recently entered into direct distribution agreements with

Sony, Lionsgate and Paramount. (*See* Coinstar Inc. 8-K dated July 21, 2009, Item 8.01 (Sony);

Conistar Inc. 8-K dated Aug. 11, 2009 (Lionsgate); Coinstar Inc. 8-K dated Aug. 25, 2009

(Paramount), attached as Exs. A-C to Horowitz Decl.)[7] According to Redbox, the DVDs

licensed and/or purchased from these three studios are expected to represent over 45% of the

total DVDs licensed and purchased by Redbox in 2009. (*See id.*)

Thus, it is not surprising that Redbox does not, and cannot, allege that *Fox's* distribution

policy has any effect at all, let alone an anticompetitive effect, on the retail rental of DVDs from

---

[6]     Because they are public records, the Court may take judicial notice of and consider the allegations in Redbox's complaints against Universal and Warner Brothers. *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (noting that in deciding motions to dismiss under Rule 12(b)(6), courts may consider "the allegations in the complaint, exhibits attached to the complaint, *matters of public record*, and documents that form the basis of a claim") (emphasis added); *see also Waris v. HCR Manor Care*, No. 07-3344, 2008 WL 5352278, at *6 (E.D. Pa. Dec. 17, 2008) (noting that a complaint is a public record, and therefore, the "Defendant did not act improperly by bringing it to th[e] Court's attention").

[7]     Like complaints, "[SEC] filings fall within this category of public record." *Rosenberg v. XM Ventures*, 129 F. Supp. 2d 681, 687 n.6 (E.D. Pa. 1988); *see also Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888. 892-93 (D. Del. 1991) (considering SEC filings on a Rule 12(c) motion). Accordingly. the Court may also take judicial notice of and consider Coinstar's SEC filings on this motion.

the many other studios that compete with Fox. Rather, Redbox only alleges that Redbox and its customers will be injured because Fox's distribution policy allegedly "prevent[s] consumers from renting *new-release Fox DVDs* from Redbox and other kiosk rental outlets." (Compl. ¶ 39 (emphasis added).) But allegations of injury to *intra-brand competition* (even if true) are insufficient to plead injury to *market-wide competition* in this case. "To prevail on a section 1 claim, a plaintiff must also show more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995). According to a leading antitrust treatise: "[I]njury to competition can be expected only if [a competitor] is denied access to a *market*, but not if it is denied access to only one particular buyer or seller within the market." 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802b (emphasis in the original).

Accordingly, Redbox's allegation that intra-brand competition for Fox DVDs will be injured (even if true) does not state injury to competition. Because Redbox does not allege that Fox's distribution policy injures market-wide, inter-brand competition, Redbox's Section 1 claim should be dismissed as a matter of law. *See Crane & Shovel Sales Corp v. Bucyrus-Erie Co.*, 854 F.2d 802, 806 (6th Cir. 1988) (upholding dismissal of Section 1 claim under the rule of reason because complaints did not allege an "anticompetitive effect at the interbrand level"); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 768 (S.D. Miss. 1992) ("It is clear . . . that a complaint charging restraint of trade based on a supplier's substitution of one distributor for another must allege anticompetitive effect at the interbrand level of competition to survive a Rule 12(b)(6) motion for failure to state a violation of section 1 of the Sherman Act."); *see also Orson, Inc.*, 79 F.3d at 1372 (rejecting vertical restraint claim based on movie distributor's agreement with theater limiting the sale of the

distributor's first-run movies: although the agreements "most certainly reduced intrabrand competition," they "undeniably promoted interbrand competition" and thus "did not produce the anticompetitive effects the Sherman Act was designed to prevent").

## 2. Redbox's Allegations Of Injury to Itself and Injury to *Intra-brand* Competition Do Not Satisfy the Requirement of Pleading Harm to Competition.

Redbox alleges that Fox's distribution policy injures competition by preventing Redbox from "hav[ing] access to new-release Fox DVDs through its normal wholesale channels" and thereby "preventing consumers from renting new-release Fox DVDs from Redbox[.]" (Compl. ¶¶ 38, 39.) But Redbox's allegations of injury to a *single competitor* or to a *single brand* do not withstand scrutiny and, in any event, are insufficient as a matter of law to satisfy the requirement of pleading injury to *market-wide competition*.

*First*, the Complaint does not allege that *Redbox* has been foreclosed from obtaining Fox DVDs to rent in its kiosks. Rather, Redbox alleges that it cannot obtain new-release Fox DVDs through its "normal wholesale channels," identifying Ingram and VPD only. (Compl. ¶ 38.) The Complaint does not state that Redbox is foreclosed from obtaining Fox DVDs from sources other than VPD and Ingram. For example, Redbox does not allege that it cannot obtain Fox DVDs from retailers, such as Best Buy and Wal-Mart. Nor does Redbox allege that it cannot obtain Fox DVDs from Fox directly. In fact, Fox was willing to provide new-release DVDs directly to Redbox; Redbox rejected the offer. (*Id.*, Ex. C.)

In this regard, Redbox's allegations against Fox differ significantly from its allegations against Universal. In its Amended Complaint against Universal, Redbox alleged that it was completely foreclosed from renting and reselling new-release Universal DVDs because Universal organized an alleged "boycott" among several sources of supply, including "Ingram, VPD, and other distributors and retailers, including Best Buy and Wal-Mart." (Universal Op. at

18

7.) Absent factual allegations that Redbox is foreclosed from obtaining Fox DVDs, Redbox cannot assert that it has been injured, let alone that market-wide competition is injured.[8]

*Second*, even if Redbox could plead that it was completely foreclosed from obtaining new-release Fox DVDs, that would not satisfy the requirement of pleading injury to *competition* under Section 1. The law draws a significant distinction between a business practice that injures a particular *competitor*, and a business practice that injures market-wide *competition*. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'") (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis in the original); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) ("[B]ecause 'antitrust law aims to protect competition, not competitors, [a court] must analyze the antitrust injury question from the viewpoint of the consumer.'") (quoting *Alberta Gas Chems., Ltd., v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1241 (3d Cir. 1987)).[9] Thus, even if Redbox

---

[8]  *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (rejecting argument that alternative distributors were "inadequate substitutes" because the "antitrust laws were not designed to equip the plaintiffs' hypothetical competitor with [the defendants'] legitimate competitive advantage") (citations omitted); *Seagood Trading Corp.*, 924 F.2d at 1573 (finding no anticompetitive impact where plaintiffs not foreclosed from every alternative).

[9]  In its order denying Universal's motion to dismiss Redbox's antitrust claims, the Court concluded that Redbox had sufficiently pled that Universal had caused "anticompetitive effects, specifically *Redbox's* inability to compete in the DVD rental and sales markets of *Universal DVDs*." (Universal Op. at 10 (emphasis added).) The Court, therefore, appeared to equate injury *to Redbox* with injury *to competition*. But alleged injury to a single retailer (Redbox) of a single brand of DVD rentals (in that case, Universal DVDs — in this case, Fox DVDs) is insufficient as a matter of law to plead injury to market-wide competition for DVD rentals.

19

could assert its own foreclosure from Fox DVDs, that does not state injury to *competition* as a matter of law.[10]

*Third*, Redbox cannot plead that intra-brand competition for rental of Fox DVDs will be hurt. Redbox is not the *only* company renting Fox DVDs. Redbox admits that there are *competing retailers* who rent Fox DVDs. (Compl. ¶¶ 17, 19, 22.) Other companies — such as Blockbuster, Netflix, local DVD rental stores, etc. — also offer Fox DVDs in competition with each other and Redbox. (*See* Coinstar Inc. 10-K dated Feb. 26, 2009 at Item 1.A, attached as Ex. D to Horowitz Decl. (listing competitors).) Redbox does not, and cannot, allege that these many other rental companies will stop competing just because Redbox no longer purchases new-release Fox DVDs through Fox's distributors.[11] In other words, Redbox's *conclusion* that prices will rise because *Redbox* will no longer offer Fox DVDs simply restates the allegation that injury

---

[10] *See, e.g., Perry v. Rado*, 504 F. Supp. 2d 1043, 1047 (E.D. Wash. 2007) (dismissing the complaint where "[t]he allegations in [the] [c]omplaint [we]re concerned with the impact on [the plaintiff] . . . rather than with injury to competition in general") (footnote reference omitted); *Tigard Elec. v. Nat'l Elec. Contractors Ass'n*, 790 F. Supp. 1498, 1503 (D. Or. 1992) ("Plaintiffs are essentially complaining not that *competition* is being injured, but that they, as *competitors*, are being injured . . .") (emphasis in the original); *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (affirming, in part, dismissal of complaint that failed to allege "an *actual* adverse effect on competition as a whole in the relevant market; to prove [that plaintiff] has been harmed as an individual competitor will not suffice") (citation omitted) (emphasis in the original); *Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987) (granting the motion to dismiss and noting that "[i]ndispensable to any section 1 claim is an allegation that *competition* has been injured rather than merely competitors") (citation omitted) (emphasis in the original); *IDT Corp.*, 2005 WL 3447615, at *8.

[11] *See Associated Gen. Contractors v. Cal. State Counsel of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not, however, proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.").

to Redbox equals injury to competition — the very proposition that case after case has rejected. *See, e.g., George Haug Co.*, 148 F.3d at 139; *Rutman Wine Co.*, 829 F.2d at 734.

## C.    Redbox Asserts An Implausible Market Definition.

This motion to dismiss Redbox's Section 1 claim can be granted for the additional, independent reason that Redbox fails to allege a product market satisfying applicable legal standards.

As discussed at Part I.A above, Redbox is unable to allege that Fox's distribution policy injures *market-wide, inter-brand competition*. Recognizing this, Redbox attempts to re-draw the market, alleging that *every single DVD comprises its own relevant market*. (Compl. ¶ 60.) In other words, according to Redbox's pleading, a customer interested in renting one DVD would never substitute with another DVD rental. By alleging markets consisting of a single product where no two DVDs ever compete, Redbox apparently hopes that alleging injury to *Redbox's sales of Fox DVDs* equates to alleging injury to competition *market-wide*.

Redbox's attempt to gerrymander its market definition to avoid dismissal of this case for failure to allege injury to inter-brand competition does not work because its market definition is not viable. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997) (citing cases). Redbox's reference to single-DVD product markets defies legal precedent and common sense.

*First*, Redbox's allegation that DVDs have no economic substitutes, or are "price inelastic," because they are copyrighted is conclusory and finds no support in the law. (*See*

Compl. ¶ 23 ("The demand for new-release DVDs is price inelastic due to the monopoly power arising from Fox's government-granted copyright.").) Courts have rejected the idea that a copyrighted product necessarily comprises its own antitrust market.[12] This is because the uniqueness of a product does not mean that it lacks economic substitutes. The Supreme Court also recently rejected the proposition that an intellectual property right (in that case, a patent) necessarily confers market power.[13] Just as the fact that a product is patented cannot support a presumption of market power, neither can the fact that a product is copyrighted. Thus, the mere fact that Fox DVDs are copyrighted intellectual property does not in any way establish that each is its own economic market or that Fox has market power.

   *Second*, with certain extreme exceptions not applicable here,[14] courts have consistently rejected "single product" markets at the pleading stage, including in the context of copyrighted

---

[12] *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956) (trademarked products do not themselves constitute product markets); *E-Z Bowz, LLC v. Prof'l Prod. Research Co.*, No. 00 8670, 2003 WL 22068573, at *27 (S.D.N.Y. Sept. 5, 2003) (reasoning that "it is obvious that merely obtaining a patent for a product does not create a product market for antitrust purposes") (citation omitted); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 265-66 (S.D.N.Y. 2000) (dismissing Section 1 antitrust claim because proposed market for licensing of copyrighted makeup designs and other intellectual property relating to *Cats* Broadway show was implausibly narrow).

[13] *See Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006) (holding that the mere fact that a product is patented does not support a presumption of market power); *see also Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 967 (9th Cir. 2008) ("Because intellectual property rights are no longer presumed to confer market power, [plaintiff's] conclusory allegation that [defendant's] intellectual property rights nonetheless do confer market power, unaccompanied by supporting facts, is insufficient.") (citing *Illinois Tool Works, Inc.*, 547 U.S. at 42-43.)

[14] For example, a single-brand product market may exist for after-market replacement parts required for a single-brand of equipment (e.g. custom parts for a brand-name copy machine). In that situation, it may be impossible for the consumer to substitute for the brand-name component part.

entertainment. *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) is instructive. There, plaintiff proposed a market consisting of advance sales tickets to *Phantom of the Opera*. *Id.* at 154. On defendant's motion to dismiss, the court rejected plaintiff's proposed market definition, finding that plaintiffs had failed to provide a rational explanation as to "why other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events are not adequate substitute products." *Id.* at 154-155; *see also Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 679 (S.D.N.Y. 1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces."). Thus, courts repeatedly grant motions to dismiss complaints attempting to plead single-product markets, understanding that overly narrow market definitions can be used to hide the inability to plead injury to market-wide competition.[15]

*Third*, Redbox's assertion that each new-release DVD comprises its own market defies common sense and thus fails under *Iqbal*. *Iqbal*, 129 S. Ct. at 1950 (court must "draw on [their] judicial experience and common sense" to determine whether allegations "plausibly" allege entitlement to relief). Consider an example. According to Redbox's theory, the Fox DVD

---

[15] *See Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461, at \*9-10 (E.D. Tenn. Aug. 20, 2008) (dismissing complaint with prejudice on the grounds that there was not a single-brand market despite allegations that demand for the product was "inelastic"); *Hack v. President and Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) (allegation that Yale was "without substitute or equal" and so there was a product market consisting of "Yale education" was untenable), *abrogated on other grounds, Swierkeiwicz v. Sorema*, 534 U.S. 506 (2002); *UGG Holdings v. Severn*, No. 04-1137, 2004 WL 5458426, at \*4 (C.D. Cal. Oct. 1, 2004) (dismissing complaint that limited the relevant market to "sheepskin, fleece-lined boots" where there were no allegations regarding why other types of boots were not acceptable substitutes); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993) (dismissing complaint and rejecting proposed market consisting of single computer program for elementary school students).

"Aliens in the Attic," listed in Exhibit D[16] to the Complaint, does not compete with any other DVD created by Fox or any other studio. If Redbox's theory is true, then Fox and retailers who rent that DVD have monopoly power and should be able to command any price they want for the DVD upon its release because the DVD would have no competition from other DVDs. *See, e.g., Syncsort Inc. v. Sequential Software, Inc.,* 50 F. Supp. 2d 318, 329 (D.N.J. 1999) ("Monopoly or market power has been defined as the power to control prices or exclude competition in the relevant market.") (citations omitted). Yet Redbox does not, and cannot, allege that Fox or retailers of Fox DVDs can demand any price they want for this movie without regard to competition from other DVDs. Indeed, the Complaint itself alleges that there is price competition amongst DVD rental companies. (Compl. ¶ 17.) Moreover, Redbox's market definition assumes that a patron searching for one movie would never consider renting other movie titles in its place.[17] That is inconsistent with common experience and not supported by factual allegations. Because Redbox fails to allege a plausible product market, its antitrust claims should be dismissed. *See Iqbal,* 129 S. Ct. at 1950; *see also Queen City,* 124 F.3d at 430.

*Fourth,* Redbox's assertion that each new-release DVD comprises its own market because studios time their releases to avoid competition (*see* Compl. ¶ 24) collapses under

---

[16] Redbox attaches to its Complaint a list of Fox DVDs it claims it can no longer purchase through "normal wholesale channels." (Compl. ¶ 38; *id.* Ex. D.) So, according to Redbox, each of the DVDs listed on Exhibit D comprises its own separate product market. Redbox, however, does not attempt to allege why any of these particular titles has no reasonable substitute. Instead, Redbox relies only on sweeping assertions about consumer preferences without alleging any supporting facts. These kinds of conclusory allegations do not overcome a motion to dismiss. *See Iqbal,* 129 S. Ct. at 1950 ("conclusions [] are not entitled to the assumption of truth").

[17] For purposes of this Motion, Fox uses examples concerning alternative DVD rentals. Fox does not concede that the product market consists of DVD rentals alone.

Redbox's own factual allegations. Redbox defines "new release" as DVDs that are within 30 days of their release date. (*Id.* ¶ 21.) To support its market definition, Redbox would need to allege for each DVD that no other DVD to which consumers would substitute exists within that 30-day period.[18]

But Redbox's *factual* allegations illustrate just the opposite. For example, referencing box office releases that are allegedly analogous to DVD releases, Redbox states that "Fox avoided head-to-head competition with '*War of the Worlds*' during a coveted Fourth of July weekend by releasing its '*Fantastic Four*' a week later. Similarly, Warner Brothers released '*Batman Begins*' in mid-June, thereby avoiding competition with Fox's '*Fantastic Four*.'" (*Id.* ¶ 24.) Redbox thus *admits* that these three movies *compete with each other* — the only issue is timing. (*See, e.g., id.* ¶ 24 ("Fox avoided *head-to-head competition* . . . "); *id.* (Warner Brothers "avoid[ed] *competition*").) This contradicts Redbox's earlier proposition that DVDs cannot compete because they are each unique, copyrighted works.

These allegations also contradict Redbox's statement that release dates are scheduled so as to completely avoid inter-brand competition. This is because the alleged release periods for each of these movies *overlap*. Specifically, "*Batman Begins*" was allegedly released in "mid-June"; "*War of the Worlds*" was allegedly released on July 4th; and "*Fantastic Four*" was allegedly released "a week later." (*Id.* ¶ 24.) Thus, each movie would be considered a "new-release" (i.e., according to Redbox's definition, a movie that is within 30 days of its release date)

---

[18] Significantly, as further evidence that Redbox has attempted to impermissibly gerrymander its proposed product market, Redbox's definition of what constitutes a "new-release" DVD differs across the separate complaints it filed against Fox, Universal and Warner. While Redbox defines "new-release" DVDs here as DVDs within "30 days of their street date" (Compl. ¶ 21), in the Warner complaint, the new-release period is 28 days (Warner Compl. ¶ 20) and in the Universal Complaint, the period is 45 days (Universal Am. Compl. ¶ 31.)

25

simultaneously. In short, the example intended to show that each new-release DVD has *no substitute* during its new-release period proves just the opposite: three competing movies, produced by different studios, have 30 day new-release periods that substantially overlap. Thus, Redbox's single-DVD market definition does not overcome its own factual allegations. Because Redbox has not alleged a plausible antitrust market, its Section 1 claims should be dismissed. *See, e.g., Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (dismissing Section 1 claim due to the party's failure to properly allege a relevant product market); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 565 (E.D. Pa. 2002) (dismissing Section 1 claim because "[p]laintiff never alleges how trade has been restrained, or how the market in which [p]laintiff does business has become less competitive due to the actions of Defendant").

Redbox also does not plead a plausible antitrust market by its alternative allegation that the relevant market consists not of each individual DVD, but the newly-released DVDs in each genre or category. (*See* Compl. ¶ 27.) Apart from failing for vagueness,[19] Redbox does not offer any basis for concluding that DVDs in one genre do not compete with another. So, for example, Redbox alleges no facts supporting its theory that someone interested in renting an "action/adventure" DVD would not also consider renting a "sci-fi" or "suspense" DVD. Experience tells us that many people do not have monolithic tastes in film. Someone can enjoy

---

[19] For example, is *"Terminator"* considered "action/adventure," "sci-fi," or "suspense"? (*See id.* ¶ 25.) This is reason enough to reject the alleged market. *See, e.g., Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Ten. 2004) (dismissing complaint where "Plaintiff's attempted definition of the relevant product market [was] insufficient and fatally vague") (citation omitted).

both "comedy" and "drama," "action/adventure" and "science fiction," etc. Redbox's genre-based approach to market definition, therefore, on its face fails to account for "all interchangeable substitute products" and thus cannot support a Section 1 claim. *See Queen City Pizza, Inc.*, 124 F.3d at 436.

Just as significant, even if Redbox's genre-based market definition were workable (and it is not), a genre-based market would contain *multiple brands* and thus would require Redbox to allege injury to market-wide, *inter-brand* competition. The example discussed above illustrates that three studios released three movies within the same genre within thirty days of each other. If the market is defined as new-release DVDs within a given genre, then these three movies produced by three different studios *compete*. In other words, a genre-based market would not only include Fox DVDs within the genre, but other studios' DVDs as well. To state a Section 1 claim, therefore, Redbox would need to allege that Fox's distribution decisions harm *inter-brand* competition — something that Redbox has not and cannot do.

## II. Redbox's Copyright Misuse Claim Fails Because Copyright Misuse is an Affirmative Defense, Not a Claim.

In Count I of its Complaint, Redbox seeks a declaration that Fox's actions with respect to VPD and Ingram constitute copyright misuse. (Compl. ¶¶ 41-46.) But copyright misuse is an equitable defense to a copyright infringement claim; not an affirmative cause of action. *See, e.g., Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 203-04 (3d Cir. 2003) (refusing to apply copyright misuse doctrine to licensing agreements); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005) (copyright misuse is not an independent claim where there has been no allegation of copyright infringement); *Ticketmaster, L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1198-99 (C.D. Cal. 2008) (copyright misuse is only an affirmative defense to a claim for copyright infringement and does not support an independent

27

claim for damages); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1225-1226 (C.D. Cal. 2003) (dismissing defendant's claim for declaratory relief as to copyright misuse); *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1199 n.4 (N.D. Cal. 2004) ("Plaintiffs cite no legal authority, and the Court is aware of none, that allows an affirmative claim for damages for copyright misuse").

Redbox's copyright misuse claim against Fox is nearly identical to its copyright misuse claim against Universal. (*Compare* Universal Am. Compl. ¶¶ 57-63 with Compl. at ¶¶ 41-46.) This Court dismissed Redbox's copyright misuse claim against Universal, concluding that "[c]opyright misuse is not a claim, but a defense, and Redbox may not create a justiciable claim for copyright misuse in this jurisdiction by labeling Count I as one seeking declaratory relief." (Universal Op. at 6 (citing *Arista Records v. Flea World, Inc.*, 356 F. Supp. 2d 411, 428 (D.N.J 2005)).) Nothing in Redbox's Complaint against Fox warrants a different result here. Accordingly, Redbox's copyright misuse claim should be dismissed.

## III. Redbox's Tortious Interference Claim Fails Because Redbox Cannot Allege That Ingram or VPD Breached Their Contract With Redbox.

To state a claim for tortious interference, Redbox must plead (1) the existence of a valid contract between Redbox and Ingram/VPD; (2) Fox's knowledge of those contracts; (3) Fox's intentional interference with those contracts; (4) a breach of contract by VPD and Ingram; and (5) damages. (Universal Op. at 10 (citation omitted)); *see also In re Frederick's of Hollywood, Inc. Shareholders Litig.*, No. 15944, 1998 WL 398244, at *5 (Del. Ch. July 9, 1998). Here, as with its tortious interference claim against Universal, Redbox's claim fails because Redbox cannot allege that VPD or Ingram breached their alleged agreements with Redbox. Redbox attached its contract with Ingram as Exhibit A to the Complaint. Redbox alleges that this contract is "similar" to its contract with VPD. (Compl. ¶ 32.) Because the contract is attached to

Redbox's Complaint, the Court may consider Redbox's claims in light of the Ingram contract. *See, e.g., Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("Generally, in ruling on a motion to dismiss, a district court relies on the complaint [and] attached exhibits . . .") (citation omitted).

The contract between Redbox and Ingram does not in any way guarantee that Ingram will provide Fox DVDs to Redbox. The operative terms of the Redbox-Ingram contract appear to be the same as those in the Redbox-Ingram contract attached to Redbox's Complaint against Universal. (*See* Universal Op. at 11-12.) Upon reviewing that contract, this Court stated that "Ingram's contractual obligations to Redbox do not include the guaranteed provision of Universal DVDs upon Redbox's demand." (*Id.* at 10.) The Court concluded that "[b]ecause the contract does not obligate Ingram to unconditionally deliver Universal, or any, DVDs to Redbox, Ingram's decision not to supply Redbox with Universal DVDs technically is not a breach of the agreement between Redbox and Ingram." (*Id.* at 11-12.)

In this case, the contract between Redbox and Ingram likewise contains no unconditional obligation to provide Fox DVDs to Redbox and "cautions that Ingram's timely delivery to Redbox is conditioned on 'Ingram Entertainment's suppliers mak[ing] timely delivery to Ingram." (*Id.*) Because Redbox states that its VPD agreement is similar to its agreement with Ingram, the Court may conclude that the Redbox-VPD agreement is also conditioned on Fox's delivery of DVDs to VPD. Accordingly, Redbox's tortious interference claim fails because Redbox cannot allege that Fox caused VPD or Ingram to breach their alleged agreements with Redbox.[20] (Universal Op. 11); *Luscavage v. Dominion Dental USA, Inc.*, No. 06C-07-219, 2007

---

[20] Redbox's tortious interference claim also fails because Fox is "privilege[d] to protect [its] business affairs in a lawful manner." (Universal Op. at 12 (citing *DeBonaventura v.*

WL 901641, at *2 (Del. Super. Ct. Mar. 20, 2007) (dismissing tortious interference claim because plaintiff failed to adequately plead a breach of contract).

## CONCLUSION

For the foregoing reasons, Fox respectfully requests that the Court grant this motion and dismiss Redbox's Complaint with prejudice.

Dated: October 1, 2009

Respectfully submitted,

/s/ Beth Moskow-Schnoll
Beth Moskow-Schnoll (No. 2900)
BALLARD SPAHR LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel:    (302) 252-4447
Fax:    (302) 355-0221
Email: moskowb@ballardspahr.com

---

*Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)). Delaware courts rely on Section 773 of the Second Restatement of Torts which "provides a defense [to a tortious interference claim] to a party who, in good faith, 'assert[s] a legally protected interest of [its] own.' (Universal Op. at 12 (citing Restatement (Second) of Torts § 773 (1979).) "To qualify for the defense available under § 773, the defending party must '(1) [have] a legally protected interest, and (2) in good faith assert [] or threaten[] to protect it, and (3) the threat is to protect it by appropriate means.'" (Universal Op. at 12 (citing Restatement (Second) of Torts § 773 (1979).) Here, because Fox acted in good faith in exercising its right to control its own distribution chain, it cannot be liable for tortious interference.

Neal Walters
BALLARD SPAHR LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043
Tel: (856) 761-3438
Email: waltersn@ballardspahr.com

*Attorneys for Twentieth Century Fox Home Entertainment, LLC*

OF COUNSEL

Yosef Riemer (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York City, NY 10022
Tel: (212) 446-4802
Email: yosef.riemer@kirkland.com

Corey C. Watson (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017
Tel: (213) 680-8482
Email: corey.watson@kirkland.com