## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | Civil Action No. 09-592-RBK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| vs. | ) | |
| | ) | |
| | ) | |
| TWENTIETH CENTURY FOX HOME | ) | |
| ENTERTAINMENT, LLC | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED COMPLAINT

Plaintiff Redbox Automated Retail, LLC ("Redbox") makes the following allegations against Defendant Twentieth Century Fox Home Entertainment LLC ("Fox" or "Defendant"):

### OVERVIEW

1.    Redbox is the nation's leading, low-cost alternative for consumers to rent DVDs for home entertainment.  Redbox rents and sells digital video disks ("DVDs") to consumers through innovative, consumer-friendly means: automated, self-service kiosks located at various retail outlets.  Consumer demand for Redbox has exploded since the company's inception in 2002, primarily due to Redbox's efficient means of providing consumers with low-cost, easily accessible DVD releases on the day those new-release DVDs become available to the general public.

2.    Historically, the movie industry has weathered recessions — and even a depression — better than most other sectors of the economy.  People simply need some form of release from their financial pressures, even if just for a couple of hours, during tough economic times.  Redbox offers that release to millions of consumers across America through a simple,

831758

$1.00 per night value proposition.  Despite clear consumer preference to move to this lower-priced alternative during this recession, Fox seeks to strangle that alternative to prop up an artificially high pricing scheme.  Fox's tactics — cutting off all source of supply unless Redbox acquiesces to a business-killing "blackout period" — hearkens back to the days when Fox and other providers of DVDs controlled the entire distribution chain under the old "studio system," when they sought to choke off the supply of content to the new television medium during its infancy, and later, when they fought the introduction of the VCR in the 1980s.  Now, despite the fact that consumers are being battered by one of the toughest recessions in history, Fox again wants to restrict supply and impose higher prices.

3.      Fox seeks to eliminate consumers' ability to enjoy low-cost new-release DVD rentals from Redbox.  Specifically, on August 5, 2009, Fox contacted the two firms that distribute new-release DVDs to Redbox, Ingram Entertainment, Inc. ("Ingram") and Video Product Distribution ("VPD"), as well as all of Fox's other distributors, and asked for confirmation that they would agree to withhold new-release DVDs from Redbox because Redbox refused to agree to a 30-day blackout period during which consumers would be allowed to procure these DVDs only through more expensive channels.  Fox told the distributors that, absent agreement, it would eliminate all supply to them.  Faced with the choice Fox provided to them, the distributors agreed to Fox's request and thereby chose to join Fox's boycott.  Obtaining agreement of the distributors was critical to Fox's illegal plans.  Absent assurance that all distributors would not sell to Redbox, Fox's plan would fail.

4.      Consumer demand for a DVD is at its highest immediately after its release and declines substantially within a period of weeks thereafter.  Fox's unlawful actions harm consumers by decreasing the available supply of copyrighted new-release DVDs, reducing

consumer choice in the marketplace and increasing the prices that consumers must pay.  Fox

seeks to unlawfully eliminate the popular and growing kiosk distribution channel, which

provides low-cost, highly-convenient new-release DVD rental.  Fox seeks to eliminate

consumers' ability to enjoy Redbox's "Dollar-Per-Night" rental rate for new-release DVDs.

5.     Fox's actions constitute copyright misuse, violate the antitrust laws, tortiously

interfere with Redbox's existing supply contracts with its distributors and with its

prospective business opportunities, and constitute unfair competition.   Redbox seeks the

following relief against Fox: (1) declaratory relief; (2) injunctive relief; (3) money damages;

(4) attorneys' fees and costs; and (5) such further relief as this Court deems just and

appropriate.  In particular, Redbox is entitled to a declaration that Defendant's conduct

renders its copyrights unenforceable so long as Fox continues to engage in its inequitable

and illegal conduct.

## THE PARTIES

6.     Redbox is a Delaware limited liability company with its principal place of

business in Oakbrook Terrace, Illinois.

7.     Fox is a Delaware limited liability corporation with its principal place of

business in Los Angeles, California.  Fox is one of the world's leading distributors of

motion pictures.  Fox, directly or through its affiliates, is engaged in the business of

developing, producing, and distributing to others copyrighted motion pictures and other

video entertainment in the United States and throughout the world.  Fox is a subsidiary of

News Corporation, the film, television, cable and publishing conglomerate owned by Rupert

Murdoch.  Some of Fox's more popular movie franchises include the *Star Wars, Ice Age, X-*

*Men, Die Hard, Alien,* and *Predator* series.

8.     Fox distributes DVDs by and through various distributors, including Ingram and VPD, both of which, in the absence of Fox's illegal and tortious behavior, would continue to sell DVDs to Redbox as they have done for years.  VPD and Ingram are important wholesale distributors for Fox, whose cooperation was critical to Fox's plan to effectively prevent Redbox from obtaining new-release DVDs.

9.     Non-party Ingram is a Tennessee corporation with its principal place of business in La Vergne, Tennessee.  Ingram is a wholesale distributor of DVDs.  As a wholesale distributor, Ingram maintains numerous warehouses filled with DVDs, including new-release DVDs.  Ingram periodically replenishes the stock in its warehouse by ordering large quantities of DVDs from Fox, as well as other providers of DVDs.  Orders are placed in bulk, not by customer.  Ingram also has overstock DVDs that are available for sale.  Ingram has, since the effective date of the Fox boycott (October 27, 2009), refused to sell any such products to Redbox.

10.     Non-party VPD is a California corporation with its principal place of business in Folsom, California.  VPD is a wholesale distributor of DVDs.  As a wholesale distributor, VPD maintains numerous warehouses filled with DVDs, including new-release DVDs. VPD periodically replenishes the stock in its warehouse by ordering large quantities of DVDs from Fox, as well as other providers of DVDs.  Orders are placed in bulk, not by customer.  It also has overstock DVDs that are available to purchasers, but not to Redbox.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction exists over Counts I, II, III, IV and V of this action pursuant to 28 U.S.C. § 1331, 17 U.S.C. §§ 101, *et seq.* (Copyright Act) and 15 U.S.C. §§ 1, *et seq.* (Sherman Antitrust Act), and 28 U.S.C. §§ 1337, 1338.  Supplemental subject matter jurisdiction over Count VI exists pursuant to 28 § U.S.C. 1367.  Pursuant to 28 U.S.C. §§

2201-02, this Court may declare the rights and other legal relations of the parties because there exists an actual controversy between them.

12.     Personal jurisdiction exists over Fox because it does business and resides in the State of Delaware.  Venue is proper pursuant to 28 U.S.C. § 1391 because Fox is organized under the laws of the State of Delaware and thus "resides" for purposes of § 1391 within that state.

## FACTUAL ALLEGATIONS

### A.     Redbox's Consumer-Friendly Business Model

13.     Since the introduction of DVDs into the marketplace, the DVD has become the dominant medium for the distribution of movies for home viewing.

14.     Redbox was founded in July 2002, when the company deployed DVD rental kiosks in a "test market" in Washington, D.C.  After initial success in that market, Redbox chose Las Vegas, Nevada as a second "test market" in 2003.  These test markets established that consumers would enthusiastically turn to this convenient, low-cost source for new-release DVD rentals and sales, and the company expanded.

15.     Redbox is an innovator.  It has developed a highly-convenient, yet low-cost, option for consumers wishing to obtain DVDs.  Redbox provides DVDs to consumers through a nationwide network of over 17,000 self-service kiosks.  Each kiosk features an interactive touch screen and sign, a robotic disk array system and a web-linked electronic communications system that allows customers to rent or buy DVDs.  Kiosks typically hold up to 700 DVDs comprising 70 to 200 individual titles.  The kiosks are updated weekly with a supply of new-release DVDs.  A single kiosk may hold up to as many as forty-five (45) copies of a popular new-release DVD.

16.     Consumers use credit cards to rent or purchase DVDs from Redbox.  They can also search for and reserve DVDs online through Redbox's website.  Consumers enjoy the ability to rent DVDs at one location and return them at any other Redbox location, thanks to Redbox's patented rent and return system.  For instance, a family can rent the latest Disney movie at a McDonald's restaurant on Friday night, and return it to their neighborhood Albertson's supermarket when shopping the next day.  In 2007, readers of "SelfServiceWorld" magazine ranked Redbox as the No. 1 self-service application, besting other kiosks deployed by NCR, IBM, Kodak and Starbucks, among others.

17.     Consumers love Redbox.  Consumer demand for Redbox rentals and sales has grown substantially in the last five years.  Redbox had 125 kiosks in 2004, had nearly 6500 by the end of 2007 and had over 12,000 kiosks nationwide at the end of 2008.  Consumer demand has enabled Redbox to surpass Blockbuster, Inc.  Redbox now has nearly four times the number of DVD rental locations in the United States than Blockbuster has.  To date, consumers have rented nearly 500 million DVDs from Redbox.  Consumers average approximately 50 DVD rentals per day per kiosk, and in the first half of 2009, Redbox rented an average of 27 million DVDs per month.  Indeed, consumer demand has supported Redbox's expansion such that Redbox installed a new kiosk, on average, every 58 minutes somewhere in the United States this year.  As part of this expansion, Redbox hired over 600 new employees during the past year.

**B.     The Market For Redbox DVD Rental**

18.     Consumers currently find Redbox kiosks located in retail outlets such as McDonald's restaurants, Wal-Mart stores, grocery stores such as Albertson's, Kroger, Stop & Shop, Harris Teeter, and Meijer's, convenience stores like 7-Eleven, and drug stores such as Walgreen's, throughout the continental United States and Puerto Rico.  Redbox has contracts

with these retail outlets.  Much of Redbox's success depends on maintaining a business model that satisfies the expectations of the retail outlets and consumers.

19.     Consumers seeking to rent a new-release DVD generally search by specific title, or by category or genre.  Video rental stores are laid out this way.  So are video rental websites and so, too, are the menus of Redbox DVD rental kiosks.  This is because consumers seeking to rent a new-release musical comedy DVD are generally not interested in renting or buying a new-release action DVD.  Accordingly, Redbox, like others in the new-release DVD rental and resale business, categorizes each DVD by title, release date and also by category or genre.

20.     Consumers can also purchase previously-viewed new-release DVDs from Redbox, typically beginning 12 days after their release, for as little as $7.

21.     Consumer preference for Redbox rentals can largely be attributed to its ability to conveniently provide consumers with low-cost rentals on or soon after the day that a DVD is released by a studio and made available for home viewing.  This release date is known as the "street date." By industry convention, the "street date" for nearly every new-release DVD is on Tuesday of the week of its release.  Consumer demand for a new-release DVD is the highest during the weekend immediately after its street date and declines substantially thereafter.  Over thirty percent of a new-release DVD's revenue is generated during the first two weeks of its release.  More than sixty percent of the rental demand for a particular title occurs within forty-five days of the street date.  In this Complaint, a "new-release" DVD refers to those DVDs that are within 30 days of their street date.

22.     The primary reason that consumers prefer using Redbox, rather than alternative means such as brick and mortar stores, is Redbox's low cost.  Whereas consumers can rent from Redbox for $1 per night, the average cost per rental from other sources is $3.41.  Through

convenience and lower cost per rental, Redbox saves consumers a total of more than $38 million per month.  The result of Redbox's more efficient distribution of new-release DVDs is not just lower prices.  Redbox customers report that they watch 20% more films because of Redbox's low-cost, consumer-friendly model.

C.      **The New-Release DVD Industry And Markets**

23.     New-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first date they appear on the shelf. Because consumer demand for a particular new-release DVD is highest while new on the market, consumer demand for a new-release DVD is different from consumer demand for back-catalog DVDs, i.e., DVDs that have been on the market for longer periods.  Like the difference between fresh produce and canned goods, or the difference between first-run theatrical films and older films that are displayed in smaller theaters and at lower prices, new-release DVDs constitute a separate market.  In economic terms, the cross-elasticity of demand between new-release DVDs and back catalog items is low.  This is reflected, among other ways, by different pricing and different marketing for new-release DVDs, as opposed to older, back-catalog DVDs.  The demand for new-release DVDs is price inelastic due, in part, to the monopoly power arising from government-granted copyrights.  New-release DVDs also are relatively insensitive to changes in price because of the manner in which the market for a new-release DVD is structured by the providers of new-release DVDs, including, for example, the staging of the street dates for new-release DVDs to avoid competition among new-release DVDs of the same genre.  Other relevant characteristics of the markets for new-release DVDs are set forth in the following paragraphs.

24.     Fox recruits new audiences for each of its theatrical films by advertising on its television and cable networks, and then attempting to ensure that the audience will not defect to

another film by scheduling, or rescheduling, the release date of its film to a date when there will be no competition. For instance, the National Research Group supplies a "Competitive Positioning" report to major providers of DVDs. The NRG polls likely moviegoers to project how well upcoming movies will do against each other in each audience quadrant (males under 25, males over 25, females under 25, females over 25) should they be released during the same time period. A "losing" provider will reschedule the release of a film to a different time period, even if it is less advantageous (i.e. not the summer and not the holidays). For instance, Fox avoided head-to-head competition with *"War of the Worlds"* during a coveted Fourth of July weekend by releasing its *"Fantastic Four"* a week later. Similarly, Warner Brothers released *"Batman Begins"* in mid- June, thereby avoiding competition with Fox's *"Fantastic Four."* As a result all three films won their weekend box office and could advertise themselves, as *Fantastic Four* did, as "America's No. 1 hit." On information and belief, the providers of DVDs apply a similar approach to scheduling the release dates for their new-release DVDs.

25.    Because of this industry practice, a particular new-release DVD is generally not an acceptable substitute for another new-release DVD. Providers of DVDs work hard to ensure that a release in a particular category, or genre, does not share its street date with another release in the same category or genre. Moreover, consumers seeking to rent a new-release DVD generally search by title, or by genre. Video rental stores are laid out this way. So are video rental websites and so, too, are the menus of Redbox DVD rental kiosks. This is because consumers seeking a family-oriented new-release DVD will not often rent a new-release action DVD instead. Accordingly, Redbox, like others in the new-release DVD rental business, categorizes DVDs by title, by release date and also by their genre. Each category, or genre, constitutes a distinct submarket within the overall new-release DVD market. Common

categories, or genres, include: action/adventure, comedy, drama, family and kids, horror and sci-fi, suspense and others. There is low cross-elasticity of demand among consumers for new-release DVDs of different genres. Consumers who want to see Keanu Reeves in a science fiction film *(e.g. "The Day the Earth Stood Still")* are unlikely to accept a Jennifer Aniston comedy *("Marley and Me")* instead.

26.     Release dates for new-release DVDs are timed so that a particular new-release DVD title will face as little competition as possible with other new-release DVDs in the same genre. Thus, for example, the Fox DVD *"Marley and Me,"* was released on Tuesday, March 31, 2009, when it directly competed with few, if any, other DVDs in its category.

27.     Because of the inelastic demand for each particular new-release DVD, Fox possesses significant market power for a particular new-release DVD and, in the alternative, within a specific category or genre during the weeks immediately following the street date. Consumers have few, if any, acceptable substitutes for a particular new-release DVD in a particular category or genre during the relevant time period.

28.     Because demand peaks for a new-release DVD in the first weekend following its release, consumers also value Redbox's ability to stock multiple copies (as stated above, as many as 45 copies per kiosk in some instances) of popular, high-demand new-release DVDs.

### D.     Redbox's Relationship With Ingram and VPD

29.     Redbox has historically been able to meet consumer demand for multiple copies of new-release DVDs for rental on a title's street date because of its longstanding contractual and business relationships with its distributors, VPD and Ingram. Redbox has historically purchased all, or nearly all, of its supply of new-release DVDs from these distributors, and Redbox had enjoyed long term, mutually beneficial business relationships with VPD and Ingram.

30.    Redbox has a supply contract with Ingram (the "Ingram Supply Contract" (attached as Ex. A, redacted so as to protect sensitive commercial information)) that gives Redbox the right to purchase DVDs from Ingram, and similarly obligates Ingram to sell to Redbox, upon Redbox's request, DVDs. Specifically, the Ingram Supply Contract requires Ingram to order DVDs from providers of DVDs. The term "providers of DVDs" has, throughout the relationship between Redbox and Ingram, always included Fox and its affiliates.

31.    The Ingram Supply Contract also contains a "DVD Buy Back" clause that permits Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new-release DVD product" pursuant to a timeframe tied to the title's street date. Under this arrangement, Ingram purchases back significant amounts of previously-viewed DVDs from Redbox, and in turn sells them to other buyers in the distribution stream.

32.    Redbox has a similar business relationship with VPD, although the agreement is not reflected in a single integrated document. VPD has always permitted Redbox to buy Fox DVDs from VPD and receive these DVDs in advance of their street date. VPD, like Ingram, holds itself out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood providers of DVDs, which includes Fox. As with Ingram, Redbox is able to sell back significant amounts of previously-viewed DVDs to VPD, which in turn sells them to other buyers in the distribution stream.

33.    Notwithstanding these contractual relationships, VPD and Ingram have informed Redbox that they will bow to Fox's direct demands. Both have stopped filling Redbox's orders for Fox DVDs with release dates beginning October 27, 2009. Absent Fox's unlawful acts, Redbox would have continued to purchase all, or nearly all, of its supply of Fox DVDs from VPD and Ingram beyond October 27, 2009 and into the foreseeable future. Fox's ability to stop

Ingram and VPD from selling to Redbox is due to Fox's dominant market position and monopolistic power within the industry with respect to its unique, new-release DVDs. Based on Fox's communications with the distributors, each distributor has agreed not to supply Redbox. Redbox lacks viable alternative wholesale channels from which to purchase the new- release DVDs that it needs.

> **E.   Fox's Decision To Tortiously Interfere With Redbox's Relationships With Ingram and VPD And To Shut Off Redbox's Supply Of New-Release DVDs**

34.     On August 5, 2009, Chase Carey, Chief Operating Officer of Fox's parent company, stated in a conference call with industry analysts that Fox saw Redbox's competition as a "problem" that News Corporation would "actively" attempt to solve. *(See* Ex. B). Later that day, Fox told Redbox that it was demanding that its wholesalers, including VPD and Ingram, cease selling any new-release DVD to Redbox for at least 30 days after its street date.

35.     But Fox did not stop there. Redbox employees have learned from speaking with VPD and Ingram employees that Fox representatives contacted representatives of both VPD and Ingram, seeking confirmation that both VPD and Ingram would agree to stop selling new-release DVDs to Redbox during the 30-day blackout period. According to Redbox's sources, both VPD and Ingram communicated to Fox that they would agree to stop selling new-release DVDs to Redbox during the 30-day blackout period.

36.     Discovery will show that Fox representatives contacted not only VPD and Ingram, but also numerous other distributors and retailers of DVDs, seeking confirmation that they would agree not to sell new-release DVDs to Redbox during the 30-day blackout period. For example, Redbox representatives have attempted to purchase new-release DVDs from Wal-Mart, Best Buy and Target and have been informed by Wal-Mart, Target and Best Buy that Redbox may not purchase more than three copies of any new-release DVD. Ordinarily, each

- 12 -

retailer has an incentive to sell as many DVDs as possible to any purchaser who walked into a store and wanted to buy DVDs.  It makes no economic sense for any retailer to deny sales to Redbox unless it knows that other retailers have also agreed not to meet Redbox's demand.  On information and belief, Fox continues to seek agreement with, and cooperation from, major wholesalers and retailers to prevent sales of new-release DVDs to Redbox.

37.    News of Fox's attempt to solve its "problem" with Redbox spread quickly, prompting media reports with headlines such as "Fox Tries to Strangle Redbox." (Ex. C). Wholesalers, including VPD and Ingram, agreed to comply with Fox's demand due to Fox's dominant market position with respect to new-release DVDs and their need for the DVDs Fox sells.

38.    Fox's attempt to choke off Redbox's supply of new-release DVDs follows a failed attempt to require Redbox to end its "dollar-a-night" pricing and to force Redbox to substantially raise its prices to consumers.  Redbox refused, and Fox's boycott followed.

**F.    Fox's Actions Are Unlawful And Substantially Harm Both Redbox and Consumers**

39.    Fox's actions, if not remedied by this Court, will restrict output, eliminate competition in the rental and sales markets and artificially raise prices to consumers.  Fox seeks to restrict output, increase prices and artificially control the markets for new-release DVD rentals and re-sales.

40.    Fox has no legally valid right to restrict or govern how or to whom VPD and Ingram resell Fox DVDs that they have purchased.  But because of Fox's monopoly power derived from its government-granted copyrights, and its position within the industry, Fox has the power to unlawfully coerce VPD and Ingram to not sell new-release DVDs to Redbox.  VPD and Ingram have acquiesced to Fox's demands, and accordingly have refused to fill Redbox's orders

for Fox DVDs beginning in October 2009 — even though Redbox is entitled to have these orders filled pursuant to its supply contracts with VPD and Ingram. A list of titles affected by the boycott appears at Ex. D. Thus, as a result of Fox's unlawful acts, Redbox no longer has access to new-release DVDs through its normal wholesale channels.

41. Fox's actions, if allowed to stand unchecked, will artificially constrain output by preventing consumers from renting new-release DVDs from Redbox and other kiosk rental outlets. Fox's actions have no pro-competitive effects.

42. Fox's true purpose in demanding that VPD and Ingram stop selling to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product with a correspondingly high artificial price for rental or re-sale of new-release DVDs. Fox seeks to eliminate the low-cost, highly-convenient and fast-growing Redbox channel, because (1) Redbox (and other independent kiosk vendors) threaten to undercut the artificial pricing of the distribution structure that Fox seeks to establish; and (2) by virtue of its monopoly power, Fox seeks to capture excess revenue from artificially high prices for new-release DVD rentals and re-sales.

43. Simply because Fox views Redbox's efficient, consumer-friendly business model as a "problem" that it wants to "strangle" does not justify the unlawful measures it has taken. Antitrust and copyright laws prohibit Fox's unlawful acts, as does tort law protecting Redbox's longstanding business and contractual relationships with Ingram and VPD and Redbox's prospective business opportunities.

## COUNT I

### DECLARATORY RELIEF: COPYRIGHT MISUSE

44. Redbox incorporates the allegations set forth in paragraphs 1 through 43, above, as if fully set forth herein.

45.    Copyright law provides copyright holders only a limited monopoly in order to enhance retail competition and maximize dissemination of copyrighted works to the general public.  The first-sale doctrine prevents copyright holders from extending the monopoly beyond the initial sale of the copyrighted work.  Thus, Congress expressly provided that "[T]he owner of a particular copy . . . lawfully made under [Title 17 of the United States Code] . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . ." 17 U.S.C. § 109(a).

46.    The public policy behind copyright law favors the enhancement of retail competition and the maximization of dissemination of copyrighted works.  Anti-competitive agreements or anti-competitive behavior, such as an unlawful group boycott, conflicts with this public policy, subverts the goals of copyright law and constitutes "copyright misuse." The doctrine of copyright misuse prevents copyright holders from using their copyright to extend their government-sanctioned monopoly beyond its proper scope.  The existence of such anti-competitive agreements or unlawful activity precludes the enforcement of the copyright during the period of copyright misuse.

47.    Fox's actions with respect to VPD and Ingram are unlawful, contrary to and violative of, the first sale doctrine.  Fox has improperly restricted the statutory right of VPD, Ingram and other wholesalers to sell or otherwise dispose of the DVDs that they have purchased. Defendant's attempts to thwart the first sale doctrine of Section 109(a) of the Copyright Act violate the public policy embodied in the grant of copyright, and constitute copyright misuse.

48.    There is an actual controversy over Fox's copyright misuse because it has now cut off Redbox's wholesale supply sources.  Consumers and Redbox will suffer harm as a result of Fox's coercion of VPD and Ingram to cease selling DVDs to Redbox.

49.     Redbox is entitled to a declaration that Fox's actions constitute copyright misuse and that Fox is precluded from enforcing copyrights for new-release DVDs.  Further, Redbox is entitled to a declaration that so long as Fox continues to engage in its inequitable conduct, Redbox may lawfully reproduce and sell copies of copyrighted DVDs without incurring any liability pursuant to copyright law.

## COUNT II

## VIOLATION OF SHERMAN ANTITRUST ACT: QUICK LOOK DOCTRINE

50.     Redbox incorporates the allegations set forth in paragraphs 1 through 49, above, as if fully set forth herein.

51.     Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

52.     The boycott of Redbox orchestrated by Fox constitutes a naked restraint of trade that will decrease the supply of new-release DVDs in many, or all genres, reduce consumer choice in the various submarkets in the new-release DVD marketplace and artificially increase prices that consumers will have to pay to rent or buy new-release DVDs in those submarkets, thereby negatively affecting consumer welfare.  In simple terms, because of the restraint, there are consumers who want to rent titles like *"Night at the Museum 2"* from Redbox for $1 per night, but will be unable to do so because of the boycott.  These consumers will now either have to pay more elsewhere or do without.

53.     Fox's actions will limit the number of copies of new-release DVDs that individual kiosks may contain and prevent consumers from renting new-release DVDs until 30 days after their street date.  Consumers will face artificially constrained supply and artificially higher prices.

54.     Fox's actions are intended to unlawfully eliminate Redbox's ability to rent or re-sell new-release DVDs and have no pro-competitive effect that would enhance inter-brand or intra-brand competition with rentals or resales through other channels, such as brick-and-mortar stores.  Fox's actions nakedly reduce output and increase prices paid by consumers for new-release DVDs.  Fox's scheme does not enhance competition with new-release DVDs released by other copyright holders.  Fox's actions are so plainly anti-competitive that even a "cursory exam" demonstrates that they constitute unlawful and illegal restraint of trade in violation of Section 1 of the Sherman Act.

### COUNT III

### VIOLATION OF SHERMAN ANTITRUST ACT: MISUSE OF COPYRIGHT ACT

55.     Redbox incorporates the allegations set forth in paragraphs 1 through 54, above, as if fully set forth herein.

56.     Each copyrighted work recorded on DVD constitutes an individual product market.  Each copyrighted work is unique, and each such unique work has been granted a limited governmental monopoly.  The geographic market for each such copyrighted work is nationwide.

57.     A copyright holder enjoys a "distribution right" and may initially sell, or not sell, copies of a copyrighted work to others on such terms as he or she sees fit.  However, the copyright holder's distribution right is limited to the first sale of the copyrighted item.  Under the "first sale" doctrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies."

58.     Fox's right to control distribution of copyrighted new-release DVDs ends once the DVD has been sold by Fox to a third-party purchaser.  The distribution right may not

lawfully be exercised after the initial sale, "to prevent or restrict the resale or further transfer of possession of such copies."

59.     Fox's boycott of Redbox exceeds the scope of the government-granted distribution right, and violates the antitrust laws as an illegal restraint of trade.

60.     As such, Fox has violated Section 1 of the Sherman Act and unlawfully entered into agreements with VPD and Ingram to restrain commerce within the United States.

## COUNT IV

### VIOLATION OF SHERMAN ANTITRUST ACT: UNREASONABLE RESTRAINT OF TRADE

61.     Redbox incorporates the allegations set forth in paragraphs 1 through 60, above, as if fully set forth herein, and pleads, as an alternative to Count III, as follows.

62.     Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

63.     New-release DVDs are introduced to the nationwide marketplace on a weekly basis. Within the new-release market, a particular new-release DVD competes with another only to the extent that consumers view one as a reasonable substitute for another. As described above, each DVD category, or genre, constitutes a separate submarket.

64.     The reason that Redbox kiosks, like all new-release DVD outlets, carry dozens of titles at a time is because consumer behavior plainly demonstrates that there are few, if any, substitutes for a given new-release DVD title. If all new-release DVDs were fungible, consumers would be satisfied with rental/resale outlets that carried only a few titles. Consumers would be indifferent if rental and resale outlets stocked three, ten or a hundred individual titles at one time. Thus, even if one does not accept the premise that each copyrighted title is a

monopoly, well-established consumer preferences, as reflected by industry practice, demonstrate that there is low cross-elasticity of demand among new-release titles belonging to different categories, or genres, and that each such genre constitutes a distinct submarket.

65.     Fox's actions will eliminate or significantly decrease the supply of new-release DVDs in each relevant submarket, will reduce consumer choice in the marketplace and will artificially increase prices that consumers have to pay to rent and/or buy new-release DVDs.

66.     By boycotting Redbox (and orchestrating a boycott of Redbox by others), Fox is in violation of Section 1 of the Sherman Act and has entered into unlawful agreements to restrain commerce within the United States.

## COUNT V

## VIOLATION OF SHERMAN ANTITRUST ACT:
## UNLAWFUL BOYCOTT

67.     Redbox incorporates the allegations set forth in paragraphs 1 to 66 as part of this Count.

68.     Under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

69.     Despite the clear language of Section 1, Fox, Ingram and VPD have entered into agreements that will forbid Ingram and VPD from selling DVDs to Redbox and other DVD rental kiosk operators, including new-release DVDs.

70.     Fox has orchestrated this boycott to artificially restrain output, raise prices and give Fox a bigger cut of rental revenues, or in the alternative to force Redbox out of business. Either way, Fox will be able to restrict supply and increase prices that consumers must pay to rent or buy new-release DVDs.

71.    Fox's agreements with VPD and Ingram that they not sell to Redbox are unlawful group boycotts in violation of the antitrust laws.

## COUNT VI

### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL/BUSINESS RELATIONSHIPS

72.    Redbox hereby incorporates the allegations set forth in paragraphs 1 through 71, above, as if fully set forth herein.

73.    Redbox has a valid and existing contract with Ingram to purchase, among other things, new-release DVDs.

74.    Redbox has a valid and existing contract with VPD to purchase, among other things, new-release DVDs.

75.    Fox is aware of the existence of Redbox's supply contracts with its distributors. This is evidenced by Fox's efforts to obtain the agreement of VPD and Ingram to cease selling to Redbox.

76.    Fox's threat to no longer supply DVDs to VPD and Ingram unless they boycott Redbox constitutes an intentional inducement to those distributors to breach their supply agreements with Redbox.  This inducement is not protected by any recognized judicial, statutory, constitutional or other privilege and therefore is not justified.

77.    Fox's threatened action to no longer supply DVDs to VPD and Ingram has made it impossible for those distributors to satisfy their contractual obligations to Redbox. Fox's coercion of VPD and Ingram has caused those distributors to stop selling DVDs, including new-release DVDs, to Redbox effective October 27, 2009, notwithstanding Redbox's purchase orders for such product, thereby resulting in a breach of their supply contracts with Redbox.

78.     Fox's actions have been carried out with the improper motive of, inter alia, interfering with Redbox's contracts with VPD and Ingram.

79.     Defendant's decision to cut off the supply of DVDs to Redbox through VPD and Ingram has and will continue to result in substantial damages to Redbox.  Damages have and will continue to accrue not only as a direct result of the breach of the supply contracts, but also due to the proximate causes of that breach, including loss of customers, decreased demand for Redbox rentals and sales, attorneys' fees, and loss of customer goodwill.

**COUNT VII**

**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY**

80.     Redbox hereby incorporates the allegations set forth in paragraphs 1 through 79, above, as if fully set forth herein.

81.     After implementation of the Fox boycott by VPD and Ingram, Redbox was forced to turn to other channels from which to purchase DVDs.  Redbox commenced business relationships with other wholesalers and retailers, such as Best Buy, Target and Wal-Mart, to continue its supply of DVDs.

82.     Redbox reasonably expected that these other wholesalers and retailers, such as Best Buy, Target and Wal-Mart, would supply it with DVDs, as they would for any other purchaser who seeks to buy DVDs.

83.     Because Redbox could no longer receive its supply of DVDs from VPD and Ingram, these other wholesalers and retailers were Redbox's only means of acquiring DVDs for its kiosk business.

84.     Defendant has intentionally interfered with Redbox's supply relationship with these other wholesalers and retailers, in order to prevent Redbox from buying new-release

DVDs from other wholesalers and retailers and to maintain its illegal boycott against Redbox.

85.     Defendant's intentional interference is evidenced by instances in which retailers have refused to sell DVDs and limited the number of DVDs that they would sell to Redbox personnel.

86.     In engaging in the conduct described above, Defendant intended to impair or destroy Redbox's supply relationship with these other wholesalers and retailers, such as Best Buy, Target and Wal-Mart.  Defendants' conduct is not protected by any recognized privilege and, therefore, is not justified.

87.     Defendant obstructed Redbox's only remaining channels for the supply of DVDs for its kiosks and resulting in the loss of economic profits it would have received in renting and selling DVDs in its kiosks.  Defendant's obstruction in the supply of DVDs to Redbox has and will continue to result in substantial damages to Redbox, including loss of customers, decreased demand for Redbox rentals and sales, and loss of customer goodwill.

## COUNT VIII

## UNFAIR COMPETITION

88.     Redbox hereby incorporates the allegations set forth in paragraphs 1 through 87, above, as if fully set forth herein.

89.     As described above in Counts VI and VII, Redbox reasonably expected that these other wholesalers and retailers, such as Best Buy, Target and Wal-Mart, would supply it with Fox DVDs.  Defendant wrongfully interfered with Redbox's supply relationship with these other wholesalers and retailers, in order to prevent Redbox from buying new-release DVDs from other wholesalers and retailers and to maintain its illegal boycott against Redbox.

- 22 -

90.     Defendant's actions constitute unfair competition, which have and will continue to result in substantial damages to Redbox, including loss of customers, decreased demand for Redbox rentals and sales, and loss of customer goodwill.

## DEMAND FOR JURY

Redbox demands a trial by jury in this action for all issues so triable pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Redbox respectfully requests that this Court award the following relief:

    a.    A declaration that Defendant's conduct constitutes copyright misuse, and thereby renders copyrights for DVDs — however marketed, sold or distributed - unenforceable during the period of misconduct;

    b.    Injunctive relief prohibiting Fox from engaging in any efforts to limit the supply of DVDs, including new-release DVDs, from third-parties, including VPD and Ingram, to Redbox;

    c.    Judgment that Fox's actions violate the Sherman Antitrust Act;

    d.    Damages to the full extent permitted by law;

e.    Attorneys' fees and costs; and

f.    Such further relief as this Court deems just and appropriate.

*Of Counsel*

Charles S. Bergen
George P. Dougherty
Colleen P. Sorensen (pro hac pending)
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone:  (312) 704-7700
Fax:  (312) 558-1195

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
Phone:  (630) 756-8255
Fax:  (630) 756-8885

Dated:  November 30, 2009

/s/  Henry E. Gallagher, Jr.
Henry E. Gallagher, Jr. (Bar ID #495)
Chad S.C. Stover (Bar ID #4919)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
Phone:  (302) 888-6288
Fax:  (302) 658-0380

*Attorneys for Plaintiff*

737063v1

- 24 -

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2009, I electronically filed **REDBOX'S AMENDED COMPLAINT** with the Clerk of Court using CM/ECF which will send notification of such filing to the following, and I have also sent the foregoing in the manner indicated:

| VIA E-MAIL | VIA E-MAIL |
|---|---|
| Yosef Riemer<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 446-4802<br>Email: yosef.riemer@kirkland.com<br><br>Corey C. Watson<br>KIRKLAND & ELLIS LLP<br>777 South Figueroa Street<br>Los Angeles, CA 90017<br>Telephone: (213) 680-8482<br>Email: corey.watson@kirkland.com | Beth Moskow-Schnoll (No. 2900)<br>Barllard Spahr LLP<br>919 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 252-4447<br>Facsimile:  (302) 355-0221<br>Email: moskowb@ballardspahr.com<br><br>Neal Walters<br>Ballard Sphar LLP<br>Plaza 1000 - Suite 500<br>Main Street<br>Voorhees, NJ 08043<br>Telephone: (856) 761-3438<br>Email: waltersn@ballardsphar.com |

/s/ Henry E. Gallagher, Jr.
Henry E. Gallagher, Jr. (DE Bar ID #495)