**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 09-592-RBK |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TWENTIETH CENTURY FOX HOME | ) | |
| ENTERTAINMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**REDBOX'S ANSWERING BRIEF IN OPPOSITION TO
TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC'S
MOTION TO DISMISS REDBOX'S AMENDED COMPLAINT**

Charles S. Bergen
George R. Dougherty
Pei Y. Chung
Colleen P. Sorensen (*pro hac* pending)
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax:    (312) 558-1195

Frederick W. Stein
REDBOX AUTOMATED RETAIL, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, IL 60181
Phone: (630) 756-8255
Fax:    (630) 756-8885

Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
Phone:  (302) 658-9141
hgallagher@cblh.com
cstover@cblh.com

*Attorneys for Plaintiff
Redbox Automated Retail, LLC*

Dated:  January 14, 2010

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................... 1

STATEMENT OF RELEVANT FACTS ......................................................................... 3

    A.    Relevant Entities. .................................................................................... 4

    B.    Industry Practice Regarding New-Release DVDs. ................................. 5

    C.    The Commercial Realities Of The New-Release DVD Markets ............ 6

    D.    Redbox's Relationship With Ingram And VPD. .................................... 8

    E.    Fox's Decision To Interfere With Redbox's Relationships With Ingram And VPD And To Shut Off Redbox's Supply Of Fox New-Release DVDs. ................................................................................ 9

    F.    The Effects Of Fox's Activities. .......................................................... 10

ARGUMENT .................................................................................................................. 11

I.    REDBOX HAS STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT. ..................................................................................................... 11

    A.    This Court Has Already Determined That Facts Essentially The Same As Those Pled Here State A Section 1 Antitrust Claim. ............ 11

    B.    Redbox Has Adequately Alleged The Requisite Agreements Involving Fox, Distributors And The Retailers. .................................. 13

        1.    Fox's Cases Merely Recite the Uncontroversial Principle (Usually Determined After Discovery) That a Manufacturer's *Unilateral* Policy Announcement and Refusal to Deal, Followed by a Distributor's *Unilateral* Acquiescence, Is Not a Conspiracy. .......................................... 17

    C.    Redbox Has Properly Pled An Unlawful Restraint Of Trade. ............. 19

        1.    Fox's Argument that Redbox Has Not Pled Anticompetitive Effects Ignores Redbox's Well-Pled

818528

Allegations of Price Increase, Output Reduction and Boycott.  Redbox's Allegations Are Sufficient to Show Anticompetitive Effects and Harm to Competition. ................................ 20

2.     Fox's Arguments Regarding Interbrand Competition Lack Merit. ...................................................................................................... 21

D.     Fox's Remaining Arguments Regarding Redbox's Purported Failure To Plead Harm To Competition Should Also Be Rejected...................... 24

E.     Redbox Has Properly Alleged New-Release DVD Product Markets.  Fox's Claim To The Contrary Should Be Rejected. ........................... 25

II.     FOX'S MOTION TO DISMISS REDBOX'S COPYRIGHT MISUSE CLAIMS SHOULD BE DENIED. ................................................. 30

III.     FOX'S MOTION TO DISMISS REDBOX'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DENIED...................... 30

IV.     REDBOX HAS PROPERLY ALLEGED TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY AND UNFAIR COMPETITION CLAIMS. ........................................................................... 30

CONCLUSION ................................................................................................... 34

818528

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Accenture Global Serv. GMBH v. Guidewire Software, Inc.*,
631 F. Supp. 2d 504 (D. Del. 2009) ...................................................................... 33

*Agilent Techs. v. Kirkland*,
No. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009) ..................................... 30, 33

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) ...................................................................... 18

*Am. Airlines v. Christensen*,
967 F.2d 410 (10th Cir. 1992) ...................................................................... 18

*Ashcroft v. Iqbal*,
___ U.S. ___, 129 S. Ct. 1937 (2009) ...................................................... 3, 15

*Bell Atlantic Co. v. Twombly*,
550 U.S. 544 (2007) ...................................................................... 3, 14, 19

*Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*,
646 F. Supp. 1110 (S.D.N.Y. 1986) .............................................................. 33

*Burtch v. Milberg Factors, Inc.*,
No. 07-556, 2009 WL 840589 (D. Del. March 30, 2009) ................................... 19

*Cernuto, Inc. v. United Cabinet Corp.*,
595 F.2d 164 (3d Cir. 1979) ...................................................................... 21

*Cont'l T.V. Inc. v. GTE Sylvania, Inc.*,
433 U.S. 36 (1977) ...................................................................... 25

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ...................................................................... 13, 17

*Corning Incorp. v. SRU Biosystems, LLC*,
292 F. Supp. 2d 583 (D. Del. 2003) ...................................................... 30, 31

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
495 F.3d 46 (3d Cir. 2007) ...................................................................... 18

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ...................................................................... passim

818528

*Erickson v. Pardus,*
    551 U.S. 89 (2007) ............................................................................................3

*Ethypharm S.A. France v. Abbott Laboratories,*
    598 F. Supp. 2d 611 (D. Del. 2009) ............................................32

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1987) ......................................................33

*Forseth v. Village of Sussex,*
    199 F.3d 363 (7th Cir. 2000) ......................................................14

*Fowler v. CPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ......................................... 3, 12, 14, 16

*Frederico v. Home Depot,*
    507 F.3d 188 (3d Cir. 2007) ......................................................14

*Gill v. Delaware Park, LLC,*
    294 F. Supp. 2d 638 (D. Del. 2003) ............................................31

*Gordon v. Lewistown Hosp.,*
    423 F.3d 184 (3d Cir. 2005) ................................................ 20, 25

*Helicopter Support Sys. Inc. v. Hughes Helicopter, Inc.,*
    818 F.2d 1530 (11th Cir. 1987).....................................................16

*Houser v. Fox Theaters Mgmt. Corp.,*
    845 F.2d 1225 (3d Cir. 1988).......................................................25

*IDT Corp. v. Bldg. Owners and Managers Ass'n Int'l,*
    No. 03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005) ...............13

*Illinois Tool Works, Inc. v. Indep. Ink, Inc.,*
    547 U.S. 28 (2006)......................................................................28

*In re Brand Name Prescription Drugs Antitrust Litigation,*
    123 F.3d 599, 603 (7th Cir. 1997), *cert. denied,* 522 U.S. 1153 (1998) .........................29

*Int'l Logistics Group, Ltd. V. Chrysler Corp.,*
    884 F.2d 904 (6th Cir. 1989) ......................................................18

*Isaksen v. Vt. Castings, Inc.,*
    825 F.2d 1158 (7th Cir. 1987) (Posner, J.) ............................. 16, 19

*Jala v. Western Auto Supply Co.,*
    No. 95-100, 1995 WL 463683 (D. Me. July 26, 1995) ..................18

818528

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995) ................................................................. 22, 25

*Lucas Indus. Inc. v. Kendiesel, Inc.*,
   No. 93-4480, 1995 WL 350050 (D.N.J. June 9, 1995) ................................ 22

*Mathews v. Lancaster Gen. Hosp.*,
   87 F.3d 624 (3d Cir. 1996) ...................................................................... 25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................................................... 15, 16

*Nat'l Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*,
   468 U.S. 85 (1984) ............................................................................. 28, 29

*Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc.*,
   747 F.2d 1396 (11 Cir. 1984)................................................................... 25

*Natural Design, Inc. v. Rouse Co.*,
   302 Md. 47 (1984)................................................................................... 33

*Orson, Inc. v. Miramax Film Corp.*,
   79 F.3d 1358 (3d Cir. 1996) .............................................................. passim

*Perry v. Rado*,
   504 F. Supp. 2d 1043 (E.D. Wa. 2007) ...................................................... 24

*Phillips v. County of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...................................................................... 3

*Queen City Pizza v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ................................................................ 25, 26

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002)....................................................... 25

RE/MAX Int'l, Inc. v. Smythe, Cramer Co.,
   265 F. Supp. 2d 882 (N.D. Ohio 2003) ...................................................... 19

*Reazin v. Blue Cross & Blue Shield of Kansas City*,
   635 F. Supp. 1287 (D. Kan. 1986) ............................................................ 16

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008) ............................................................... 28, 29

*Seaboard Supply Co. v. Congoleum Corp.*,
   770 F.2d 367 (3d Cir. 1985) ..................................................................... 25

v

*Seagood Trading Corp. v. Jerrico, Inc.*,
924 F.2d 1555 (11th Cir. 1991)...................................................................................25

*Shaw v. Rolex Watch, USA, Inc.*,
673 F. Supp. 674 (S.D.N.Y. 1987).................................................................................27

*Spahr v. Leegin Creative Leather Prods.*,
No. 2:07-CV-187, 2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ...............................27

*Stark v. Ear Nose & Throat Specialists of Northwestern Pennsylvania., P.C.*,
No. 05-2345, 2006 WL 1371571 (3d Cir. May 19, 2006)...............................................18

*Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div.*,
932 F.2d 1384 (11th Cir. 1991).....................................................................................25

*Toscano v. Prof'l Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) .........................................................................................18

*Tunis Bros. Co. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991) ..........................................................................................22

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
756 F.2d 1467 (10th Cir. 1985)......................................................................................16

**Treatises**

Landis & Posner, Market Power in Antitrust Cases,
94 Harv. L. Rev. 937 (1981)...........................................................................................29

Sullivan, The Law of Antitrust:  An Integrated Handbook,
Second Edition (2006)....................................................................................................22

818528

## NATURE AND STAGE OF PROCEEDINGS

On August 11, 2009, plaintiff Redbox Automated Retail, LLC ("Redbox") filed its initial Complaint (D.I. 1). On October 1, 2009, defendant Twentieth Century Fox, LLC ("Fox") moved to transfer Redbox's action to the Central District of California (D.I. 15), seal its unredacted supporting brief (D.I. 13), declaration and exhibits, and dismiss Redbox's action in its entirety (D.I. 19).

On October 28, 2009, Redbox filed its opposition to Fox's motion to transfer (D.I. 28) and its statement of position in response to Fox's motion to seal (D.I. 27). On November 30, 2009, Redbox filed an Amended Complaint (D.I. 38). On December 21, 2009, Fox moved to dismiss the Amended Complaint (D.I. 43), filing a 39-page brief ("Fox Br.") (D.I. 44). Redbox now responds to, and opposes, Fox's new motion to dismiss.

## SUMMARY OF THE ARGUMENT

Fox's Motion to Dismiss should be denied with respect to Redbox's claims under the antitrust laws (Counts II - V), for tortious interference with prospective business opportunity (Count VII), and for unfair competition (Count VIII). This Court held in the Universal action that factual allegations similar to those set forth in the Amended Complaint stated viable Section 1 Sherman Act claims. *See* Universal Opinion dated August 11, 2008 in *Redbox Automated Retail, LLC v. Universal City Studios LLP, et al.*, No. 08-766 (the "Universal Opinion"). Specifically, after extensive consideration of Redbox's factual statements, this Court held that it was "convinced" that Redbox had pled a valid claim under Section 1 of the Sherman Act, including its claim that Universal had induced or convinced others to boycott Redbox and that Universal's actions had produced anticompetitive effects. *Id.* at 9. Resolution of Redbox's claims, therefore, would require discovery on the "multitude of factors bearing on whether Universal's alleged acts are uncompetitive in nature." *Id.* at 10.

Redbox's Amended Complaint contains essentially the same factual allegations found in its Universal complaint. Like the Universal complaint, Redbox has here stated facts reflecting a concerted effort, orchestrated this time by Fox, also a distributor of DVDs, to artificially restrict supply and increase prices for the rental of new-release DVDs through facially anticompetitive behavior. *See, e.g.*, Am. Compl. at ¶¶ 39, 42. As a result, new-release DVDs that had been renting for one dollar per night before Fox's anticompetitive restraints are now available, if at all, at fewer outlets, at a restricted supply and at a higher price. *Id.* at ¶¶ 39-43. Consumers are harmed by this unlawful activity. *Id.*

Fox is able to orchestrate this activity based upon several distinctive features of the new-release DVD market: (1) the low cross-elasticity of demand between new-release DVDs and other DVDs; (2) the structure of the market(s) for new-release DVDs, including Fox's and other providers' efforts to structure those markets so as to avoid direct competition between new-release DVDs of similar type or genre; (3) the short shelf life of new-release DVDs; and (4) the unique nature of copyrighted new-release DVDs, including the monopoly power that a copyright conveys to its holders. *See, e.g.*, Am. Compl. at ¶¶ 19-22; 23-28; 39-43. Fox provides no compelling reason for the Court to reach conclusions here different from those it reached in the Universal action, especially given that the Amended Complaint contains virtually identical factual statements. Indeed, Fox simply reargues points earlier raised by Universal and rejected by this Court.

Redbox's remaining claims are for copyright misuse, tortious interference with contract, tortious interference with a prospective business opportunity and unfair competition. We acknowledge with respect to Redbox's copyright misuse and tortious interference with contract claims, that this Court's earlier Universal decision is based on similar allegations and need not be

818528

re-argued here.  Therefore, we reserve all appellate rights and restate the arguments raised in the

Universal case in Exhibits A and B, incorporating them as part of this brief, but understanding

that under this Court's reasoning in the Universal Opinion, those claims will also be dismissed in

the present action.

Redbox's new claims for tortious interference with prospective business opportunity and

unfair competition are claims not raised in the Universal action.  They are discussed in

Section IV, *infra*.  These claims have not previously been considered by the Court.  Redbox will

show that Fox's interference with Redbox's relationship with retailers such as Best Buy, Target

and Wal-Mart, constitutes tortious interference with prospective business opportunity and unfair

competition.  Fox's motion to dismiss these claims should be denied.

## STATEMENT OF RELEVANT FACTS

Because Fox  misstates and ignores[1] the well-pled facts of Redbox's Amended

Complaint, we set forth, consistent with *Fowler v. CPMC Shadyside*, 578 F.3d 203 (3d Cir.

2009), the facts upon which Redbox bases its claims.  These facts must be accepted as "true,"

construed in the "light most favorable" to Redbox, and used to determine whether under "any

reasonable reading of the complaint," Redbox "may be entitled to relief."  *Id.* at 210, *quoting*

*Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations and

citations omitted).  In deciding whether Redbox's stated facts show that Redbox has asserted a

"plausible claim for relief," a court must draw on its "judicial experience and common sense."

*Fowler*, 578 F.3d at 211.  A complaint need only give a defendant "fair notice" of what the claim

is and the "grounds on which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

---

[1]      For example, Fox's brief devotes only a page and a half to its summary of  Redbox's
factual allegations.  Fox fails to discuss certain critical items and misstates others.  Neither *Bell
Atlantic Co. v. Twombly*, 550 U.S. 544 (2007), nor *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct.
1937 (2009), teach that a defendant may ignore well-pled facts in seeking dismissal of a claim.

818528

A.      **Relevant Entities.**

Redbox is the nation's leading low-cost alternative for consumers seeking to rent digital

video disks ("DVDs").  Am. Compl. at ¶ 1.  Redbox serves its customers through innovative,

consumer-friendly means:  automated self-service kiosks located in various retail outlets.  *Id.*

Consumers can rent new-release DVDs from Redbox kiosks for $1 per night – a lower cost than

traditional brick-and-mortar outlets or alternative sources for new-release DVD rental where the

average cost of a DVD rental is over $3.40.  *Id.* at ¶ 22.  Customers can also purchase

previously-viewed, new-release DVDs from Redbox beginning 12 days after their release for as

little as $7.00.  *Id.* at ¶ 20.  In comparison, new-release DVDs are sold at brick-and-mortar

outlets (and other sources) and often cost over $20.00.  *See, e.g.,* www.foxconnect.com (last

visited Jan. 13, 2010) (listing "500 Days of Summer" for $26.99).

Consumer demand for Redbox's rentals and sales has grown substantially in the last five

years.  *Id.* at ¶ 17.  Redbox began with 125 kiosks in 2004.  *Id.*  By the end of 2008, it had over

12,000 kiosks.  *Id.*  As of the time this Amended Complaint was filed, Redbox had over 20,000

kiosks.  This growth has enabled Redbox to surpass Blockbuster, Inc. as the leader in terms of

DVD rental locations in the United States.  Am. Compl. at ¶ 17.  Consumers have rented more

than 500 million DVDs from Redbox.  *Id.*

Fox is one of the world's leading distributors of copyrighted DVDs and other video

entertainment in the United States and throughout the world.  *Id.* at ¶¶ 7-8.  Fox does not

manufacture DVDs, but instead purchases them from others for marketing and distribution.

*See id.*

Ingram and VPD are wholesale distributors of DVDs, including new-release DVDs

offered by Fox.  *Id.* at ¶¶ 9, 10.  As distributors, Ingram and VPD maintain warehouses filled

with new-release DVDs.  *Id.*  VPD and Ingram place orders for DVDs in bulk; they are not

4

merely relay points through which individual customer orders are transmitted to larger distributors such as Fox. *Id.* Since the effective date of Fox's boycott, both VPD and Ingram have refused to sell any Fox DVDs to Redbox. *Id.*

Wal-Mart, Best Buy, and Target are nationwide retailers. *Id.* at ¶¶ 36. Redbox representatives have attempted to purchase new-release DVDs from these entities. *Id.* Contrary to past practice and normal economic self-interest, these retailers have refused to sell more than an inadequate quantity of new-release DVDs to Redbox. *Id.*

**B.    Industry Practice Regarding New-Release DVDs.**

A critical aspect of Redbox's business success is its ability to provide consumers new-release DVDs on the same day they are made available for home viewing (the "street date," typically a Tuesday). *Id.* at ¶ 21. Consumer demand for a new-release DVD is at its highest during the weekend immediately following its street date and declines substantially thereafter. *Id.* Over thirty percent of a new-release DVD's revenue is generated during the first two weeks after its release, and over 60% of the rental demand for a new-release DVD occurs within 45 days of its release.[2] *Id.* Thus, new-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first day they appear on the shelf. *Id.* at ¶ 23.

Because consumer demand for a particular new-release DVD is highest while the DVD is new in the market, consumer demand for a new-release DVD is different from consumer demand for a back-catalog DVD, *i.e.*, a DVD that has been on the market for longer than 30 days. *Id.*

---

[2]    In fact, Redbox's allegations concerning the "decay rate" for new-release DVDs appear to understate the speed with which the value of a new-release DVD drops. Recent industry publications state that between 50-70% of the sales revenue for a new-release DVD is generated within the first week following its release. Exhibits C and D. *Id.*

New-release DVDs constitute separate market(s). *Id.* In economic terms, the elasticity of demand between new-release DVDs and back-catalog items is low. *Id.*

   C.   <u>**The Commercial Realities Of The New-Release DVD Markets.**</u>

Release dates for new-release DVDs are timed so that a particular new-release DVD title faces as little competition as possible from other new-release DVDs of the same genre when it is released. *Id.* at ¶¶ 24-25. Fox recruits new audiences for each of its theatrical films by advertising on its television and cable networks, and then attempting to ensure that the audience will not defect to another film by scheduling, or rescheduling, the release date of its film to a date when there will be no competition.[3] *Id.* at ¶ 24. For instance, Fox avoided head-to-head theatrical competition with "*War of the Worlds*" during a coveted Fourth of July weekend by releasing its "*Fantastic Four*" a week later. *Id.* Similarly, Warner Brothers released "*Batman Begins*" in mid-June, thereby avoiding competition with Fox's "*Fantastic Four.*" *Id.* As a result, all three films won their weekend box office and could advertise themselves, as *Fantastic Four* did, as "America's No. 1 hit." *Id.*

Providers of DVDs apply a similar approach to scheduling the release dates for their new-release DVDs. *Id.* at ¶ 25. Because of this industry practice, one particular new-release DVD may not have a readily acceptable substitute. *Id.* Providers of DVDs work hard to ensure that a release in a particular category, or genre, does not share its street date with another release in the same category or genre. *Id.*

---

[3]   To help studios avoid such competition, the National Research Group ("NRG"), for example, supplies a "Competitive Positioning" report to major providers of DVDs. Am. Compl. at ¶ 24. The NRG polls likely moviegoers to project how well upcoming movies will do against each other in each audience quadrant (males under 25, males over 25, females under 25, females over 25) should they be released during the same time period. *Id.* A "losing" provider will reschedule the release of a film to a different time period, even if it is less advantageous (*i.e.*, not the summer and not the holidays). *Id.*

818528

Consumers seeking to rent a new-release DVD generally search by title and by category or genre (but not, for example, by distributor, *e.g.*, Fox, Warner, or Universal). *Id.* at ¶ 25. The industry is structured in this manner, as evidenced by the way in which video rental stores and video rental websites are laid out. *Id.*[4] Each genre or category constitutes a distinct sub-market within the overall new-release DVD market. *Id.* Common categories or genres include action/adventure, comedy, drama, family and kids, horror, sci-fi and suspense. *Id.*[5] There is a low cross elasticity of demand among consumers for new-release DVDs of different genres. *Id.* For example, consumers who want to see Keanu Reeves in a science fiction film (*e.g.* "*The Day the Earth Stood Still*") are unlikely to accept a Jennifer Aniston comedy ("*Marley and Me*") instead. *Id.*

Because of the inelastic demand for each particular new-release DVD, the way the markets are structured by their participants, and Fox's monopoly power derived from its government-granted copyrights, Fox possesses significant market power for each of its new-release DVDs, and, in the alternative, within a specific category or genre during the period immediately following the DVD's release. *Id.* at ¶¶ 24-29. During this limited period, consumers have few, if any, acceptable substitutes for a particular new-release DVD in a

---

[4]     Fox's own website allows consumers to search for DVDs by selecting what it terms as "genres." *See* http://www.foxconnect.com (last visited Jan. 8, 2010). The genres listed on Fox's website include, among others, family, comedy, drama, children's, horror, sci-fi and action. *Id.* Indeed, within the four "video" categories available on Fox's website–"all" "top rated" "new-release" and "coming soon" – "genres" is the only way to search other than by word search. *Id.* Likewise, Universal and Warner websites also categorize DVDs by genre. *See* Universal Studios Home Entertainment, http://homevideo.universalstudios.com/index.html (last visited Jan. 12, 2010) and Warner Bros., http://www.warnerbros.com/#/page=wb-library/ (last visited Jan. 12, 2010).

[5]     For example, the Golden Globes confer separate "Best Picture" awards to films in different genres, including Drama, Comedy or Musical, Animated Film and Foreign Language Film. *See* Golden Globes Official Website, http://www.goldenglobes.org/nominations/ (last visited Jan. 12, 2010).

818528

particular category or genre, especially during the critical weekend following a DVD's street date. *Id.* at ¶ 27.

D. **Redbox's Relationship With Ingram And VPD.**

Redbox has historically been able to meet consumer demand for copies of new-release DVDs for rental on a title's street date because of its longstanding contractual and mutually-beneficial business relationships with distributors like VPD and Ingram. *Id.* at ¶ 29. Redbox has historically purchased all, or nearly all, of its supply of new-release DVDs from these distributors. *Id.*

Specifically, Redbox has supply contracts with Ingram and VPD. *Id.* at ¶¶ 30-32. These contracts give Redbox the right to purchase Fox DVDs from Ingram and VPD, and similarly obligates both of them to sell to Redbox, upon Redbox's request, Fox DVDs. *Id.* at ¶¶ 30, 32. The Ingram Supply Contract also contains a "DVD Buy Back" clause that permits Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new-release DVD product" pursuant to a timeframe tied to the title's street date. *Id.* at ¶ 31. Under this arrangement, Ingram purchases back significant amounts of previously-viewed DVDs from Redbox, and in turn sells them to other buyers in the distribution stream. *Id.* Redbox is also able to sell back significant amounts of previously-viewed DVDs to VPD, which in turn sells them to other buyers in the distribution stream. *Id.* at ¶ 32. VPD and Ingram hold themselves out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood providers of new-release DVDs. *Id.*

Notwithstanding these contractual relationships, VPD and Ingram have stopped filling Redbox's orders for Fox DVDs with release dates beginning October 27, 2009 and have stopped buying back DVDs from Redbox. *Id.* at ¶ 33. Absent Fox's boycott and other unlawful acts, Redbox would have continued to purchase all, or nearly all, of its supply of Fox DVDs from

VPD and Ingram beyond October 27, 2009 and into the foreseeable future.  *Id.*  Fox's ability to

stop Ingram and VPD from selling to Redbox is due to Fox's dominant market position and

monopolistic power within the industry with respect to unique, new-release DVDs.  *Id.*  Because

Fox has ordered *all* of its distributors to stop selling to Redbox and has entered into agreements

with retailers to have them not sell DVDs to Redbox, Redbox lacks viable channels from which

to purchase new-release Fox DVDs.  *Id.*

> **E.**     **Fox's Decision To Interfere With Redbox's Relationships With Ingram And**
> **VPD And To Shut Off Redbox's Supply Of Fox New-Release DVDs.**

On August 5, 2009, Chase Carey, Chief Operating Officer of Fox's parent company,

stated in a conference call with industry analysts that Fox saw Redbox's competition as a

"problem" that News Corporation would "actively" attempt to solve.  *Id.* at ¶ 34.  Later that day,

Fox told Redbox that it was demanding that its wholesalers, including VPD and Ingram, cease

selling any new-release Fox DVD to Redbox for at least 30 days after its street date.  *Id.*

Redbox employees have learned from speaking with VPD and Ingram employees that

Fox representatives contacted representatives of both VPD and Ingram, seeking confirmation and

assurances that both VPD and Ingram would agree to stop selling new-release DVDs to Redbox

during the 30-day blackout period.  *Id.* at ¶ 35.  According to Redbox's sources, both VPD and

Ingram communicated to Fox that they would agree to stop selling new-release DVDs to Redbox

during the 30-day blackout period.  *Id.*

Discovery will also show that Fox representatives contacted not only VPD and Ingram,

but also numerous other distributors and retailers of DVDs, seeking confirmation that they would

agree not to sell new-release DVDs to Redbox during the 30-day blackout period.  *Id.* at ¶ 36.

For example, following Carey's announcement, Redbox representatives attempted to purchase

new-release DVDs from Wal-Mart, Best Buy and Target stores.  *Id.*  Redbox's representatives

were informed by representatives at certain Wal-Mart, Target and Best Buy stores that Redbox would not be allowed to purchase more than three copies of any new-release DVD. *Id.* It makes no economic sense for any retailer to deny sales to Redbox unless it knows that other retailers have agreed not to meet Redbox's demand. Am. Compl. at ¶ 36. Fox continues to seek agreement with, and cooperation from, major wholesalers and retailers to prevent sales of new-release DVDs to Redbox. *Id.* Wholesalers, including VPD and Ingram, have agreed to comply with Fox's demand due to Fox's dominant market position with respect to new-release DVDs and their need for the DVDs Fox sells.[6] *Id.* at ¶ 37.

### F.     The Effects Of Fox's Activities.

Fox's actions, if not remedied by this Court, have, and will, restrict output, eliminate competition in the rental and sales markets and artificially raise prices to consumers. *Id.* at ¶ 39. Contrary to Fox's assertions, Fox's goal in entering into agreements with distributors and retailers is not to "promote" or "strengthen" its brand, *see, e.g.*, Fox Br. at 19,[7] but rather to restrict output, increase prices and artificially control the market for new-release DVD rentals and re-sales. *Id.* at ¶ 42. Fox has no valid legal right to restrict or govern how or to whom VPD, Ingram and other distributors and retailers may resell DVDs that they have purchased. *Id.* at

---

[6]     Fox makes much of the fact that Redbox has stated that certain Best Buy, Wal-Mart, and Target stores have continued to sell new-release DVDs to Redbox without restriction. Fox Br. at 26 n.20. That Fox has not yet been successful in completely foreclosing all sources of supply to Redbox does not mean that its tightening restrictions on supply of new-release DVDs have not harmed competition, Redbox and consumers.

[7]     Indeed, the defendants here neither create nor manufacture most of the DVDs they distribute. Fox distributes DVDs of movies made by others. Am. Compl. at ¶¶ 7-8. Nor is Fox a "brand" that consumers seeking a Friday night DVD rental seek out. Indeed, it will be fairly simple for Redbox to establish that the purported Fox "brand" means nothing to consumers. No one, except perhaps a Fox executive, bases his or her rental choice on whether Fox is the distributor of the DVD.

818528

¶ 40.  However, as a result of Fox's unlawful acts, Redbox no longer has access through its regular channels to new-release DVDs distributed by Fox  *Id.*

Fox's actions, if allowed to stand unchecked, artificially constrain output and prevent consumers from renting new-release DVDs from Redbox and other kiosk rental outlets.  *Id.* at ¶ 41.  Fox's true purpose in demanding that VPD and Ingram stop selling to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product with a correspondingly high artificial price for rental or re-sale of new-release DVDs.  *Id.* at ¶ 42.  Fox seeks to eliminate the low-cost, highly-convenient and fast-growing Redbox channel, because (1) Redbox (and other independent kiosk vendors) threaten to undercut the artificial pricing of the distribution structure that Fox seeks to establish; and (2) by virtue of its monopoly power, Fox seeks to capture excess revenue from artificially high prices for new-release DVD rentals and re-sales.  *Id.*

## ARGUMENT

I. **REDBOX HAS STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.**

    A. **This Court Has Already Determined That Facts Essentially The Same As Those Pled Here State A Section 1 Antitrust Claim.**

This Court held in its Universal Opinion that Redbox had "properly pleaded a claim for a violation of Section 1 of the Sherman Act." *Id.* at 9.  Redbox's factual allegations here are virtually identical to those that the Court found "convinc[ing]" in the Universal action.  *Id.* Specifically, as was true in the Universal action, Redbox alleges (1) a boycott of Redbox involving distributors and retailers, Am. Compl. at ¶ 3; (2) a new-release DVD market structured to avoid competition, especially during the critical period right after the street date when demand for a new-release DVD is at its highest and when most rental revenues are generated, *id.* at ¶¶ 21, 23-28; (3) higher rental prices in alternative venues for new-release DVD rentals, *id.* at ¶ 22; and

(4) a distributor of new-release DVDs (Fox) that is not seeking to promote interbrand competition by imposing the challenged restraints, but rather is seeking to create and sustain an artificially high price for new-release DVDs for the limited (but critical) period immediately after release when there are few, if any, viable substitutes available to consumers, *id.* at ¶ 42. These actions harm consumers and have no offsetting procompetitive effects.  Am. Compl. at ¶ 41.

Fox provides the Court with no compelling reason to deviate from the conclusions reached in the Universal Opinion.  Indeed, in its 25 pages of argument related to Redbox's antitrust claims, Fox identifies just two issues that it claims distinguishes Redbox's claims here from those in the Universal action:  that (1) this Court had "no occasion" to consider whether Redbox had properly alleged an "agreement," Fox Br. at 15, because (a) Universal did not raise the requirement and (b) *Iqbal* and *Fowler* had not yet been decided, *id.*, and (2) Redbox continues to "thrive" despite the boycott by Universal imposed over a year ago.  *Id.* at 26.

Both arguments are meritless and should be rejected.  *Iqbal* was decided more than three months before the Court issued the Universal Opinion, and *Fowler* does nothing more than apply the relevant standards set forth in *Twombly* and *Iqbal*, something that this Court also did when it issued the Universal Opinion.  Under *Fowler*, the issue is whether the well-pled facts set forth a "plausible claim for relief," *Fowler*, 578 F.3d at 211, exactly the determination this Court made when it held that Redbox had adequately pled each required element of a Section 1 claim, including the requisite agreement.  Universal Opinion at 9; *see also id.* at 5-6 (*citing Twombly* and stating that the complaint must contain enough facts to raise a right to relief above a "speculative level").

With respect to Fox's second assertion, that Redbox purportedly continues to "thrive," that assertion does not lead to the conclusion that Fox's (and Universal's) actions have not harmed consumers and competition, as well as cutting into Redbox's growth.  Moreover, Fox did not begin to implement its scheme until October 27, 2009, less than 30 days before the Amended Complaint was filed.  The impact of the Fox boycott on Redbox, competition and consumers remains to be seen.  But it is clear that absent Fox's illegal behavior, more consumers would have rented or purchased new-release DVDs for $1 per night from Redbox, as opposed to being forced to pay an artificially high price for the same item through some other channel of distribution.  This issue is a matter of proof that Redbox will address with evidence; it is not a valid basis for dismissal at the pleading stage.  *Cf. IDT Corp. v. Bldg. Owners and Managers Ass'n Int'l*, No. 03-4113, 2005 WL 3447615, at *7 (D.N.J. Dec. 15, 2005) (an antitrust plaintiff "need not prove an actual lessening of competition in order to recover.  [C]ompetitors may be able to prove antitrust injury before they are actually driven from the market and competition is thereby lessened"), cited in Fox Br. at 18.

Fox's remaining antitrust arguments were all raised by Universal and rejected by this Court.

**B.**      **Redbox Has Adequately Alleged The Requisite Agreements Involving Fox, Distributors And The Retailers.**

A Section 1 plaintiff must show "concerted action," a "collective reference to the contract . . . combination or conspiracy" requirement of Section 1.  *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  Liability is triggered by a "unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement."  *Id.*, quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).  All that is needed at the pleading stage, as conceded by Fox, is for a complaint to state enough "factual matters (taken

13

as true) to *suggest* that an agreement was made." Fox Br. at 12 (emphasis added), *citing*

*Twombly*, 550 U.S. at 556; *see also Fowler*, 578 F.3d at 213 (a plaintiff is "not required to

establish elements of a *prima facie* case but instead, need only put forth allegations that raise a

reasonable expectation that discovery will reveal evidence of the necessary element").

     Redbox's Amended Complaint clearly contains enough factual material to "suggest" an

agreement among Fox, distributors and retailers.  Redbox has alleged that immediately following

Fox's CEO's announcement that Redbox was a "problem," Redbox's two largest suppliers,

contrary to past practice, stopped selling Fox DVDs to it.  Well-known and powerful retailers

also stopped selling to Redbox shortly after Fox implemented its boycott.[8]  It defies "common

sense" that a diverse group of entities, each with competing and conflicting economic

self-interest, would each simultaneously agree to forego the economic benefit of millions of

dollars of sales to Redbox .  *Orson*, 79 F.3d at 1369-70 (stating that an entity acting contrary to

its economic self-interest is evidence that suggests an agreement).  Such facts certainly render

Redbox's claims of agreement plausible.  *Twombly*, 550 U.S. at 570.

     Fox seeks to avoid the effect of these well-pled facts by claiming that (1) each wholesale

distributor was simply following Fox's announced "unilateral" policy and that, as a

manufacturer, Fox is entitled to decide with whom it wishes to deal, Fox Br. at 11-15, and

(2) with respect to the retailers, Fox posits that they may have suddenly and simultaneously

---

[8]     Attached as Exhibit E is a copy of an internal Best Buy memorandum received by a
Redbox representative from a Best Buy store manager in December 2009, after Redbox had filed
its Amended Complaint.  It provides in the very first sentence that Best Buy's agreements with
the "major studios" provide that Best Buy "can't sell to Redbox or any other . . . rental business."
*Id.*  Thus, there is no question that an agreement not to sell to Redbox exists.  To the extent the
Court believes a formal amendment adding this email and the related facts to a new complaint is
appropriate, Redbox requests leave to do so.  *Compare Forseth v. Village of Sussex*, 199 F.3d
363, 368 (7th Cir. 2000) (permitting "supplementation" of factual allegations through briefing)
*with Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007) (not allowing a plaintiff to
allege entirely new allegations in a brief for the first time).

818528

decided to limit sales to Redbox because these retailers may have all simultaneously decided to use new-release Fox DVDs as "loss leaders," items used to entice customers into a store. *Id.* at 16-17.

But no standard for deciding a motion to dismiss states that Fox, as the moving party, is entitled to rely on such "unadorned," unsupported, and self-serving speculation as a basis for dismissal. *Compare Iqbal*, 129 S. Ct. at 1941 (stating that civil complaints must make more than unadorned accusations). There is no evidence before the Court to show that any of the retailers identified in Redbox's Amended Complaint use new-release DVDs as loss leaders, much less that they all simultaneously chose to stop selling to Redbox solely on that basis. Fox is simply not entitled to dismissal based upon such unsupported speculation.

In addition to seeking the benefit of inferences and conclusions to which it is not entitled, Fox's arguments ignore, contrary to *Twombly*, additional facts set forth in Redbox's Amended Complaint which remove Fox's alleged policy from the "manufacturer's privilege" on which it relies. Redbox specifically alleges that Fox representatives "contacted" representatives of VPD and Ingram "seeking confirmation" that the entities would agree to stop selling new-release DVDs to Redbox during the 30-day blackout period, both of which gave assurances that they would do so. These allegations are based on conversations between representatives of Redbox and representatives of VPD and Ingram. Fox is alleged to have engaged in similar behavior with respect to the retailers. There is no valid basis for Fox to ignore these well-pled facts which, under established law, refute Fox's unilateral action argument. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 n.9 (1984) (an agreement exists whenever a manufacturer seeks acquiescence or agreement to one of its policies from a distributor and the distributor then communicates its acquiescence or agreement to the manufacturer); *Helicopter Support Sys. Inc.*

15

*v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1533 (11th Cir. 1987) (same); *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987) (Posner, J.) (same); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1475 (10th Cir. 1985) (same).  Fox's attempt to gain assurance and acquiescence from other parties establishes the requisite agreement.

Finally, Fox quotes allegations from Redbox's initial complaint – not the operative complaint – which focused on Fox's effort to coerce agreement from VPD and Ingram.  Fox Br. at 14-15.  But being pressured to accept a restraint does not remove the resulting agreement from the scope of Section 1.  *Monsanto Co.*, 465 U.S. at 765 & n.10 (finding conspiracy where distributors were threatened with loss of product); *Isaksen*, 825 F.2d at 1163-64 (Posner, J.) (interpreting *Monsanto* and holding "The fact that Isaksen may have been coerced into agreeing is of no moment; *an agreement procured by threats is still an agreement for the purposes of Section 1.*  A conspiracy is not less sinister because some of its members are intimidated, rather than bribed, into joining it.") (emphasis added and internal citations omitted); *Reazin v. Blue Cross & Blue Shield of Kansas City*, 635 F. Supp. 1287, 1320 (D. Kan. 1986) ("But the *Monsanto* requirement indicates no retreat from cases holding that a combination occurs between a seller and buyers whose acquiescence in the seller's firmly enforced restraints was induced by the communicated danger of termination.").  Redbox's current allegations are entirely consistent with those found in the initial Complaint, and both allege facts sufficient to establish a Section 1 agreement.

*Fowler* requires a court to accept all factual allegations in a complaint as true, to construe them in a manner "most favorable" to the plaintiff and to use the court's "judicial experience and common sense" in deciding whether a party has stated a plausible claim for relief.  *Fowler*, 578 F.3d at 210-11.  Common sense suggests that no Hollywood image-conscious company like

Fox would risk its corporate reputation in announcing a unilateral policy sure to anger key distributors and retailers without discussion with its valued business partners as to why the policy was being implemented.  And correspondingly, competing businesses would be unlikely to follow such a policy without assurances that it would be enforced across the board.[9]  Otherwise, each would run the risk of losing customers to another entity if the policy was not uniformly enforced.

Redbox's well-pled allegations clearly establish the requisite agreement and refute Fox's "unilateral policy" argument.  Redbox has clearly set forth facts rendering agreements between Fox, distributors, and retailers as "plausible." That is all the law requires, and Fox's motion to dismiss should be denied.

> **1.    Fox's Cases Merely Recite the Uncontroversial Principle (Usually Determined After Discovery) That a Manufacturer's *Unilateral* Policy Announcement and Refusal to Deal, Followed by a Distributor's *Unilateral* Acquiescence, Is Not a Conspiracy.**

None of the cases Fox cites support its argument that Redbox's factual statements are insufficient at the pleading stage to establish an agreement.  First, seven of the eleven cases Fox cites are summary judgment cases.  In other words, consistent with "common sense" and the result this Court reached in the Universal Opinion, antitrust plaintiffs are given the opportunity to develop evidence of an agreement and to exclude the possibility of unilateral conduct.  *See* Fox Br. at 11-13 (citing seven summary judgment cases).[10]  Fox's arguments that the Court should

---

[9]    Each distributor is alleged to have warehouses of new-release DVDs available for sale. Am. Compl. at ¶¶ 9-10.  Economic theory teaches that each would have an incentive to sell these items to Redbox if others did not.  The same is true for the retailers.  Fox's alleged "unilateral policy" could only be successful if each party was assured that some other retailer or distributor would not replace the units that any particular distributor had previously sold to Redbox.

[10]    Fox relies on several inapposite summary judgment cases:  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) (holding that a parent company and its wholly owned

accept as incontrovertible fact its naked assertion that it has implemented a unilateral policy and accept as incontrovertible fact that *all* retailers unilaterally and simultaneously decided to stop selling to Redbox because each of them incontrovertibly use DVDs as a "loss leader" ignores the process followed by the very cases that Fox cites.

Fox's four remaining cases are not on point.  In *Stark v. Ear Nose & Throat Specialists of Northwestern Pennsylvania., P.C.*, No. 05-2345, 2006 WL 1371571, at *3 (3d Cir. May 19, 2006), the court held that a company, its owner, and its employees are a single actor for the purposes of antitrust law and could not conspire together.  *Stark* has no applicability here.

In *Jala v. Western Auto Supply Co.*, No. 95-100, 1995 WL 463683, at *1 (D. Me. July 26, 1995), the court held that allegations of the plaintiff's own acquiescence to a manufacturer's policy is insufficient to state a conspiracy.  *Id.*  But Redbox does not base the agreements in this case on its own acquiescence.  Rather, Redbox's claims of agreement are based on first-hand communications with (former) business partners and the resulting acts in which those partners have engaged, all of which are contrary to their respective economic self-interest and past

---

subsidiary cannot conspire together because they are one actor for the purposes of antitrust law); *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46 (3d Cir. 2007) (holding that evidence of parallel conduct, without more, is not evidence of concerted actions); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994) (reversing a grant of summary judgment and finding sufficient evidence of conspiracy); *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978 (9th Cir. 2001) (holding there was insufficient evidence of conspiracy where local sponsors merely acquiesced to PGA conditions in order to avoid termination); *Am. Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992) (holding that there was insufficient evidence of a conspiracy between American Airlines and AAdvantage members to prevent the sale of AAdvantage "awards" to the plaintiff where – regardless of contractual prohibitions against the sale – the suit itself was instigated because members were selling "awards" to plaintiff); *Int'l Logistics Group, Ltd. V. Chrysler Corp.,* 884 F.2d 904 (6th Cir. 1989) (holding that there was insufficient evidence of a conspiracy where plaintiff Chrysler did not need the acquiescence of either alleged conspirator to terminate plaintiff's distributorship and there was no evidence of communications between the alleged conspirators).

18

practices.  Redbox has provided extensive factual development that is more than sufficient to render the identified agreement "plausible."

In *RE/MAX International, Inc. v. Smythe, Cramer Co.*, the court found that the plaintiff had failed to plausibly allege a conspiracy between the defendant and its former agents because the defendant did not need the agreement of its former agents to implement the disputed policy – a lower commission to RE/MAX agents.  265 F. Supp. 2d 882, 899-900 (N.D. Ohio 2003).  As stated above, Fox needs both the help and the agreement of its distributors and retailers to prevent Redbox from obtaining new-release Fox DVDs.  Each re-seller would have an incentive not to follow any alleged policy unless it knew that others planned to do so, too; and that any failure to do so would unambiguously result in adverse consequences.

Finally, *Burch v. Milberg Factors, Inc.*, No. 07-556, 2009 WL 840589 (D. Del. March 30, 2009) merely holds – like *Twombly* – that allegations of conscious parallelism combined with conclusory allegations of agreement do not allege a conspiracy.  In *Burch* the plaintiff relied on allegations of purportedly similar conduct engaged in by multiple defendants and failed to allege even the substance of, or the parties to, the purported conspiracy, facts that the Court believed should have already been within the party's knowledge.  Redbox is not relying on allegations of conscious parallelism here, and it has clearly presented facts of which it is aware that are sufficient to show agreement.  These allegations must be accepted as true and, under established law, are sufficient to establish an agreement.  *Twombly*, 550 U.S. at 556 (plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"); *Isaksen*, 825 F.2d at 1164.

### C.  <u>Redbox Has Properly Pled An Unlawful Restraint Of Trade.</u>

In this part of its brief, Fox essentially repeats two arguments that Universal previously asserted and that this Court rejected in the Universal Opinion:  that (1) Redbox has not pled harm

to competition or anticompetitive effect, especially harm to interbrand competition, and (2) harm

to "mere" intrabrand competition is not sufficient to state a Section 1 claim.  Fox's arguments

should fare no better than those asserted by Universal, and its efforts to have Redbox's claims

dismissed on these bases should be rejected.

> 1.     **Fox's Argument that Redbox Has Not Pled Anticompetitive Effects Ignores Redbox's Well-Pled Allegations of Price Increase, Output Reduction and Boycott.  Redbox's Allegations Are Sufficient to Show Anticompetitive Effects and Harm to Competition.**

In the Third Circuit, factual allegations of restricted output, increased prices and reduced

quality are sufficient to demonstrate anticompetitive effects or "harm to competition."  *Gordon v.*

*Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (to establish anticompetitive effects, the

plaintiff must show that the restraint is "facially anticompetitive" or that "enforcement reduced

output, raised prices, or reduced quality"); *Orson*, 79 F.3d at 1367 (same); *see also Eastman*

*Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 478 (1992) ("[t]he alleged conduct – higher

service prices and market foreclosure – is facially anticompetitive and exactly the harm that

antitrust laws aim to prevent").  Here, Redbox has alleged that:  (1) "Fox's actions . . . will

restrict output, eliminate competition in the rental sales markets and artificially raise prices to

consumers," Am. Compl. at ¶ 37; (2) "Fox's actions . . . will artificially constrain output by

preventing consumers from renting new-release Fox DVDs from Redbox and other kiosk rental

outlets," *id.* at ¶ 39; and (3) Fox's true purpose in demanding that VPD and Ingram stop selling

to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby

create an artificial shortage of product with a corresponding higher artificial price for rental or

resale of new-release Fox DVDs, contrary to the interests of consumers, *id.* at ¶ 42.  Moreover,

Fox's actions and the resulting restraints have no pro-competitive effects.  *Id.* at ¶ 41.  These

allegations are true and must be accepted as true; they are more than merely "plausible" and they

are more than sufficient to establish the anticompetitive effects requirement. Fox's motion should be denied for this reason alone.

## 2.     Fox's Arguments Regarding Interbrand Competition Lack Merit.

Fox's interbrand competition arguments are based on obfuscation and misstatement. First, Fox spends four pages (Fox Br. at 17-20) discussing general principles concerning a manufacturer's right to promote the "brand" of products it makes. But, as stated above, Fox is not a manufacturer, and Redbox challenges the notion that Fox is a "brand" that is relevant to consumers. Fox is a distributor of DVDs, and no one goes to a movie or rents a DVD because Fox distributed it. Nor is Fox alleged to be acting with the goal of promoting or strengthening its purported "brand" so as to increase interbrand competition. Fox is specifically alleged to be acting to eliminate a low-cost innovator so that it can create and maintain artificially high prices for the new-release DVDs it sells. Am. Compl. at ¶ 42.

Fox's claim that a plaintiff must allege interbrand harm to sustain a Section 1 claim is also false. Fox Br. at 20. No case of which we are aware says that harm to intrabrand competition is insufficient as a matter of law to sustain a Section 1 claim. *Compare Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 n.11 (3d Cir. 1979) (although interbrand competition is the "primary" concern of antitrust law – it is not the only concern). Indeed, both commentators and the Third Circuit have recognized that in markets largely devoid of interbrand competition (exactly what is alleged here), harm to intrabrand competition is more than adequate to establish anticompetitive effects:

> For *downstream power* restraints, a key issue that courts often overlook is the relative importance of intrabrand competition. Even an amateur student of marketing can perceive distinctions that suggest when intrabrand competition would be more or less important. For example, if brands are relatively undifferentiated and consumers do not demonstrate strong brand preferences, intrabrand competition may be less important. On the other hand, strong brands or highly differentiated products will create potential seller power over price.

> Under these circumstances, intrabrand competition arises naturally and is a healthy and needed response to maintain retail competition that allows consumers to shop for price and amenities. *If particular products enjoy a monopoly, as would be the case with copyrighted books or recordings, competition among retailers is particularly important in giving consumers price alternatives and pressuring the producer to keep prices low.*

Sullivan, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK, Second Edition (2006), at

p. 327 (emphasis added); *see also Orson*, 79 F.3d at 1372 n.13 ("[I]t is also true that a well-

defined submarket may constitute a relevant product market and so under certain circumstances a

relevant product market could consist of one brand of a product, placing intrabrand competition

at issue."), *quoting Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723 (3d Cir. 1991)); *see

also Lucas Indus. Inc. v. Kendiesel, Inc.*, No. 93-4480, 1995 WL 350050, at *7 (D.N.J. June 9,

1995) (holding that allegations of exclusion from an intrabrand market constituted a sufficient

anti-competitive effect to survive a 12(b)(6) motion). Thus, allegations of harm to intrabrand

competition are sufficient to support Redbox's Amended Complaint. *See, e.g., Orson* , 79 F.3d

at 1372 n.13.[11]

     In addition to acknowledging the contextual importance of intrabrand competition,

"commercial realities" should be considered in evaluating a restraint. *See, e.g., Kodak*, 504 U.S.

at 481-82. Here, Redbox has alleged markets comprised of unique products stored in DVD

format or in the alternative, a market comprised of new-release DVDs in particular genres,

characterized by staged release dates to avoid competition and relatively inelastic demand during

---

[11]     To support its claim that a Section 1 plaintiff must allege harm to interbrand competition, Fox misconstrues *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995). *K.M.B.* states, consistent with this Court's Universal Opinion, that the "*The overarching standard is whether defendants' actions diminish overall competition, and hence consumer welfare.*" *Id.* at 127-28 (emphasis added). In other words, a restraint's effect must be examined factually to determine its effect on competition and consumers. *K.M.B.* does not state that "harm to interbrand" competition must always be alleged to establish anticompetitive effects.

818528

relevant times periods.  These factors demonstrate that retail competition (intrabrand competition) is critical to protecting consumers from paying an artificially high price for new-release DVDs.  Because DVDs are timed to avoid competition during the critical first weeks following release, there is no basis to credit Fox's claim that competition from other DVD titles supplied by other DVD suppliers will "discipline" the price and output of Fox DVDs regardless of its boycott.  Fox Br. at 23.  Indeed, it is more likely that other suppliers will follow Fox's lead and raise prices to the detriment of consumers, if Redbox is eliminated as a low-cost retailer.

In sum, Fox provides no valid basis for the Court to conclude that its agreements with VPD, Ingram, other distributors and retailers to cut off supply to Redbox will have a pro-competitive effect on new-release DVD market(s) which, according to the facts Redbox has pled (and which must be accepted as true), consists of unique items, with short shelf lives, that are released at staged intervals so as to avoid direct competition.  As a result of this market structure, Fox (and other suppliers) have the ability to raise prices above the competitive level, resulting in price increases with no offsetting pro-competitive benefits.  In other words, a "must-see" DVD is not only that – it is also the "only see" new-release DVD available in its category at the time consumers are most likely to desire it.  A reasonable inference in such carefully constructed market(s) is that other suppliers of new-release DVDs would follow Fox's example and charge a supra-competitive price for rentals to the detriment of consumers.[12]

---

[12] Fox's brief tutorial on economic theory therefore is completely irrelevant.  In a fully-functioning and competitive market, Fox may well be correct that "basic economics" disciplines the seller's decisions "and if a seller raises its prices too high" or decides "the wrong distribution method," the "market will make the seller pay for bad business decisions."  Fox Br. at 17-18.  But here, Redbox has pled factually a market that is both not competitive and not fully functioning.

23

In sum, Fox's arguments raise no valid basis for the Court to reconsider its previous conclusion that these allegations are sufficient to establish anticompetitive effects. Fox's motion to dismiss should be denied.

**D.**     **Fox's Remaining Arguments Regarding Redbox's Purported Failure To Plead Harm To Competition Should Also Be Rejected.**

Fox's remaining arguments lack merit. First, Redbox does not contest the general statement that the law "draws a significant distinction between a business practice that injures a competitor, and a business practice that injures market-wide competition." Fox Br. at 20-21. But contrary to Fox's assertion, Redbox has alleged harm to competition – in the form of reduced output and increased prices to consumers – exactly the types of injury that are the primary concern of antitrust law. Again, the case law cited by Fox actually supports Redbox's position. *See, e.g., Perry v. Rado*, 504 F. Supp. 2d 1043, 1047 (E.D. Wa. 2007) ("Antitrust law are intended to preserve competition for the benefit of consumers. . . . [R]eduction of competition does not invoke the Sherman Act until it harms consumer welfare").

Fox's related claim, that Redbox continues to "thrive," Fox Br. at 26, and has been able to obtain some quantity of Fox DVDs from sources other than its traditional distributors (during the short period between the start of the boycott on October 27, 2009 and the filing of the Amended Complaint on November 30, 2009) is fatuous. Fox Br. at 23, 26. That Redbox has been able to cover, to some extent, does not mean that Redbox and consumers have not been harmed. How many consumers have been forced to pay extra for a DVD that they could have rented for a dollar from Redbox or may have been foreclosed from renting at all because of higher prices? These are matters of proof, not a basis for dismissal. Fox claims that, because consumers may be able to obtain the product (at a higher price) elsewhere, there is no alleged harm. Fox Br. at 23. But a rule which allowed a defendant to avoid liability on the basis that

24

consumers could always elect to pay monopoly prices would completely undermine antitrust law.

In this Circuit, the legality of a vertical restraint should only be decided based on a full factual record and a determination that the challenged restriction promotes (or harms) competition as a whole. *See, e.g.*, *Orson*, 79 F.3d at 1371-72; *Houser v. Fox Theaters Mgmt. Corp.*, 845 F.2d 1225, 1232-33 (3d Cir. 1988). Fox's cases establish this, in that virtually every case Fox cites is one decided by summary judgment or at trial.[13] Redbox has adequately and plausibly pled that Fox's challenged restraints harm competition. These allegations must be accepted as true, and Redbox is entitled to discovery to gather further admissible evidence. Fox's motion to dismiss should be denied.

### E.    Redbox Has Properly Alleged New-Release DVD Product Markets. Fox's Claim To The Contrary Should Be Rejected.

Under relevant Supreme Court and Third Circuit precedent, the touchstone of a plausible market is "reasonable interchangeability." *Eastman*, 504 U.S. at 482 (upholding a market of Kodak parts); *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("As we have noted, the outer boundaries of a relevant market are determined by reasonable interchangeability of use."). The relevant product market is defined by those "commodities reasonably interchangeable by consumers for the same purpose." Products in the relevant market

---

[13]    Fox cites the following summary judgment cases in support of its anticompetitive effects argument: *Cont'l T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005); *Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624 (3d Cir. 1996); *K.M.B. Warehouse Distribs. Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995); *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384 (11th Cir. 1991); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991); *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir. 1985); *Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc.*, 747 F.2d 1396 (11 Cir. 1984); *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002).

should also be characterized by a cross-elasticity of demand. *Id.* at 437-38.  A rise in the price of a good should tend to create a greater demand for other like goods in the market. *Id.*

Here, Redbox claims, to the extent such market definition is relevant, product markets comprised of either (1) a market for single, unique copyrighted movies on DVD or (2) alternatively, a weekly market for new-release DVDs with relevant submarkets by genre or category.  Redbox has supported these markets with facts describing the commercial realities that characterize those markets (*e.g.*, peak demand for a limited period that deteriorates rapidly, releases coordinated to avoid direct competition), all of which must be accepted as true.

Fox gives lip service to the controlling "reasonable interchangeability" standard, Fox Br. at 28, but then fails to apply it as the courts have done. Fox Br. at 21.  Instead, Fox argues that Redbox's allegations are categorically insufficient because (1) a single-product is not "necessarily" a market; (2) a copyright does not "necessarily" create a market or confer market power on Fox; (3) Redbox's alleged markets "defy [Fox's view of] common sense"; and (4) Redbox's market is inconsistent with other allegations in its complaint.  Fox Br. at 27-34. Fox is incorrect on each point.

First, Fox claims that, with certain "exceptions," a single-product can never be a market. Fox Br. at 29.  But, as both the Supreme Court and the Third Circuit have recognized, a single product can readily be its own market if it is defined in terms of reasonable interchangeability and cross-elasticity of demand.  *Eastman Kodak Co.*, 504 U.S. at 482 (upholding a market of Kodak parts); *Queen City Pizza*, 124 F.3d at 439 (recognizing that a single product can be its own market where it is "unique and therefore not interchangeable with other products").  Here, Redbox has explained why a given week's new-release DVD in a certain category can comprise its own market.  Providers of DVDs work hard to recruit audiences for new-release DVDs and

then take steps to ensure that those audiences will not defect to other movies, including by rescheduling the release date of a DVD to avoid direct competition. Am. Compl. at ¶ 24.  Thus, while it is certainly plausible that a person seeking the latest blockbuster new-release action DVD would not be satisfied with renting a four-week-old romantic comedy, Redbox has also factually pled that an alternative new-release action DVD is unlikely to be found on the particular Friday evening the consumer is "in the market."  Because of the calculated manner in which providers release DVDs, consumers have few, if any, acceptable substitutes for a particular new-release DVD in a given category or genre.  *Id.* at ¶ 25.  As such, and as Redbox will show, providers therefore have significant market power to increase the rental price of new-release DVDs without sufficient reduction in demand to render the price increase unprofitable.  *Id.* at ¶ 27.  Indeed, although Fox is not willing to say it directly, that is exactly the point of the challenged restraints, to raise rental prices of new-release DVDs from the current competitive $1.00 per night offered to consumers by Redbox to the $3.41 charged in alternative venues (*e.g.*, brick and mortar stores).  *Id.* at ¶ 22.  Fox bears the burden of showing that such an anti-consumer result is pro-competitive.  *Orson*, 79 F.3d at 1367 (burden of showing pro-competitive effect on defendant).  For purposes of responding to the current motion, it is sufficient to say that resolution of the issue requires the evaluation of evidence, not the carefully-constructed sentences that Fox has proffered.[14]

---

[14]     Fox's cited cases involve situations where the plaintiff, unlike here, failed to allege facts showing only the single product or brand was not reasonably interchangeable with others.  *See*, *e.g.*, *Shaw v. Rolex Watch, USA, Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987) (dismissing "Rolex" brand watches as a market where plaintiff made no attempt to explain why "Rolex" watches were not interchangeable with other high quality timepieces from the consumers' perspective); *Spahr v. Leegin Creative Leather Prods.*, No. 2:07-CV-187, 2008 WL 3914461, at * 11 (E.D. Tenn. Aug. 20, 2008) (finding "Brighton-brand accessories" not a valid market where the plaintiff failed to allege facts explaining why Brighton accessories were not interchangeable with others, but noting "[T]he Kodak case does establish the principle that one brand of a product can,

27

With respect to Fox's second argument, Redbox does not base its claim of a market of single, unique copyrighted works on DVD solely on the fact that a DVD has a copyright. The test is reasonable interchangeability, and a proper market definition can only be determined after a "factual inquiry into the commercial realities faced by consumers." *Kodak*, 504 U.S. at 481-82. Redbox has plausibly alleged that there are some at least some individual unique copyrighted works or DVD (*Harry Potter*, *Batman, Star Wars*) that are so uniquely differentiated so as to be their own market. *Nat'l Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma ("NCAA")*, 468 U.S. 85, 111 (1984) (stating that certain sporting events are unique and constitute a separate market). For other DVDs, the copyright may be an aspect of the overall power the seller possesses given the stated market structure and other commercial realities, which include the staged releases of unique copyrighted DVDs so as to avoid direct competition with other copyrighted DVDs. Thus, Fox's statement that courts have "rejected the idea that exclusive intellectual property rights means that a product *necessarily* comprises its own antitrust market" or that a "patent *necessarily* confers market power" are simply not pertinent to the issue here. Fox Br. at 28-29 (emphasis added in italics). Fox's carefully-drafted statement has no applicability to Redbox's factual allegations here, which plainly state that Fox's attempt to restrict Redbox's ability to offer new-release DVDs to consumers will increase the prices that consumers must pay for the product, with no counter-balancing pro-competitive effects. *NCAA*, 468 U.S. at 112 (when a product is "controlled by one interest, without substitutes available in the market, there is monopoly power").[15]

---

under some circumstances, constitute the relevant market where the product is unique and no reasonable substitute exists.").

[15]    Fox cites *Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) and *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) for the proposition that a patent does not necessarily confer market power. *Illinois Tool*, as noted by *Rick-Mik*, overruled

Fox's third argument – that new-release DVDs must be interchangeable, otherwise Fox could "command any price" it wanted for the release, Fox Br. at 3 – reflects a fundamental misrepresentation of economic theory.  That new-release DVDs are not reasonably interchangeable with each other does not mean that new-release DVDs are perfectly price inelastic.  It means only that, for a particular new-release DVD, Fox can raise its price above a competitive level without a significant drop in demand.  *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 603 (7th Cir. 1997) (market power is the power to "raise price above cost without losing so many sales as to make the price rise unsustainable"), *cert. denied*, 522 U.S. 1153 (1998); Landis & Posner, MARKET POWER IN ANTITRUST CASES, 94 Harv. L. Rev. 937, 939 (1981) (market power is the seller's ability to raise and sustain a price increase without losing so many sales that it must rescind the increase); *NCAA*, 468 U.S. at 109 n.38 (collecting cases).  That, not the existence of buyers willing to pay any price, is the test for anticompetitive exploitation of market power.  Fox's attempt at *reductio absurdum* fails.

Fourth and finally, Fox's claim that, in some cases, the release of one DVD in a category may sometimes overlap with another release in that category does not negate Redbox's position.  The most critical period for a new-release DVD is the weekend immediately after its street date.  Am. Compl. at ¶ 21.  Thus, it follows that a consumer seeking to rent Fox's "*The Fantastic Four*" the weekend after its release, would not necessarily be satisfied with "*War of the Worlds*" released a week earlier.  *Id.* at ¶ 25.  That some new-release DVDs may overlap with others, or that providers have not yet perfectly structured the alleged markets so as to completely foreclose any competition among their respective products, does not mean that Fox's actions have not harmed consumers or that the challenged restraints should not be declared unlawful.

---

prior precedent that tying arrangements involving patents provided presumptive market power.  *See Rick-Mik*, 532 F.3d at 971-72 n.2, *citing Illinois Tool*.

## II. FOX'S MOTION TO DISMISS REDBOX'S COPYRIGHT MISUSE CLAIMS SHOULD BE DENIED.

Redbox incorporates its positions from the Universal action with respect to this claim (Exhibit A), accepting – for purposes of proceedings before this Court only and without waiver of any appeal right – that the Universal Opinion should control resolution of this claim based on the similarity of the well-pled allegations.

## III. FOX'S MOTION TO DISMISS REDBOX'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DENIED.

Redbox incorporates its positions from the Universal action with respect to this claim (Exhibit B), accepting – for purposes of proceedings before this Court only and without waiver of any appeal right – that the Universal Opinion should control resolution of this claim based on the similarity of the well-pled allegations.

## IV. REDBOX HAS PROPERLY ALLEGED TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY AND UNFAIR COMPETITION CLAIMS.

To state a claim for tortious interference with business opportunity, a complaint must state: (1) the existence of a valid business relation or expectancy; (2) the interferor's knowledge of the relationship or expectancy; (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy, and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. *Corning Incorp. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003). The tort of unfair competition has similar elements. *See Agilent Techs. v. Kirkland*, No. 3512-VCS, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009). Contrary to Fox's assertions that Redbox has not pled reasonable expectancy, intentional interference, or wrongful conduct, Redbox's complaint satisfies all essential elements and

818528

properly states claims for tortious interference with prospective business opportunity and unfair competition.[16]

Redbox has effectively pled "reasonable expectancy" of a business relationship with wholesalers and retailers, and is not merely "reciting the elements" as Fox contends.  As Redbox has alleged, retailers have an incentive to sell as many DVDs as possible to any purchaser who walks in the door and wants to buy DVDs.  Am. Compl. at ¶ 36.  As Redbox also indicated in its Amended Complaint, it makes no economic sense for a retailer to deny sales to Redbox unless it knows that other retailers have also agreed not to meet Redbox's demands.  *Id.*  Redbox's Amended Complaint also includes allegations that its reasonable expectation of a business relationship with retailers is based upon the logical expectation that it would be able to buy DVDs from these retailers just as any purchaser who walked into Best Buy, Target, and Wal-Mart stores would be able to buy DVDs.  Am. Compl. at ¶ 82.  As discovery will show, these retailers and wholesalers would, in fact, be willing to engage in a business relationship to supply Redbox with Fox DVDs without an artificial limit, if it were not for Fox's interference.  Redbox's allegations meet the reasonable expectancy prong.  *See, e.g., Corning Incorp.*, 292 F. Supp. 2d at 585-86 (allegations that party's actions interfered in negotiations with companies and disrupted receipt of financing from potential investors sufficiently alleged tortious interference claim); *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 645 (D. Del. 2003) (plaintiff racehorse owner stated a tortious interference claim where plaintiff alleged that

---

[16]    Redbox has not yet raised claims for tortious interference with prospective business opportunity and unfair competition in the *Universal* matter, and this Court's prior opinion in the *Universal* matter did not address these claims.  In addition, these claims rely on different factual allegations and are based upon different legal elements than Redbox's tortious interference with contract claim.

defendants had improperly influenced race track's decision not to permit plaintiff to rent stalls or race horses at the track).

Redbox has also satisfied the element of "intentional interference."  Fox argues that seeking an agreement with retailers not to sell to Redbox is not intentional interference without an actual agreement to do so.  First, Fox cites no authority for this proposition.  Second, Redbox has, in fact, alleged not only that Fox has sought such agreements from retailers, but also that Redbox has since been precluded from buying DVDs from retailers.  Am. Compl. at ¶ 36.  These events establish the reasonable conclusion that retailers are not selling to Redbox due to Fox's interference.  Discovery will establish that Fox demanded that retailers prohibit or limit sales to Redbox and that the retailers agreed to Fox's demands not to sell to Redbox.  *See id.*[17]  These allegations are sufficient for intentional interference, and the law does not require more at this early stage.  *See Ethypharm S.A. France v. Abbott Laboratories*, 598 F. Supp. 2d 611, 619 (D. Del. 2009) (where essential elements of tortious interference and unfair competition claims have been articulated, "the court declines to require more absent the benefit of discovery").

Finally, Redbox has validly alleged that Fox engaged in "wrongful conduct."  According to Fox, "there is nothing wrongful, malicious or tortious about Fox announcing a unilateral wholesale distribution policy."  However, as Redbox has alleged, Fox's interference in Redbox's dealings with wholesalers and distributors is part of its illegal boycott against Redbox, in violation of the antitrust laws.  *See* Am. Compl. at ¶ 84.  As described above, Redbox has sufficiently pled a antitrust claim against Fox, and, as this Court has already held, Redbox

---

[17]     The Redbox SEC statement to which Fox refers has no bearing on this element or on the adequacy of these claims in general.  Although Redbox has been able to procure some DVDs from Wal-Mart, Best Buy, and Target stores in some instances, as Redbox alleged, restrictions have been imposed in other instances as a result of Fox's actions.  Am. Compl. at ¶ 36.  Fox's interference is intentional, wrongful, and has caused damage to Redbox.

818528

properly alleged a similar antitrust claim against Universal.  *See* Universal Op. at 9.  Because Fox's intentional interference in Redbox's dealings with wholesalers and retailers violate the antitrust laws, its actions also constitute wrongful conduct for tortious interference and unfair competition.  *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 547 (7th Cir. 1987) (defendants intentionally interfered with plaintiffs' business expectancy through unfair and anticompetitive acts); *Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*, 646 F. Supp. 1110, 1126 (S.D.N.Y. 1986) (plaintiff's antitrust claim satisfied the "improper means" requirement of tortious interference claim); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 73-74 (1984) (defendant's acts, if proven to be part of scheme in violation of antitrust law, would also constitute unlawful and improper acts for tortious interference).

Fox's motion to dismiss Redbox's tortious interference with prospective business opportunity and unfair competition claims must be denied.  *See, e.g., Accenture Global Serv. GMBH v. Guidewire Software, Inc.*, 631 F. Supp. 2d 504, 509 (D. Del. 2009) (denying motion to dismiss tortious interference claim where each element has been alleged); *Agilent Techs., Inc.*, 2009 WL 119865, at *10 (denying motion to dismiss tortious interference and unfair competition claims where each element has been alleged).

## <u>CONCLUSION</u>

For all the foregoing reasons, Fox's motion should be denied.

| | |
|---|---|
| Charles S. Bergen |   /s/ Chad S.C. Stover         |
| George R. Dougherty | Henry E. Gallagher, Jr. (DE Bar ID #495) |
| Pei Y. Chung | Chad S.C. Stover (DE Bar ID #4919) |
| Colleen P. Sorensen (*pro hac* pending) | CONNOLLY BOVE LODGE & HUTZ LLP |
| GRIPPO & ELDEN LLC | 1007 North Orange Street |
| 111 South Wacker Drive | Wilmington, DE  19801 |
| Chicago, IL 60606 | Telephone:  (302) 658-9141 |
| Phone: (312) 704-7700 | Facsimile:   (302) 658-5614 |
| Fax: (312) 558-1195 | hgallagher@cblh.com |
| | cstover@cblh.com |

Frederick W. Stein
REDBOX AUTOMATED RETAIL, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, IL 60181
Phone: (630) 756-8255
Fax: (630) 756-8885               *Attorneys for Plaintiff*
                                       *Redbox Automated Retail, LLC*

Dated:  January 14, 2010

818528

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 14**,** 2010, I caused to be electronically filed

**REDBOX'S ANSWERING BRIEF IN OPPOSITION TO TWENTIETH**

**CENTURY FOX HOME ENTERTAINMENT LLC'S MOTION TO DISMISS**

**REDBOX'S AMENDED COMPLAINT** with the Clerk of Court using CM/ECF which

will send notification of such filing to the following, and I have also sent the foregoing in

the manner indicated:

| <u>**VIA E-MAIL**</u> | <u>**VIA E-MAIL**</u> |
|---|---|
| Yosef Riemer<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 446-4802<br>Email: yosef.riemer@kirkland.com<br><br>Corey C. Watson<br>KIRKLAND & ELLIS LLP<br>777 South Figueroa Street<br>Los Angeles, CA 90017<br>Telephone: (213) 680-8482<br>Email: corey.watson@kirkland.com | Beth Moskow-Schnoll (No. 2900)<br>Barllard Spahr LLP<br>919 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 252-4447<br>Facsimile:  (302) 355-0221<br>Email: moskowb@ballardspahr.com<br><br>Neal Walters<br>Ballard Sphar LLP<br>Plaza 1000 - Suite 500<br>Main Street<br>Voorhees, NJ 08043<br>Telephone: (856) 761-3438<br>Email: waltersn@ballardsphar.com |

   _/s/ Chad S.C. Stover_    
Chad S. C. Stover (DE Bar ID #4919)