# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,    )
                                )
           Plaintiff,           )
                                )    C.A. No. 08-766-RBK
         v.                    )
                                )    **JURY TRIAL DEMANDED**
UNIVERSAL STUDIOS HOME           )
ENTERTAINMENT, LLC; UNIVERSAL    )
CITY STUDIOS, LLP; UNIVERSAL CITY   )    **REDACTED VERSION**
STUDIOS PRODUCTIONS, LLP, and FOCUS )
FEATURES, LLC,                    )
                                )
           Defendants.      )

## REDBOX'S ANSWERING BRIEF IN
## OPPOSITION TO UNIVERSAL'S MOTION TO DISMISS

Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
hgallagher@cblh.com
cstover@cblh.com

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
(312) 704-7700

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
(630) 756-8255

*Attorneys for Plaintiff Redbox Automated
Retail, LLC*

684567.1

**B.   Redbox Has Pled A Claim For Copyright Misuse. Universal's Contention That This Claim Should Be Dismissed Should Be Rejected.**

**1.   Applicable Copyright Standards.**

Copyright law is designed to "stimulate artistic creativity for the general public good." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 204 (3d Cir. 2003) (*citing Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984)). Contrary to Universal's claim that the Copyright Act's intended purpose is to expand the "control rights copyright owners enjoy" (D.I. 33, Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss ("Supp. Mem.") at 8), copyright statutes have been "amended repeatedly in an attempt to balance the authors' interest in the control and exploitation of their writings with society's competing stake in the free flow of ideas, information and commerce." *Sebastian Internat'l v. Consumer Contacts, Ltd.*, 847 F.2d 1093, 1095 (3d Cir. 1988). Although it is important that an author receive a "fair return" for his creative labor, that concept must be balanced against the competing (and more important) goals of stimulating artistic creativity for the public good and society's need for a free flow of ideas and information. *Id.* Ultimately, the copyright law regards "financial reward to the owner as a *secondary consideration.*" *Id.* (emphasis added).

Section 106 of the Copyright Act gives a copyright owner an exclusive right: "Subject to sections 107 through 122 . . . (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(3). But this distribution right is not absolute. It is limited by the "first sale doctrine" codified at section 109(a), which provides expressly:

(a)    Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner,

10

is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . . 17 U.S.C. § 109(a).

Under the first sale doctrine, once a copyright owner has authorized the sale of a particular copy of a copyrighted work, the owner loses the right to control the subsequent downstream sale or distribution of that copy. *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 159-60 (3d Cir. 1984) (first sale doctrine "prevents the copyright owner from controlling the future transfer of a particular copy once its material ownership has been transferred"), *citing Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908) (striking down the copyright owner's attempt to prevent the resale of its books at a discounted price). *See also Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 457 (1940) (after authorized first sale to refiner, producer could not rely on patent to exercise "any control over price" at which product could be resold). After a sale or authorized disposition by which title passes, DAVID NIMMER, NIMMER ON COPYRIGHT, § 8.12[B][1], 8-158 (2008) (first sale doctrine applies to any authorized transfer), continued control over the work by the copyright owner does not serve the purpose of protecting the owner's rights in the intangible copyright, but rather is "primarily a device for controlling the disposition of tangible personal property which embodies the copyrighted work." *CM Paula v. Logan*, 355 F. Supp. 189, 191 (N.D. Tex. 1973). "[A]t this point, the policy favoring a copyright monopoly for authors gives way to the policy opposing restraints of trade and to restraints on alienation." *Id.* at 191 (citation omitted), *cf. Video Pipeline*, 342 F.3d at 205-06 (stating a holder's attempt to restrict expression that may be critical of it may "subvert — as do anti-competitive restrictions — a copyright's policy goal to encourage the creation and dissemination to the public of creative activity.").

Copyright misuse is an equitable doctrine. *Video Pipeline*, 342 F.3d at 204. Misuse exists where the "patent or copyright holder has engaged in some form of anticompetitive

11

behavior." *Id.* The misuse doctrine prevents copyright holders from expanding their limited

monopoly to allow them to control economic activity that is outside the scope of that monopoly.

*Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 976-77 (4th Cir. 1990).

> 2.   **Redbox's FAC Properly Pleads A Claim For Copyright Misuse.**

This case involves a clear effort by a copyright holder (Universal) to use its copyright in a

manner that is contrary to the public policy embodied in the grant of a copyright. *Lasercomb,*

911 F.2d at 978. Because Redbox has refused to join Universal's unlawful scheme to raise

prices, reduce output, and limit consumer choice of new-release DVDs, Redbox is now the

victim of a Universal-orchestrated boycott involving Universal, its distributors, and an array of

retailers. Universal has the power to orchestrate this boycott based on the limited monopoly

permitted by the copyright laws. Moreover, Universal's threats to distributors and retailers that it

would cut off their supply of Universal DVDs absent their agreement not to sell to Redbox is a

naked invasion of the first sale rights granted under the Copyright Act. Thus, contrary to the rule

stated in *Columbia Pictures* and Section 109 of the Act, Universal is seeking to control the

"future transfer" of its new-release DVDs after its initial transfer of ownership of products to the

distributors and to retail stores.

Universal's actions are inconsistent with the ultimate goal of the copyright laws, which is

to increase the public store of creative expression. *Video Pipeline,* 342 F.3d at 205-06.

Universal's actions will have the effect of reducing output and increasing the prices at which

new-release DVDs are made available to the public. When copyright holders engage in such

anticompetitive actions, courts have not hesitated to find misuse.

For example, in *Lasercomb,* the copyright holder's standard license agreement forbade

the licensee from developing any product that competed with the holder's product. 911 F.2d at

12

972-73. This anticompetitive restraint lasted 99 years longer than the copyright. *Id.* Based on

these facts, the court found misuse. *Id.* at 979. Similarly in *Video Pipeline*, this Circuit

considered whether misuse existed when Disney, the copyright holder, sought to forbid the

licenser of its movie trailer from displaying any material derogatory of Disney on their websites.

Although the court there rejected the charge of misuse, it specifically stated that anticompetitive

licensing agreements may form the basis for misuse, especially to the extent they conflict with

the purpose behind a copyright's protection by depriving the public of the would-be

competition's creativity. *Video Pipeline*, 342 F.3d at 206.

These cases stand for the proposition that a copyright holder may not, by contract,

magnify its rights beyond those sanctioned by the Copyright Act. But that is exactly what

Universal is seeking to do here. Under the Act, the copyright holder's right to control

distribution is subject to the first sale doctrine. *Lucasarts Ent. Co. v. Humongous Enter. Co.*,

870 F. Supp. 285, 290 (N.D. Cal. 1993) (the "essence of a copyright interest is the power to

exclude use of the copyrighted work by those . . . who are not authorized to use it"). Thus, once

Universal has sold its DVDs to distributors or retailers or, *a fortiori*, the distributors have re-sold

the DVDs to retailers, the first sale doctrine eliminates Universal's power to control the future

transfer of the individual DVDs or to impose related restraints. Universal is abusing the limited

government monopoly it has received under the Act to compel its distributors and retailers to

forego their statutory first sale rights. This sort of improper extension of the copyright monopoly

is exactly what the misuse doctrine forbids.

Universal suggests that it should be allowed to restrict the distributors' first sale rights

because it is seeking to promote its own interest in obtaining a fair return for the product of its

creativity. Op. Br. at 11 ("Universal [ ] is not stripped of its ability to direct and implement a

13

distribution plan with respect to its goods just because elements of those goods are copyrighted."). That argument should be rejected. First, Universal's assertion is contrary to Redbox's well-pled allegation that Universal's actions are motivated not by a desire to better compete, but by its desire to eliminate its low-cost retail rental competitor and to control or take over the kiosk distribution system, all to the detriment of consumers. *Compare* Supp. Mem. at 8 *with* FAC at ¶ 5. Universal's "fair return" argument also completely ignores Redbox's well-pled allegations that Universal has forbidden Ingram and VPD not just from selling Universal DVDs to Redbox, but from providing other services to Redbox, including bar code labeling, packaging DVDs in Redbox jewel cases, sorting, shipping and storage of original DVD cases and providing art work prior to the street date, as well. No defense of these actions is made anywhere in Universal's briefs. Second, copyright law permits Universal to receive its "fair return" when it voluntarily sells product to VPD and Ingram (or to Best Buy or other retailers). Under the law, Universal then loses the monopoly power to control what the subsequent purchasers do with the individual DVDs that they have purchased from Universal at the "first sale" price that Universal is entitled to set. *See* cases cited at 10-13, above; *see also United States v. Univis Lens Co.*, 62 U.S. 1088, 1093-94 (1942) (once patent holder sold invention and received the reward requested, the holder is "no longer free to control the price at which it may be sold").

In sum, Universal's arguments fail. Under the copyright laws, Universal is not entitled to extend its monopoly any further than the first sale. *Columbia Pictures*, 749 F.2d at 159-60. Universal's demand that Count I be dismissed at the pleading stage should be rejected.

3.   **Universal's Arguments Demanding Dismissal Are Not Well-Founded. At The Very Least, They Raise Factual Questions That Cannot Be Decided In Universal's Favor On A Motion To Dismiss.**

Faced with these facts, Universal claims that Redbox is not procedurally entitled to pursue its misuse claims because (a) Redbox's allegations do not support a finding of misuse; (b) Universal has made no claim for infringement; and (c) copyright misuse is a defense, not an affirmative claim. Supp. Mem. at 6-10. Each argument should be rejected.

a)   **Redbox's Allegations Support a Finding of Misuse.**

Universal's first argument is based on its assertion that it has not tried to improperly expand its copyright monopoly to "gain control of other markets or other products." Supp. Mem. at 9-10. This assertion ignores three key points: (1) Universal plainly seeks to expand its limited copyright monopoly to secure other monopoly rights — including the right to control the distribution chain after a first sale — not granted by the Copyright Act (*see*, FAC at ¶¶ 48-51); (2) Universal's attempt to prevent distributors (such as Ingram and VPD) and retailers (such as Best Buy and others) from selling new-release DVDs to Redbox is directly contrary to public policy (*i.e.*, the first sale doctrine, *Lasercomb*, 911 F.2d at 976-77, *citing Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942)); and (3) Redbox's allegations that Universal is seeking to control through joint ventures or unilaterally take over the kiosk distribution system and drive competition from the market. FAC at ¶¶ 5, 55-56. Each of these acts, independently unlawful, also constitutes copyright misuse.

Universal relies upon *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135 (1998) to support its claim that it is entitled to control the sales policies of its distributors despite its sale and transfer of title to them. Universal claims that the Supreme Court "took as a given that the plaintiff in that case properly 'had relie[d] on the terms of its contracts with its

15

domestic distributors to limit their sales to authorized retail outlets.'" *See* D.I. 16, Universal's

Opening Brief in Support of [Its] Motion to Dismiss, filed December 5, 2008 ("Op. Br."), at 11.

Universal fails to disclose that two sentences later, the Supreme Court specifically states that

based on Section 109(a), L'Anza would not be entitled to treat any unauthorized resales as a

copyright violation because those distributors, pursuant to the first sale doctrine, were now the

owners of the product. *Quality King*, 523 U.S. at 143.

     In any event, Universal's entire argument rests on a false and illusory premise — its

purported contracts with VPD and Ingram.  Even if one could accept, with no discovery, that the

documents that Universal attached to its initial brief were authentic and valid contracts, complete

and unmodified by subsequent agreements or course of dealing, ██████████████████████

████████████████████████████████         *See* D.I. 17, 12/8/2008 Transmittal Affidavit

of R. Montgomery Donaldson in Support of Defendants' Motion to Dismiss Complaint

("Transmittal Affidavit"), Exs. C and D, at ¶ 4.  Moreover, no language in those documents can

be read to give Universal any right to unilaterally forbid the distributors from selling to Redbox.

To support its contention that it has the right to control to whom its distributors may sell,

Universal cites to paragraphs 17 and 6 of the documents.  Op. Br. at 5.  But neither cited

paragraph supports Universal's contention.  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

2

████████████████████████████████████████████



By misstating the content of its own unauthenticated, possibly modified and plainly expired exhibits, Universal underscores just how tenuous its defenses really are.

Furthermore, even if the documents actually said what Universal claims they say, Universal's reliance on them as a means to dismiss Redbox's FAC is improper. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), cited by Universal, holds only that a court may "consider an *undisputably authentic* document that a defendant attaches as an exhibit to a motion to dismiss *if the plaintiff's claims are based on that document*" (emphasis added). Such a result is appropriate because when a complaint "relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Id.* at 1196-97.

Redbox, however, was not "on notice" of the content of Universal's alleged distributor contracts at the time it filed its initial Complaint. Indeed, Universal continues to insist that these documents, expired or not, are so super-secret that neither the public nor even Redbox's executives may see them. *See* D.I. 18, Defendants' Memorandum of Law in Support of Their

Motion to Seal at 3 (stating "[t]he information contained in the [purported] Ingram and VPD distributor agreements comprises trade secrets and other confidential, sensitive, and/or proprietary business information"). Nor are Redbox's antitrust "core" claims based on these questionable documents. *Compare* Supp. Mem. at 1 (stating that Redbox's decision to drop the information and belief allegation undermines its "core antitrust theory").

Redbox's claims are based on improper agreements between and among Universal, the distributors and many large retailers to not sell new-release DVDs to Redbox and to interfere with services provided by Redbox's distributors as a means of coercing Redbox to sign the illegal Revenue Sharing Agreement. Universal's claim that the documents attached to its opening brief constitute valid contracts with Redbox's distributors, VPD and Ingram, does not excuse the illegality of Universal's actions. In its FAC, Redbox eliminated the "information and belief" allegation concerning the distributor contracts to reflect reality, something that Universal is asking the Court to ignore when it asserts that the expired purported distributor contracts provide a basis for dismissal. Supp. Mem. at 20-22.

                **b)**      **The Declaration That Redbox Seeks Should Not Require Actual Infringement.**

Universal's second argument — that there is no current claim for existing infringement — is equally unavailing. The parties are clearly at issue. Redbox's traditional supply chain has been cut off, as have numerous alternatives. Redbox claims that Universal has accomplished this result by misusing its copyright to force distributors and retailers not to sell to Redbox. A court of equity should not be bound by labels in seeking to do justice between these parties and to clarify Redbox's rights. Indeed, if a technical copyright infringement is truly needed, that issue may be easily remedied simply by Redbox making its own multiple copies of

one or more popular new-release DVDs that Universal's boycott has prevented it from obtaining from distributors or retail stores.

### c) Courts Recognize Copyright Misuse as an Affirmative Claim.

As to Universal's third argument, that copyright misuse may only be asserted as a defense, this is simply untrue. In a recent federal decision, *Apple, Inc. v. Psystar Corp.*, 2009 U.S. Dist. LEXIS 14370, at *7 (N.D. Cal. Feb. 6, 2009), the court expressly rejected the argument that copyright misuse could only be asserted as a defense and held that copyright misuse may be asserted as an affirmative claim. The *Apple, Inc.* court held that the party asserting the claim might well have a "legitimate interest in establishing misuse independent" of any claim that the opposing party may have had. *Id.* at *7. A copyright misuse plaintiff may legitimately seek to "clarify the risks it confronts by marketing the products at issue in this case or others it may wish to develop." *Id.* In identical fashion, Redbox has a legitimate interest in having this Court clarify whether Universal's actions constitute misuse given Universal's actions in leveraging its copyright to prevent VPD and Ingram from exercising their statutory first sale rights. Universal's actions have caused Redbox harm and are ripe for decision by this Court.

Some of the cases on which Universal relies regarding Count I are inapposite, while others are non-binding and outdated. For example, *Ticketmaster, LLC v. RMG Technologies, Inc.*, 536 F. Supp. 2d 1191, 1198 (C.D. Cal. 2008) deals with whether the copyright misuse doctrine could be affirmatively used to seek *monetary damages*. (Plaintiff argues that copyright misuse "is an affirmative defense to a claim for copyright infringement and does not support an independent claim for damages. The Court agrees."). The reasoning in *Ticketmaster* has no application in this case, as Redbox is not seeking pecuniary recovery based on Count I, but rather a declaration that Universal is misusing its copyright. Other cases that Universal cites in support

19

of its contentions are outdated and superseded by more recent developments in the law.  Thus,

*MGM v. Grokster*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) represents a decision from California

(and hence is not binding on this Court) that no longer states the current status of the law there.

As discussed above,  *Apple, Inc. v. Psystar* presents the current status of the copyright misuse

doctrine, which is that parties may have a "legitimate interest in establishing misuse independent

of [the copyright holder's] claim against it, for example, to clarify the risks it confronts by

marketing the products at issue in this case or others it may wish to develop."  *Apple, Inc.*, at *7.

### C.   Counts II-V Of The FAC Properly Allege Section 1 Violations.

#### 1.   Elements Of A Section 1 Violation.

A Section 1 violation for unreasonable restraint of trade under the Sherman Act is well-

pled when a plaintiff alleges "(1) concerted action by the defendants; (2) that produced

anti-competitive effects within the relevant product and geographic markets; (3) that the

concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the

concerted action."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.

1997).  The first element — concerted action orchestrated by these defendants — is clearly

alleged.  FAC at ¶¶ 4, 33, 47-51.  The second element may be established by allegations of actual

anticompetitive effects within the relevant market (for example, price increases or output

reductions).  *See FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460-61 (1986); *Gordon, M.D. v.

Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (An anticompetitive effect can be

demonstrated by showing that a restraint is "facially anticompetitive or that its enforcement

reduced output, raised prices or reduced quality").  Alternatively, a plaintiff may establish that

defendants had market power, defined as the ability to "raise prices above those that would

prevail in a competitive market."  *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.

1993) (internal citations omitted).  Whether a *per se* rule or the rule of reason is employed, the

20

684567.1

## CERTIFICATE OF SERVICE

I, Chad Stover, hereby certify that on March 4, 2009, I electronically filed the foregoing **REDBOX'S ANSWERING BRIEF IN OPPOSITION TO UNIVERSAL'S MOTION TO DISMISS** with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following and I have also sent the foregoing in the manner indicated:

| VIA E-MAIL | VIA EMAIL |
| --- | --- |
| R. Montgomery Donaldson<br>RDonaldson@mmwr.com<br>Lisa Zwally Brown<br>lzbrown@mmwr.com<br>Montgomery, McCracken,<br>Walker & Rhoads, LLP<br>1105 N. Market St., Suite 1500<br>Wilmington, DE 19801 | Paul H. Zoubek<br>PZoubek@mmwr.com<br>R. Monica Hennessy<br>Mhennessy@mmwr.com<br>Montgomery, McCracken,<br>Walker & Rhoads, LLP<br>Liberty View<br>457 Haddonfield Road,<br>Suite 600<br>Cherry Hill, NJ 08002<br><br>Glenn D. Pomerantz<br>glenn.pomerantz@mto.com<br>David C. Dinielli<br>david.dinielli@mto.com<br>Munger, Tolles & Olson LLP<br>355 South Grand Avenue<br>Thirty-Fifth Floor<br>Los Angeles, CA 90071-1560 |

/s/ Chad S.C. Stover
Chad S.C. Stover (#4919)

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　C.A. No. 08-766-RBK
　　　　v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　**JURY TRIAL DEMANDED**
UNIVERSAL STUDIOS HOME　　　　　　　)
ENTERTAINMENT, LLC; UNIVERSAL　　)
CITY STUDIOS, LLP; UNIVERSAL CITY　)　　**REDACTED VERSION**
STUDIOS PRODUCTIONS, LLP, and FOCUS )
FEATURES, LLC,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　　　)

## REDBOX'S ANSWERING BRIEF IN
## OPPOSITION TO UNIVERSAL'S MOTION TO DISMISS

Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
hgallagher@cblh.com
cstover@cblh.com

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
(312) 704-7700

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
(630) 756-8255

*Attorneys for Plaintiff Redbox Automated
Retail, LLC*

684567.1

4.     **Count VI Properly Alleges Intentional Interference With Contractual/Business Relationships With Redbox's Distributor Contracts.**

Universal's arguments against Count VI are based on the purported, but expired, distributor contracts that do not say what Universal claims. Arguments based on these highly-questionable bits of paper should be rejected for the reasons stated above.

To state a claim for tortious interference with contract, a complaint must state: (1) the existence of a valid contract ; (2) the interferer's knowledge of the contract or expectancy; (3) intentional interference; (4) that induces or causes a breach or a termination of the contract; and (5) resulting damages. *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp 2d 583, 585-86 (D. Del. 2003); *All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. LEXIS 116, at *24-25 (Del. Ch. Aug. 9, 2004).[7] Redbox has done this. Redbox has alleged the existence of contractual and business relationships with the distributors' contracts (FAC at ¶¶ 33-36, 86-87), Universal's knowledge of those contractual relationships (*id.* at ¶¶ 46, 88), Universal's wrongful inducement and coercion upon VPD and Ingram to breach those contracts (*id.* at ¶¶ 3, 47-48, 88-89), the distributors' subsequent breaches (*i.e.,* refusal to ship Universal DVDs to Redbox) due to Universal's conduct (*id.* at ¶¶ 4, 47-48, 90), and resulting damages (*id.* ¶¶ 49-51, 92).

Universal concedes the sufficiency of Redbox's allegations by its silence. Its arguments based on the distributor contracts are unfounded. Therefore, its motion to dismiss this Count must be denied.

---

[7]     The elements of this tort and pleading requirements are the same in California and Illinois as in Delaware. *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55-56 (1998); *HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989) (citation omitted).

684567.1

## CERTIFICATE OF SERVICE

I, Chad Stover, hereby certify that on March 4, 2009, I electronically filed the foregoing **REDBOX'S ANSWERING BRIEF IN OPPOSITION TO UNIVERSAL'S MOTION TO DISMISS** with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following and I have also sent the foregoing in the manner indicated:

| VIA E-MAIL | VIA EMAIL |
|---|---|
| R. Montgomery Donaldson<br>RDonaldson@mmwr.com<br>Lisa Zwally Brown<br>lzbrown@mmwr.com<br>Montgomery, McCracken,<br>Walker & Rhoads, LLP<br>1105 N. Market St., Suite 1500<br>Wilmington, DE 19801 | Paul H. Zoubek<br>PZoubek@mmwr.com<br>R. Monica Hennessy<br>Mhennessy@mmwr.com<br>Montgomery, McCracken,<br>Walker & Rhoads, LLP<br>Liberty View<br>457 Haddonfield Road,<br>Suite 600<br>Cherry Hill, NJ 08002<br><br>Glenn D. Pomerantz<br>glenn.pomerantz@mto.com<br>David C. Dinielli<br>david.dinielli@mto.com<br>Munger, Tolles & Olson LLP<br>355 South Grand Avenue<br>Thirty-Fifth Floor<br>Los Angeles, CA 90071-1560 |

/s/ Chad S.C. Stover
Chad S.C. Stover (#4919)

# Exhibit C



More than Search ... it's Research

**VIDEO STORE** **Stakes are higher in DVD marketing.**

Article from: Video Store   Article date: February 29, 2004   Author: Arnold, Thomas K.

The stakes are rising in the increasingly competitive DVD marketing arena. First-week sales are more critical than ever--Universal Studios Home Video president Craig Kornblau said new-release selloffs of 50 percent or more are not uncommon--and that makes it even more important to generate a big bang, out of the gate. "As the video business has become much more like theatrical, with the first week so critical, I think you're going to see an even higher level of marketing commitment made earlier to drive first-week sales. And that means more elaborate media spending," said Thomas Lesinski, president, worldwide, of Paramount Home Entertainment. How much more? That depends on the title. The extravagant DVD launch parties that are fast becoming the industry norm cost studios anywhere from "a couple hundred thousand dollars to more than $1 million," said one studio executive. Then come the media buys, mostly television, but also including outdoor billboards, radio spots and print advertising in the consumer media, including magazines like People and Entertainment Weekly. Prime-time TV advertising can cost as much as $500,000 for a single 30-second spot during a top-rated show, while a full-page color ad in People costs anywhere from $180,000 to $335,000, according to the magazine's latest rate card.

"Just as a ballpark range for high-profile [DVD] titles, you're talking probably about $80 million and up per release," a high-ranking studio marketing executive said. "You've got the premiere, and then you've got the trades and the consumer press--if you just listen to the news channels, the ads go on and on."

He added, "And it's not just our studio--it's the entire industry." Another high-ranking studio marketing executive, however, throws out a more modest number.

"A safe assumption is that a movie with a theatrical gross of more than $50 million that hits the core DVD audience is going to have marketing costs of $5 million to $10 million," he said. "I'm sure they can get that high [$80 million] if they throw in the kitchen sink--like co-op and promotional tie-ins--but that's folding in other people's dollars."

Still, he concedes spending is going up, with no end in sight.

"It's now a theatrical model," he said. "You have to perform day one to get week one."

Further driving up spending is the fact that with DVD sales in high gear, sellthrough has become a year-round business.

"It's getting so competitive that it's like theatrical, with three or four titles on every good date--even on the Presidents' Day weekend," said Mike Dunn, president of 20th Century Fox Home Entertainment. "A year or two ago, no one was paying attention to it, so if you were sharp, you could get a real good date. Now, it's a weekly struggle to get shelf space."

"One of the lessons we learned from last year is that it's no longer simply a make-or-break fourth-quarter business," said Kelley Avery, head of worldwide home entertainment for DreamWorks SKG. "Although the fourth quarter was huge and healthy, the first part of the year represented 43 percent of the overall business, up 6 percent from the year before.

"DVD revenue growth, meanwhile, climbed 61 percent in the first half of the year, while the second half of the year saw smaller growth of 28 percent."

That means studios will be loosening the marketing pursestrings throughout the year instead of saving the bulk of their funds for the fourth quarter.

In addition to spending more money, studios are going to have to become more creative in marketing their product, executives say. Lions Gate Home Entertainment, for example,

is using infomercials, a previously untapped marketing tool, to launch two new fitness lines this year.

"We have no vision of becoming an infomercial giant, but what it really shows is you have to be creative and kind of go outside the box in thinking about how you're going to market your product," said Lions Gate Entertainment president Steve Beeks. "This year, it's all about awareness in a very crowded marketplace. It's very easy to buy awareness; it's just that you can't afford it in a lot of cases, so for all of us, that's going to be one of the biggest challenges of 2004."

COPYRIGHT 2004 Advanstar Communications, Inc. This material is published under license from the publisher through the Gale Group, Farmington Hills, Michigan.  All inquiries regarding rights should be directed to the Gale Group. For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, a part of The Gale Group, Inc. © Copyright 2009. All rights reserved.
www.highbeam.com

# Exhibit D

HighBeam Research



More than Search ... it's Research

## *Variety* Discs get, a kick from Oscar noms.

Article from: Daily Variety   Article date: February 8, 2006   Author: Garrett, Diane

An Oscar nomination can be the gift that keeps on giving.

Five months after it first hit stores, DVD sales for Lionsgate's "Crash" jumped 150% last week after the film scored six noms, including best picture.

Also getting huge bumps were Universal Home Video's "Cinderella Man" and "The Constant Gardener." The figures are significant because studios typically generate more than half of their DVD sales in the first six days of release, after which they drop off markedly.

The DVD of "Crash," the only best picture nominee on disc, sold 45,300 copies last week. Lionsgate has shipped 4.5 million copies so far and is keeping a close watch on store inventories.

"It's almost like it's getting a second wind," Lionsgate prexy Steve Beeks said.

DVD sales of "Gardener" and "Cinderella," both nominated in supporting acting categories, also jumped more than 100% last week, according to Universal, which declined to provide actual figures.

Paramount's "Hustle & Flow," with two noms, saw disc sales climb 14%, with 2 million copies shipped.

While box office bumps often get the most attention post-Oscar noms, the DVD world is increasingly playing a key role.

In some cases, studios have changed the release date of a film to ensure that its DVD debut will coincide with awards season. In other instances, studios accelerate a DVD's release to capitalize on the Oscar recognition.

Universal had great success with such pies as "Seabiscuit," "Ray" and "Lost in Translation," whose DVDs bowed during kudos time.

U Home Ent. will save its two best-pic hopefuls until after the Academy Awards: "Brokeback Mountain" and "Munich" will both arrive after the March 5 kudocast.

"Every title's released when it's most appropriate for that title," said U homevid topper Craig Komblau. "DVD campaigns don't drive critical recognition. It's much more about taking advantage of the waves of awards campaigns." Award-season DVD launches "allow these titles to catch a huge ride on buzz that's generated and achieve DVD sales we would never hit if there was not such massive awareness," he said.

The studio is releasing "Pride & Prejudice" in the week leading up to the ceremony. Warner's "North

Country," which garnered noms for Charlize Theron and Frances McDormand, also arrives before the kudocast.

However, releasing an Academy Award winner after the ceremony still promises the biggest bump, which is why many studios target their releases for after the ceremony-- and why hopefuls wait until after nominations to confirm their homevid plans.

After nominations were announced last week, studios rushed out a series of DVD announce ments for the have-nots and haveless. Among them: contender alsorans like "Jarhead" and pics that earned noms, just not as many as once hoped.

Disney's "Chronicles of Narnia: The Lion, the Witch and the Wardrobe," which earned

three noms in tech categories, arrives April 4, while Warners' single-nom "Harry Potter and the Goblet of Fire," hits stores March 7.

Sony's "Memoirs of Geisha," which boasts six nominations, but none in the major categories, arrives March 28.

"Jarhead" debuts on disc March 7, while Sony's

"Breakfast on Pluto," arrives April 18.

In the meantime, Lionsgate is taking out full-page ads in the New York Times and Los Angeles Times to remind readers to look for "Crash" on DVD.

"When you release a pic in the first half of the year, you have to remind people about the movie," Beeks said. "Then you've got a fighting chance."

DIANE GARRETT HOLLYWOOD

COPYRIGHT 2006 Reed Business Information, Inc. (US). This material is published under license from the publisher through the Gale Group, Farmington Hills, Michigan. All inquiries regarding rights should be directed to the Gale Group. For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, a part of The Gale Group, Inc. © Copyright 2009. All rights reserved.
www.highbeam.com

# Exhibit E

To...

Cc...

Bcc...

**Subject:**

**Attachments:**

Subject: RE: can either of you two help

John and Eric,

  I hate to be the bearer of bad news but according to our vendor agreements with the major studios we can't sell to Redbox or any other reseller or rental business. That is considered sideways selling and we are expressly forbidden to do that. Our agreements, which I can send you monday morning, states the studios can withhold new releases from us for sideways selling to another retailer.

From what I hear Redbox is not happy with their vendor agreement as some of the bigger studios won't sell to them until 30-60 days after release because they are not aligned with their dollar a title rental. So as you can imagine the studios wouldn't be thrilled with us selling to them and we potentialy could put getting new releases on time in jeapordy.

Corp also won't support selling to them with more product to your location.

I can forward to you Universal Studios specific policy corp sent me over a year ago when this first came up and all major vendors have similiar policies.

Sorry...they are free to buy up to our stated 5 max per customer policy from multiple locations leaving enough product for our Tuesday NR customers.

Mark

Sent from my Windows Mobile® phone.

Analytical
Learner
Consistency
Communication
Strategic