**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 09-592-RBK |
| vs. | ) | |
| | ) | |
| TWENTIETH CENTURY FOX HOME | ) | |
| ENTERTAINMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC'S REPLY BRIEF IN
SUPPORT OF ITS MOTION TO DISMISS REDBOX'S AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(B)(6)**

OF COUNSEL:

Yosef J. Riemer (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York City, NY 10022
Tel: (212) 446-4802
Email: yosef.riemer@kirkland.com

Corey C. Watson (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Tel: (213) 680-8482
Email: corey.watson@kirkland.com

Beth Moskow-Schnoll (No. 2900)
BALLARD SPAHR LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
Tel:     (302) 252-4447
Fax:    (302) 355-0221
Email: moskowb@ballardspahr.com

Neal Walters
BALLARD SPAHR LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043
Tel: (856) 761-3438
Email: waltersn@ballardspahr.com

*Attorneys for Twentieth Century Fox Home
Entertainment LLC*

Dated:  February 4, 2010

## <u>TABLE OF CONTENTS</u>

Page No.

INTRODUCTION...................................................................................................1

ARGUMENT.........................................................................................................3

I.     Redbox Fails to State a Claim Under Section 1 of the Sherman Act. ...........3

     A.     The Court's Ruling In The *Universal* Case Does Not Resolve This
          Motion. ................................................................................................3

     B.     Redbox Has Not Pled a "Contract, Combination . . . or Conspiracy"
          Under Section 1. .................................................................................6

          1.     Redbox Has Not Adequately Pled a Section 1 Agreement
               Between Fox and Its Distributors — VPD and Ingram. ......................6

          2.     Redbox Has Not Adequately Pled a Section 1 Agreement
               Between Fox and Retailers.................................................................11

     C.     Redbox Cannot Plead Competitive Harm. .........................................13

     D.     Redbox Asserts An Implausible Market Definition...........................17

II.    Redbox's Tortious Interference With Prospective Business Opportunity and
      Unfair Competition Claims Fail. ........................................................19

CONCLUSION ...................................................................................................20

# TABLE OF AUTHORITIES

Page No.(s)

**Cases**

*Accenture Global Servs. GMBH v. Guidewire Software, Inc.*,
    631 F. Supp. 2d 504 (D. Del. 2009) ....................................................... 20

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ........................................................... 3, 5, 6, 13

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ................................................................... 5, 7

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ..................................................................... 15

*Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Found.*,
    334 F.3d 365 (3d Cir. 2003) ............................................................ 6

*Burtch v. Milberg Factors, Inc.*, No. 07-556,
    2009 WL 840589 (D. Del. Mar. 30, 2009) ............................................ 10

*Conley v. Gibson*,
    355 U.S. 41 (1957) ..................................................................... 6

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) .................................................................... 16

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*,
    854 F.2d 802 (6th Cir. 1988) ......................................................... 14

*Ethypharm S.A. France v. Abbott Labs.*,
    598 F. Supp. 2d 611 (D. Del. 2009) .................................................. 20

*Floors-N-More, Inc. v. Freight Liquidators*,
    142 F. Supp. 2d 496 (S.D.N.Y. 2001) ................................................ 15

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ................................................... 3, 5, 6, 13

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ......................................................... 12

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992) ................................................. 14

*Habitat v. Art of the Muse, Inc.*, No. 07–CV–2883,
    2009 WL 803380 (E.D.N.Y. Mar. 25, 2009) ........................................................ 15

*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, No. 03-4113,
    2005 WL 3447615 (D.N.J. Dec. 15, 2005) .......................................................... 16

*In re Frederick's of Hollywood, Inc.*, No. 15944,
    1998 WL 398244 (Del. Ch. July 9, 1998) ........................................................... 19

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*,
    884 F.2d 904 (6th Cir. 1989) .............................................................................. 9

*Isaksen v. Vt. Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ......................................................................... 9, 10

*Jala v. W. Auto Supply Co.*, No. 95-100-P-H,
    1995 WL 46383 (D. Me. July 26, 1995) ............................................................. 10

*Karnuth v. Rodale, Inc.*, No. 03-742,
    2005 WL 747251 (E.D. Pa. Mar. 30, 2005) ......................................................... 8

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ................................................................................... passim

*Olde Monmouth Stock Transfer Co., Inc. v. Depository Trust & Clearing Corp.*,
    485 F. Supp. 2d 387 (S.D.N.Y. 2007) ............................................................... 11

*Orson, Inc. v. Miramax Film Corp.*,
    79 F.3d 1358 (3d Cir. 1996) ............................................................................. 16

*Perry v. Rado*,
    504 F. Supp. 2d 1043 (E.D. Wash. 2007) ......................................................... 15

*Re/Max Int'l, Inc. v. Smythe, Cramer Co.*,
    265 F. Supp. 2d 882 (N.D. Ohio 1993) ............................................................. 10

*Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187,
    2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) .................................................. 18

*Stark v. Ear Nose & Throat Specialists of Northwestern Penn.*,
    185 Fed. Appx. 120 (3d Cir. 2006) .................................................................... 10

*Suzuki of W. Mass, Inc. v. Outdoor Sports Expo, Inc.*,
    126 F. Supp. 2d 40 (D. Mass. 2001) ................................................................... 9

*Theater Party Assocs., Inc. v. Shubert Org, Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) ............................................................... 17, 18

*U.S. ex rel. Lobel v. Express Scripts, Inc.*, No. 09-0147,
    2009 WL 37488805 (3d Cir. Nov. 10, 2009) ............................................................. 5

*UGG Holdings v. Severn*, No. 04-1137,
    2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ........................................................... 18

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ..................................................................................... passim

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, No. 09cv0480,
    2009 WL 3601600 (W.D. Pa. Oct. 29, 2009) ......................................................... 5

*Warfield Philadelphia, L.P. v. Nat'l Passenger R.R. Corp.*, No. 09-1002,
    2009 WL 4043112 (E.D. Pa. Nov. 20, 2009) ......................................................... 5

**Statutes**

The Sherman Act, 15 U.S.C. §1 .......................................................................... passim

**Rules**

Fed. R. Evid. 602 ........................................................................................... 12

Fed. R. Evid. 801 ........................................................................................... 12

Fed. R. Evid. 802 ........................................................................................... 12

## INTRODUCTION

The Supreme Court has held for at least ninety years that a seller does not violate Section 1 of the Sherman Act by formulating its own distribution policy, announcing the policy, enforcing the policy, and thereby refusing to deal with those who do not comply with the policy. *See United States v. Colgate & Co*., 250 U.S. 300, 307 (1919). This is because a seller's unilateral distribution policy is not a "contract, combination . . . or conspiracy" under Section 1. 15 U.S.C. § 1. As a result, courts have long recognized that a distributor's acquiescence in a seller's unilateral distribution policy does not violate Section 1. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

Redbox's Answering Brief confirms that it does not adequately allege a Section 1 agreement in light of these settled principles. In fact, Redbox has pled that Fox "ordered" its distributors to stop selling DVDs, that the distributors allegedly "had no choice" but to comply, and that the distributors did comply. As discussed in Part I.B, Redbox's attempt to label this as a Section 1 *agreement* fails to satisfy applicable pleading standards.

Redbox's pleadings show that Fox and Redbox negotiated over Redbox's direct procurement of newly-released Fox DVDs but did not agree on price. Without any agreement, Fox had every right to change its distribution policy to stop all sales of Fox DVDs to Redbox. Redbox never contests this point in its Answering Brief. Nevertheless, Redbox would have this Court somehow conclude that Fox violated the antitrust laws by changing its distribution policy to allow distributors to sell Fox DVDs to Redbox and other kiosk operators starting 28-days after the DVD's release date. But Section 1 was not intended to foist upon a seller the demands of a buyer, or to put the Court in a position of imposing contractual terms on parties who could not agree to those terms themselves. Fox had every right to exercise its own business judgment and

to set its own distribution policies for the DVDs it spends many millions of dollars creating and bringing to market.

Likewise, Redbox's allegations that Fox entered into a Section 1 agreement with big-box retailers (Best Buy, Walmart, Target) fall short. Redbox asserts that Fox is "seeking agreement" with these retailers, but that is not the same as *reaching* agreement, as Section 1 requires. Redbox's Answering Brief *assumes* an agreement on the theory that retailers otherwise have no reason to limit the number of units sold per customer. Redbox's speculation, however, is unsupported by any well-pled factual allegations and does not state a plausible claim. Accordingly, because Redbox has not adequately alleged a Section 1 agreement between Fox and anyone else, its antitrust claims should be dismissed.

Redbox also does not meet the pleading standard for a second required element under Section 1: injury to *competition* in a viable antitrust market. Redbox's Answering Brief uses the vocabulary of competitive injury, but the allegation is nothing more than this: consumers supposedly will pay "artificially high" prices because they must rent Fox DVDs from Redbox's competitors, not Redbox. Redbox's allegation that its competitors will charge "artificially high" market prices relies on the *assumption* that other companies (Blockbuster, Hollywood Video, local rental stores, Netflix, pay-per-view providers, video-on-demand providers) *do not compete* to rent Fox movies. That *assumption* is not supported by *any* alleged fact.

Redbox's complaint fails for a third reason: it is premised on a fictitious market definition—one where every single DVD is its own market, and no DVD competes with any other DVD or any other form of entertainment. Anyone who has ever browsed a video store or on-line website, however, knows that consumers *compare* movies and make *choices* from many

selections. Redbox's phony market definition is not plausible and, accordingly, cannot survive current pleading standards.

Redbox argues that this Court should deny Fox's motion to dismiss because the Court denied Universal's motion to dismiss Redbox's antitrust claims. But the issues and arguments are different: (i) Universal, for instance, never argued the absence of a Section 1 agreement with distributors; (ii) Universal's motion was briefed before key cases were published strengthening and clarifying pleading standards in this Circuit (*see Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)); and (iii) since briefing in the *Universal* matter was completed, Redbox has made almost a year's worth of public statements that belie its conclusory assertions of competitive harm and undermine its proposed market definition. Redbox's Answering Brief does not salvage its Amended Complaint. Fox's motion to dismiss, therefore, should be granted.

## ARGUMENT

## I.     Redbox Fails to State a Claim Under Section 1 of the Sherman Act.

Fox's Opening Brief explained that Redbox's Section 1 claims fail because Redbox has not pled facts demonstrating a Section 1 agreement; an unlawful restraint of trade; or a plausible market definition. Any one of these reasons warrants dismissal.

### A.     The Court's Ruling In The *Universal* Case Does Not Resolve This Motion.

Redbox's attempt to equate this motion with one filed by Universal fails to account for important differences in the two motions. *First*, Fox's motion to dismiss presents different issues and arguments than Universal raised. For example, Fox leads with the argument that Redbox failed to allege a Section 1 agreement with Fox's distributors. Universal did not argue in its motion to dismiss that Redbox had failed to allege a Section 1 agreement between Universal and

its distributors.  As a result, the Court had no occasion to consider the argument in the Universal case.

*Second*, judicially noticeable facts that arose after Universal's motion to dismiss contradict Redbox's proposed market definition and allegations of competitive harm.  For instance, (i) while Redbox claims that Fox's distribution policy will injure Redbox, Redbox told investors that it would have at least 22,000 kiosks by the end of 2009—nearly double the number of kiosks in place at the time Universal's allegedly similar distribution policy went into effect;[1] (ii) while Redbox claims that it has been unable to procure new-release Fox DVDs from retailers, it recently told investors that it will continue to stock new-release DVDs purchased from retailers despite Fox's alleged "boycott"[2]; and (iii) while Redbox claims that *each new-release DVD* comprises its own product market, Redbox tells investors that it faces stiff competition not only from other DVD-rental businesses, but also from other entertainment sources, including video games and sporting events.[3]

---

[1] *See, e.g.,* Coinstar 10-Q dated Nov. 6, 2009, Item 1A (Coinstar's SEC filings are attached to D.I. 44); *see also* Am. Compl. (hereinafter referred to as D.I. 38) ¶¶ 15, 17 (noting that Redbox has experienced considerable growth—from 12,000 kiosks nationwide at the end of 2008, to 17,000 kiosks in mid-2009).

[2] *See, e.g.,* Coinstar 8-K dated Dec. 3, 2009, Item 8.01 ("Although Redbox continues to encounter these types of challenges [of stores limiting sales] . . . *many third-party retailer locations, including Walmart, Best Buy and Target locations, have continued to sell new-release DVDs to Redbox without those limitations*.").  Unless otherwise indicated, all emphasis has been added by Fox.

[3] *See* Coinstar Inc. 10-K dated Feb. 26, 2009, Item 1A (Redbox admits that it is only one of many companies (including Blockbuster, Netflix, local DVD rental stores, etc.) that compete to rent Fox DVDs); Coinstar Inc. 10-Q dated Nov. 6, 2009, Item 1A (acknowledging that Redbox competes with pay-per-view and internet content providers as well as "noncommercial sources like libraries").

These statements undermine Redbox's claims, and Redbox does not dispute that they can be considered on this Motion.[4]  A company experiencing explosive growth in the face of alleged "anticompetitive" conduct cannot plausibly allege injury.  A company alleging a concerted "boycott" cannot plausibly allege injury where it claims elsewhere that the boycott is ineffective.  And a company that admits it competes with a host of other forms of entertainment cannot plausibly allege a market limited to individual new-release DVDs.

*Third*, after Universal's motion to dismiss was briefed and submitted to the Court, the Supreme Court and Third Circuit decided important cases, which made clear that courts are to apply more rigorous pleading standards to motions to dismiss.  *See Iqbal*, 129 S. Ct. 1937; *see also Fowler*, 578 F.3d 203.  Redbox does not dispute that its Amended Complaint must now be analyzed under the standards set forth in those cases.  Nor does Redbox dispute that *Fowler* and subsequent decisions characterize *Iqbal* as having established a "heightened" and "more exacting" standard for analyzing complaints.  *See Fowler*, 578 F.3d at 210-211; *U.S. ex rel. Lobel v. Express Scripts, Inc.*, No. 09-0147, 2009 WL 3748805, at *1 (3d Cir. Nov. 10, 2009).[5]

Redbox maintains that the Universal ruling already accounted for the heightened pleading standard because "*Iqbal* was decided more than three months before the Court issued the Universal Opinion, and *Fowler* does nothing more than apply the relevant standards set forth in [*Bell Atl. v. Twombly,* 550 U.S. 544 (2007)] and *Iqbal*."  (Redbox's Ans. Br. (hereinafter referred to as D.I. 45) at 12.)  But it is not that simple.  Although *Iqbal* was decided before the Court

---

[4] As described in Fox's Opening Brief, SEC filings are public records the Court may consider on a motion to dismiss.  (*See* D.I. 44, Fox's Op. Br. (hereinafter referred to as D.I. 44) at 22 n.16.)

[5] In fact, since this heightened standard was enunciated, district courts in the Third Circuit have dismissed a number of antitrust cases as inadequately pled.  *See, e.g., Warfield Philadelphia, L.P. v. Nat'l Passenger R.R. Corp.*, No. 09-1002, 2009 WL 4043112, at *3 (E.D. Pa. Nov. 20, 2009) (dismissing plaintiff's Sherman Act claims under the *Twombly/Iqbal* standard); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, No. 09cv0480, 2009 WL 3601600, at *16 (W.D. Pa. Oct. 29, 2009) (same).

ruled in the Universal case, it had not been decided when the parties in the Universal case completed briefing on Universal's motion to dismiss. Thus, neither Universal nor Redbox cited the case to the Court, and *Iqbal* was not cited in the Court's decision.[6]

Moreover, because *Fowler* was not decided until after the Universal decision, this Court did not have occasion to apply the "two-part analysis" set forth in *Fowler* to Universal's motion. *Fowler*, 578 F.3d at 210. Under that test, the Court must first disregard bare "legal conclusions," as they are not entitled to a presumption of truth. *Id.* Next, the Court must analyze the "well-pleaded" allegations to determine whether they give rise to a "plausible claim for relief." *Id.* at 210-211 (citing *Iqbal*, 129 S. Ct. at 1950). When analyzed under this test, Redbox's claims fail.

**B.     Redbox Has Not Pled a "Contract, Combination . . . or Conspiracy" Under Section 1.**

**1.     Redbox Has Not Adequately Pled a Section 1 Agreement Between Fox and Its Distributors — VPD and Ingram.**

For more than ninety years, the Supreme Court has held that "the [Sherman] [A]ct does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, *he may announce in advance the circumstances under which he will refuse to sell*." *Colgate*, 250 U.S. at 307. "Under [*Colgate*], the *manufacturer can announce* its resale prices in advance *and refuse to deal* with those who fail to comply. And a distributor *is free to acquiesce in the manufacturer's demand in order to avoid termination*." *Monsanto*, 465 U.S. at 761.

---

[6] In fact, in the Universal opinion, the Court cited *Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Found*., 334 F.3d 365, 374 (3d Cir. 2003), which relies on the overruled standard for analyzing complaints set forth in *Conley v. Gibson*, 355 U.S. 41 (1957). *See, e.g., Fowler*, 578 F.3d at 210.

Redbox originally alleged that Fox "ordered" VPD and Ingram to "withhold new-release Fox DVDs from Redbox," and that VPD and Ingram "had no choice but to acquiesce . . . ." (*See* Compl. (hereinafter referred to as D.I. 1) ¶¶ 3, 33, 38).  Any order Fox gave its distributors would fit squarely within *Colgate*.  *Colgate*, 250 U.S. at 307.  And even assuming that VPD and Ingram had "acquiesce[d]" in the distribution policy Fox announced, no Section 1 claim could be made by virtue of the reasoning in *Monsanto*.  *Monsanto*, 465 U.S. at 761.

Redbox does a 180-degree turn in its Amended Complaint and now asserts that VPD and Ingram "agreed" with Fox to boycott Redbox.  (*See* D.I. 38 ¶¶ 33, 35.)  Redbox, however, betrays this position by asserting that "Fox has *ordered all* of its distributors to stop selling to Redbox . . . ."  (*See* D.I. 45 at 9.)  In any event, simply calling Fox's unilateral distribution policy an "agreement" does not state a Section 1 claim.  *Twombly*, 550 U.S. at 550 (emphasizing that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Redbox does not plead *facts plausibly demonstrating an agreement*.

Although Redbox spends much of its argument trying to track a footnote in *Monsanto*, the language is inapposite.  According to *Monsanto*:  "The concept of 'a meeting of the minds' or 'a common scheme' in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price.  It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer."  *Monsanto*, 465 U.S. at 764 n.9.  Redbox's Amended Complaint tries to invoke this language by alleging that "Fox representatives contacted representatives of both VPD and Ingram, *seeking confirmation* that both VPD and Ingram would agree to stop selling new-release DVDs to Redbox" and that "VPD and Ingram communicated to Fox that they would

agree."  (*See* D.I. 45 at 15; D.I. 38 ¶ 35.)  Redbox cannot save its claim by copying *Monsanto*'s

language into its pleading for at least four reasons.

 *First*, note what Redbox does *not* allege.  Redbox does not allege that Fox contacted VPD

or Ingram to formulate its policy.  Nor does Redbox allege that Fox sought or obtained VPD or

Ingram's agreement or acquiescence to stop distribution before announcing its policy.

 *Second*, Fox's distribution policy is alleged to be *mandatory*, not discretionary.

According to Redbox, Fox "ordered" its distributors to stop selling to Redbox.  (*See* D.I. 1 ¶ 33.)

According to Redbox, there was no choice to make:  "[f]aced with the prospect of being denied

access to new-release Fox DVDs, VPD and Ingram have *had no choice* but to acquiesce to Fox's

demands . . . ."  (*See id.* ¶ 38.)  In light of allegations that Fox *ordered* its distributors to do

something and that the distributors had *no choice* but to comply, it is fundamentally inconsistent

for Redbox now to allege in its Amended Complaint that Fox contacted VPD and Ingram to

"seek" their agreement.  (D.I. 38 ¶¶ 3, 35.)[7]  Recognizing the problem, Redbox surmises that

"common sense" says that no "Hollywood image-conscious company like Fox" would risk its

reputation by announcing a policy "without discussion" as to why it is being implemented.  (D.I.

45 at 16-17.)  But that is rank (and unpled) *speculation*—not an allegation of fact.  It also

contradicts Redbox's other allegations.  If Fox is as powerful as Redbox alleges[8], Fox would

have no need to "discuss" its policy with distributors before putting it into effect.

---

[7] The Court should not condone Redbox's attempt to play "fast and loose" in court-filed
documents.  *See, e.g., Karnuth v. Rodale, Inc.*, No. 03-742, 2005 WL 747251, at *4 (E.D. Pa.
Mar. 30, 2005) (noting courts' concern with "flip-flopping" of allegations in sworn documents,
including complaints).

[8] (*See, e.g.,* D.I. 38 ¶ 7 ("Fox is one of the world's leading distributors of motion pictures."); *id.*
¶ 27 ("Fox possesses significant market power for a particular new-release DVD . . . ."); *id.* ¶ 40
(referring to Fox's alleged "monopoly power").)

*Third*, at best, Redbox alleges that Fox contacted VPD and Ingram to confirm compliance with Fox's unilateral, mandatory distribution policy.  (D.I. 38 ¶ 3 ("Fox contacted [VPD and Ingram] . . . and asked for *confirmation* that they would agree to withhold new-release DVDs from Redbox").)  But Fox's alleged *discussion* of its unilateral, mandatory policy with VPD and Ingram after it was announced does not transform the unilateral policy into a Section 1 agreement.  *Suzuki of W. Mass, Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40 (D. Mass. 2001) is instructive.  There, the defendant, like Fox, unilaterally developed and implemented a policy for displaying boats at boat shows.  *Id*. at 46 ("[the boat show producer] determined, on its own, the terms it would apply in selecting exhibitors and announced those terms in advance of receiving applications from dealers").  The court specifically rejected plaintiff's arguments that discussing terms of the producer's policy after it was announced somehow transformed a unilateral policy into an agreement:

> The fact that [defendants] talked, however, does not change the unilateral terms into the product of a conspiracy.  Plaintiff never alleges that [defendants] reached a new, or illicit, agreement.  Plaintiff merely asserts that [defendants] discussed the terms unilaterally adopted by [the boat producer].

*Id*. at 46 n.5  Thus, alleged communication between Fox and distributors after Fox unilaterally formulated and announced its policy would not be enough to state a Section 1 agreement.

*Fourth*, Redbox speculates that there *must* have been an agreement because competing businesses are unlikely to follow such a policy "without assurances that it would be enforced across the board."  (D.I. 45 at 17.)  Again, this is guesswork, not an allegation of fact.  The argument merely restates that following Fox's distribution policy necessarily implies an agreement—a proposition that has been flatly rejected.[9]

---

[9] *See Monsanto*, 465 U.S. at 761; *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989) ("Current legal precedent supports the conclusion that a conspiracy may not

Redbox relies on distinguishable cases. Both *Isaksen v. Vt. Castings, Inc*., 825 F.2d 1158 (7th Cir. 1987) and *Monsanto* involved situations where a defendant-manufacturer announced a *suggested* retail price and, thereafter, obtained distributors' agreements to conform to the suggested price. *Isaksen*, 825 F.2d at 1162-63; *Monsanto*, 465 U.S. at 765. Neither *Isaksen* nor *Monsanto* involved the prior announcement of a unilateral, *mandatory* policy. Indeed, *Isaksen* acknowledges that "a dealer [cannot] be allowed to manufacture an agreement by saying 'I agree to abide by your suggested prices,' when he has not been asked to agree." *Isaksen*, 825 F.2d at 1164.

Redbox also argues that whether Fox conspired with its distributors is a fact issue, noting that some of Fox's cases were decided on summary judgment. Those authorities, however, were cited to illustrate the application of the *Colgate* doctrine to facts similar to those *pled* here. Surely, it is possible for a plaintiff to allege facts sufficient to overcome a motion to dismiss. The point is that the facts *alleged here* do not state a claim as a matter of law.

Indeed, Fox cites *four* cases where courts dismissed litigation at the pleading stage for failure to allege facts demonstrating a Section 1 agreement. (D.I. 44 at 11, 13, 15.)[10] Redbox

---

evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source.").

[10] *See Stark v. Ear Nose & Throat Specialists of Northwestern Penn.*, 185 Fed. Appx. 120, 124 (3d Cir. 2006) (granting motion to dismiss and noting that "unilateral activity by a defendant, no matter the motivation, cannot give rise to a Section 1 violation."); *Re/Max Int'l, Inc. v. Smythe, Cramer Co*., 265 F. Supp. 2d 882, 899-200 (N.D. Ohio 1993) (granting motion to dismiss challenge to unilateral policy pertaining to real estate commissions); *Jala v. W. Auto Supply Co.*, No. 95-100-P-H, 1995 WL 463683, at *2 (D. Me. July 26, 1995) (granting motion to dismiss and noting that plaintiff's acquiescence in defendant's pricing demands did not form Section 1 agreement); *Burtch v. Milberg Factors, Inc*., No. 07-556, 2009 WL 840589, at *13 (D. Del. Mar. 30, 2009) (dismissing complaint that "offer[ed] only vague allegations of unspecified agreements.").

tries to explain away that authority by focusing on insignificant factual distinctions, but the legal principles in these cases still apply.[11]

In short, Redbox has not satisfied current pleading standards for alleging a Section 1 agreement between Fox and its distributors.

### 2. Redbox Has Not Adequately Pled a Section 1 Agreement Between Fox and Retailers.

In its Opening Brief, Fox showed that Redbox's claim of a supposed agreement between Fox and DVD retailers failed because, among other things, Redbox alleged only that Fox was "seeking" agreement from big-box retailers (Walmart, Best Buy, Target).  (D.I. 44 at 16-17.) Because the Sherman Act requires an *actual* agreement—not just an attempted one—Redbox has not alleged an agreement between Fox and DVD retailers.[12]  Redbox does not address this argument at all in its Answering Brief.

In addition,  Redbox merely *assumes* in its Amended Complaint that Fox has an agreement with retailers limiting the number of units that can be sold to Redbox.  Why else, argues Redbox, would a retailer want to limit the number of units sold to a customer?  Again, this is speculation, not an allegation of fact.  Redbox's speculation does not account for the world

---

[11] Redbox argues that *Re/Max Int'l, Inc.*, 265 F. Supp. 2d 882 is distinguishable because the defendant there did not need the plaintiff's agreement to implement its policy.  But that was an additional and alternative reason for the court to find the absence of a Section 1 agreement.  *See id.* at 899.  Moreover, that additional reason is also true here.  When Fox announced its mandatory distribution policy on August 5, 2009, it stated that the policy applied only to *future* DVD releases beginning with *Ice Age 3* on September 1, 2009 — 28 days later.  (*See* D.I. 38, Ex. D.)  But Redbox does not allege that VPD and Ingram had *Ice Age 3* (or any of the other DVDs that were the subject of this policy) in stock when Fox made its announcement.  Fox, therefore, did not *require* VPD's or Ingram's acquiescence in order to stop distribution of any stocked DVDs.  And Fox did not need VPD or Ingram's cooperation to stop distribution of *future* DVDs because Fox could have simply chosen to *withhold* future DVDs from VPD and Ingram rather than rely on these distributors to do so.

[12] *See Olde Monmouth Stock Transfer Co., Inc. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 396-97 (S.D.N.Y. 2007) ("Section 1 does not address 'attempt' claims . . .  Absent an actual agreement, plaintiff's Section 1 claim must fail.").

we live in where retailers often impose limits on quantities purchased for any number of legitimate reasons, such as ensuring product depth to service customers or attracting customers through loss leaders while limiting losses on those products.

Redbox's own brief illustrates the point. Redbox reaches outside the record and attaches as Exhibit E an email purportedly from a Best Buy employee (discussed further below). That document indicates that Best Buy implements a per-customer limitation so that it has enough product to service its new-release DVD customers. (D.I. 45, Ex. E (referring to a maximum of 5 units per customer to "leav[e] enough product for our Tuesday NR [new release] customers.").) In short, Redbox cannot rely on speculation to plead a Section 1 agreement, let alone speculation undercut by the record.

Next, Redbox asserts that the email at Exhibit E demonstrates an agreement between Best Buy and Fox to limit the number of units sold to Redbox. (*Id.* at 14, n.8, Ex. E.) Exhibit E is pure hearsay. *See* Fed. R. Evid. 801, 802. It has not been authenticated, and is not even dated. There is no showing that the author of the email has personal knowledge of any of the matters discussed. *See* Fed. R. Evid. 602. The email is not cited or discussed in the Amended Complaint. And the email does not even mention Fox. That Redbox feels compelled to introduce a document like this outside of its complaint highlights the weakness of its allegations, and is improper. Because the Third Circuit does not permit amendment of pleadings through briefing (D.I. 45 at 14 n. 8 (citing *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007)), the Court should not consider Exhibit E.

To the extent the Court wishes to consider the email at this juncture, the document does nothing to advance Redbox's arguments. As an initial matter, the email says nothing about any agreement between Best Buy *and Fox*. Rather, the email speaks of the author's willingness to

12

forward a supposed agreement between Best Buy and *Universal*.  Although the author paints all

the "major studios" with the same brush, there is nothing in the document demonstrating that the

author has ever seen or otherwise has any foundation to discuss any agreement with Fox.

In sum, Redbox has not alleged any Section 1 agreement between Fox and big-box

retailers to boycott or limit sales to Redbox.  All that Redbox can offer are allegations about an

attempted agreement, baseless speculation about retailers' economic motives, and an extrinsic,

unauthenticated email that does not support Redbox's allegation.

### C.       Redbox Cannot Plead Competitive Harm.

In addition to its other pleading deficiencies, Redbox also does not adequately allege

competitive harm.  Redbox's allegations that "Fox's actions . . . will restrict output, eliminate

competition . . . and artificially raise prices to consumers" (*see* D.I. 38 ¶ 39) are mere

conclusions that, under *Iqbal* and *Fowler,* are not entitled to the presumption of truth.  To

support its bare legal conclusions, Redbox argues in its Answering Brief that it rents DVDs for

$1 per night (not accounting for the many customers who fail to return the DVD within a day and

who therefore pay substantially more than $1), and that the average price at other DVD rental

stores is higher.   Therefore, according to Redbox, if consumers cannot rent Fox DVDs at

Redbox, they will have to pay an "artificially high price" elsewhere.  (D.I. 45 at 13.)  However

Redbox's prices compare to its competitors, this syllogism is not enough to sustain a Section 1

claim.

Redbox does not allege *facts* demonstrating that *market prices* for DVDs will rise just

because *Redbox* is not renting new-release *Fox* DVDs.  For this to occur, Redbox would need to

allege that other companies renting Fox DVDs do not compete on price.  If other companies

compete to rent Fox DVDs, there is no reason to believe that *market prices* will be "artificially

high" just because *one competitor* (Redbox) does not offer the Fox product.  Here, Redbox

actually *admits* that it competes with many other suppliers for the rental and sale of Fox movies. (*See supra* at 18 n.17.)  Thus, Redbox alleges no reason why companies like Blockbuster, Hollywood Video, Netflix, other kiosk vendors, thousands of local video stores, pay-per-view vendors, video-on-demand vendors, etc. will *not compete* on price for Fox movie rentals with or without Redbox.

For Redbox's prediction of "artificially high prices" to come true, Redbox also would need to allege that its customers will not rent other DVDs instead of Fox DVDs.  If consumers will choose *other* movies offered by Redbox (or by another competitor) instead of a Fox DVD, then *competition* from other DVDs will prevent "artificially high prices" from being charged for Fox DVDs in the market.  Put differently, if the market contains more than one competing product (e.g., other movies or other forms of entertainment), it is not plausible to allege that *market prices* will be "artificially high" just because *one competitor* (Redbox) does not offer *one type of product* (Fox DVDs).  Although Redbox attempts to define the market as consisting of one DVD title with no competition from any other, that allegation is implausible, defies common sense, cannot be supported in the law, and should not be permitted to defeat this motion—as discussed further below.[13]

Unable to allege both that (i) Redbox's competitors will not compete to rent Fox DVDs; and (ii) consumers have no substitutes for Fox DVDs, Redbox cannot plausibly allege that

---

[13] Redbox does not dispute that Fox's distribution policy has *no effect* on competition *across* non-Fox DVDs, or "inter-brand" competition.  (*See* D.I. 45 at 20-24.)  *Fox's* distribution policy does not impact Redbox's ability to rent Paramount, Sony, or Disney DVDs—or even Universal or Warner DVDs.  Redbox argues that it is aware of no case holding that "harm to intra-brand competition is insufficient as a matter of law to sustain a Section 1 claim."  (*Id*. at 21.)  But Fox cited two cases in its Opening Brief holding precisely that.  (*See* D.I. 44 at 24 n.17 (citing *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 806 (6th Cir. 1988); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 768 (S.D. Miss. 1992)).)

*market prices* for Fox DVDs will "artificially" rise simply because Redbox no longer rents the

Fox product for a 28-day period.  Indeed, if Redbox's speculation about "artificially high" prices

were true in the real world, one would have expected Redbox to actually allege *facts* supporting

its conclusion of competitive harm.  After all, Universal's policy (which Redbox claims to be

similar) was in place for more than a year before Redbox filed its Amended Complaint.  Yet

Redbox has alleged no facts demonstrating increased price or reduced output because of

Universal's distribution policies.  Redbox's silence is telling.  In the end, Redbox admits that its

allegations of competitive harm rely on nothing more than speculation.  (D.I. 45 at 13 ("The

impact of the Fox boycott on Redbox, competition and consumers *remains to be seen*.").)

Redbox's prediction of "artificially high" market prices is not only implausible, but it

contradicts basic antitrust law.  A fundamental proposition in antitrust law is that a *single*

*competitor's* inability to sell product does not equal injury to *market-wide competition*.  *See, e.g.,*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is

axiomatic that the antitrust laws were passed for 'the protection of *competition*, not

*competitors*.'" (emphasis in the original)).[14]  That is why complaints asserting market-wide

competitive injury based solely on the inability of a *single competitor* to sell a product are readily

dismissed on the pleadings.[15]  Redbox does not answer this argument.

---

[14] *See also Perry v. Rado*, 504 F. Supp. 2d 1043, 1047 (E.D. Wash. 2007) (dismissing complaint where allegations concerned "the impact on [the plaintiff] . . . rather than with injury to competition in general").

[15] (*See* D.I. 44 at 26–27 (citing, for example, *Floors-N-More, Inc. v. Freight Liquidators*, 142 F. Supp. 2d 496, 501–02 (S.D.N.Y. 2001) (dismissing complaint where there was no allegation that customers could not procure defendant's products elsewhere) and *Habitat v. Art of the Muse, Inc.*, No. 07–CV–2883, 2009 WL 803380, at *9 (E.D.N.Y. Mar. 25, 2009) (dismissing complaint alleging harm to competition "simply because . . . consumers can no longer purchase [the product] from [p]laintiff")).

Redbox also shrugs off the principle that antitrust law permits sellers to determine distribution policy for their own products because sellers are best motivated to promote their own products.  (*See* D.I. 44 at 19.)  Redbox asserts that this case law is somehow "irrelevant" because Fox is not a "manufacturer" and because consumers do not rent movies based on "brand."  (D.I. 45 at 21.)  Redbox's arguments miss the mark.  First, whether or not Fox manufactures the plastic DVD discs that store Fox movies, Fox is a manufacturer in that it is responsible for creating the copyrighted content which is the basis for the transaction.  Second, the antitrust principles at issue here are not confined to manufacturers.  An intermediate distributor, for instance, is equally entitled to develop distribution policies that maximize the sales of its distributed product.[16]  Third, competition among "brands" in this body of law refers to competition among sellers "of the same *generic* product."  *See Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51 n.19 (1977).  It makes no difference whether consumers buy the seller's product based on a "brand."  Thus, the relevant point under the case law is that Fox is economically motivated to maximize the distribution of its own product and is entitled to set its own distribution policy, regardless of whether consumers rent movies based on the brand of the studio.

At bottom, Redbox's claim of competitive injury based solely on its own alleged inability to rent Fox DVDs is insufficient as a matter of law.  Fox's motion to dismiss, therefore, should be granted because Redbox has failed to allege any harm to market-wide, inter-brand competition.  *See, e.g., IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, No. 03-4113, 2005

---

[16] *See Colgate*, 250 U.S. at 307 ("the [Sherman] [A]ct does not restrict the long recognized right of a *trader* or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal"); *see also Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d Cir. 1996) (applying rule of reason analysis under Section 1 to permit film distributor to restrict competition for exhibition of its films).

WL 3447615, at *10 (D.N.J. Dec. 15, 2005) (dismissing complaint in part because plaintiff "has failed to allege sufficient facts concerning the anticompetitive effects of [d]efendants' conduct in the relevant product and geographic markets").

### D.     Redbox Asserts An Implausible Market Definition.

The Court also should dismiss Redbox's antitrust claims because they rely on the extreme position that a market consists of a "single, unique copyrighted movie[] on DVD." (D.I. 45 at 26.) According to this allegation, a Fox movie like *Ice Age 3* has no economic substitutes, faces no competition from any other DVD or source of entertainment, and thus is a market unto itself. By declaring a market comprised of a single movie, Redbox tries to turn Fox into a monopolist and equate injury to Redbox's sales with injury to the "market."

Redbox's attempt to skirt the requirement of pleading market-wide competitive harm by alleging a market in which no DVD faces competition from any other DVD (or any other form of entertainment) should be rejected. As explained in Fox's Opening Brief, common experience tells us that consumers do not have monolithic tastes in movies: one can like action movies and comedy, science fiction and drama. Common experience also tells us that many people browse movies before selecting one. Redbox provides no answer. If Redbox's allegation that no DVD has a substitute were true, then there would be no reason for a consumer to browse movies. The fact of the matter is that movies compete with each other; consumers weigh their options; and ultimately the consumer selects a movie from available substitutes. Redbox's allegation that every single new-release DVD comprises its own antitrust market, therefore, is ludicrous and implausible.

Fox's Opening Brief cited several cases on point and highlighted *Theater Party Assocs., Inc. v. Shubert Org, Inc.*, 695 F. Supp. 150 (S.D.N.Y. 1988) in particular. (*See* D.I. 44 at 29-30.) In *Theater Party*, the court rejected a plaintiff's effort to propose a product market comprising

tickets to just one play—*Phantom of the Opera*.  As the Court explained, a complaint alleging

such a narrow market failed to meet applicable legal standards because "other forms of

entertainment" including "other Broadway shows, the opera, ballet or even sporting events"

could be adequate substitutes for that musical.  (*Theater Party*, 695 F. Supp. at 154.)  Redbox

does not address *Theater Party* at all.  If other Broadway shows, the opera, ballet, and sporting

events can substitute for the longest running musical in Broadway history, surely the many

available DVDs (or, for that matter, digital downloads, pay-per-view, or in-theater movies) are

potential substitutes for any particular new-release Fox DVD.[17]

 Indeed, courts look with great skepticism at alleged single-product markets and grant

motions to dismiss complaints that rely on allegations of single-product markets.[18]  Although

Redbox tries to distinguish these cases by claiming that plaintiffs there failed to allege facts

supporting a single-product market, the same can be said of Redbox's complaint here.

 Redbox asserts that Fox and other studios try to schedule DVD releases to maximize

consumer demand.  But that does not mean that no new-release DVD competes with another, or

that each DVD exists in isolation in its own market.  Indeed, the fact that studios are angling to

release DVDs to maximize their distribution itself demonstrates *competition* among studios'

---

[17] Redbox also does not attempt to explain why, if one new-release DVD has no reasonable substitutes, Redbox has told investors that it faces stiff competition not only from other DVD rental-providers but also from television, in-theater movies, video games and sporting events. Coinstar Inc. 10-Q dated Nov. 6, 2009, Item 1A ("The home video industry is highly competitive with many factors affecting our ability to profitably manage our DVD services business.  Some of the risks that could negatively impact our participation in the industry include . . . other forms of entertainment such as movie theaters, television, sporting events and video gaming.").

[18] *See, e.g., Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461, at *9-10 (E.D. Tenn. Aug. 20, 2008) (dismissing complaint and rejecting alleged single-brand market despite allegations that demand for the product was "inelastic"); *UGG Holdings v. Severn*, No. 04-1137, 2004 WL 5458426, at *4 (C.D. Cal. Oct. 1, 2004) (dismissing complaint based on alleged market for "sheepskin, fleece-lined boots" where there were no allegations regarding why other types of boots were not substitutes).

DVDs, not the absence of it.  Redbox also ignores its own allegation demonstrating three

competing movie releases (*War of the Worlds*, *Fantastic Four*, and *Batman Begins*) that actually

have *overlapping* "new release" periods.  (D.I. 44 at 32.)  Redbox cannot, on the one hand, allege

single-product new-release DVD markets attributable to non-overlapping new-release periods,

and then, on the other hand, present an example that completely undermines its allegation.[19]

Finally, Redbox does little to defend its alternative allegation of so-called genre-based

new-release DVD markets.  Redbox, for example, does not explain why an action/adventure film

does not compete with a science fiction film, or why a comedy film does not compete with a

drama.  Thus, this market definition too is facially implausible.  More to the point, however, if

Redbox relies on a market definition consisting not just of a single DVD, but including multiple

DVDs (as a genre-based market would have to), then the Section 1 claim fails as a matter of law

because, as explained above, Redbox does not allege that Fox's distribution policy injures rentals

of any DVD offered by any other studio.  In sum, setting aside the fact that a genre-based market

definition makes no sense, Redbox has not, and cannot, allege injury to *market-wide competition*

within such a market.

## II.    Redbox's Tortious Interference With Prospective Business Opportunity and Unfair Competition Claims Fail.

Fox's Opening Brief argued that Redbox had not pled a "reasonable expectancy" of

business relationships with Walmart, Best Buy or Target, or intentional or wrongful

interference.[20]  In response, Redbox identifies no expected business relationship at all.  Rather,

Redbox asserts that retailers *should* want to sell unlimited quantities of DVDs to Redbox.  Again,

---

[19] Redbox's Answering Brief inexplicably introduces yet another version of its proposed market definition, this time one consisting of "a weekly market for new-release DVDs."  (D.I. 45 at 26.) This market definition is not pled in the Amended Complaint at all.

[20] Redbox concedes that its copyright misuse and tortious interference with contract claims should be dismissed.  (D.I. 45 at 30.)

this is speculation and assumption, not fact.  Redbox alleges no facts demonstrating why national *retailers* would want to become Redbox's *distributor* and allow Redbox to clear retail shelves of Fox DVDs and thereby interfere with sales to traditional retail customers.  *See, e.g., In re Frederick's of Hollywood, Inc.*, No. 15944, 1998 WL 398244, at *5 (Del. Ch. July 9, 1998) (dismissing complaint where plaintiffs did not adequately plead a valid business expectancy that they would be able to receive a higher price for their stock).[21]

Regarding the elements of intentional and wrongful interference, Redbox's brief merely relies on the same allegations made to support its antitrust claims, namely that Fox agreed with retailers to "boycott" Redbox.  For all the reasons stated above, Redbox does not plausibly allege an *agreement* between Fox and retailers and thus does not allege the elements of intentional and wrongful interference for this tort claim.

<u>**CONCLUSION**</u>

Redbox's Amended Complaint fails to state a claim.  Accordingly, the Court should dismiss the Amended Complaint with prejudice.

Dated:   February 4, 2010                        Respectfully submitted,


                                                  /s/ Beth Moskow-Schnoll
                                                  Beth Moskow-Schnoll (No. 2900)
                                                  BALLARD SPAHR LLP
                                                  919 North Market Street, 12th Floor
                                                  Wilmington, DE  19801
                                                  Tel:    (302) 252-4447
                                                  Fax:    (302) 355-0221
                                                  Email: moskowb@ballardspahr.com

---

[21] These allegations do not even come close to those made in the cases on which Redbox relies. For example, in *Accenture Global Servs. GMBH v. Guidewire Software, Inc.*, 631 F. Supp. 2d 504, 509 (D. Del. 2009), plaintiff plead detailed facts demonstrating interference with an ongoing contract negotiation, including that defendant had misappropriated trade secrets.  *Id*. at 506-507.  And in *Ethypharm S.A. France v. Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009), the plaintiff alleged that the defendant filed a sham patent infringement claim in order to intentionally interfere with an existing contract.  *Id*. at 613-615.

Neal Walters
BALLARD SPAHR LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043
Tel: (856) 761-3438
Email: waltersn@ballardspahr.com

*Attorneys for Twentieth Century Fox Home Entertainment, LLC*

OF COUNSEL

Yosef J. Riemer (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York City, NY 10022
Tel: (212) 446-4802
Email: yosef.riemer@kirkland.com

Corey C. Watson (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Tel: (213) 680-8482
Email: corey.watson@kirkland.com